## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | |
|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : No. 171 MM 2014 |
| Petitioner | : |
| v. | : |
| SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY, | : |
| Respondent | : |

## ORDER

**PER CURIAM**

    **AND NOW**, this 26th day of August, 2015, upon the request of the supervising judge for removal of the seal from all matters involving the 35th Statewide Investigating Grand Jury and the investigation of Attorney General Kathleen Kane which have been lodged in this Court, save for grand jury materials such as testimony, exhibits, and in camera proceedings, and based on the supervising judge's assurance that there are no present grand jury secrecy concerns relative to such unsealing, it is hereby **ORDERED** that the seal is lifted, in part, upon such terms.

UNSEALED PER ORDER OF
THE COURT DATED
AUGUST 26, 2015

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : | No. ___ MM 2014 |
| Petitioner | : | |
| V. | : | |
| | : | |
| SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY, | : | **FILED UNDER SEAL** |
| Respondent | : | |

---

**PENNSYLVANIA OFFICE OF ATTORNEY GENERAL'S PETITION
FOR REVIEW OF ORDERS ENTERED BY SUPERVISING JUDGE OF THE
THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY
ON AUGUST 27, 2014, SEPTEMBER 17, 2014, AND OCTOBER 30, 2014**

---

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SUPREME COURT OF
PENNSYLVANIA:

AND NOW, comes the Office of Attorney General of the Commonwealth of
Pennsylvania by Kathleen G. Kane, Attorney General of the Commonwealth of Pennsylvania,
who files this petition seeking the Supreme Court of Pennsylvania's review and vacation of the
determination of the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury
encompassed by the four related and interconnected Orders dated August 27, 2014, September



17, 2014, and October 30, 2014 (collectively, "the protective order"). In support thereof, the following is averred:

## JURISDICTION

1.      This Court has jurisdiction over the instant petition pursuant to 42 Pa.C.S.A. § 722(5) and Pa.R.A.P. 3331(a)(3).

2.      The petition for review is timely-filed because: (a) OAG had 10 days from the date of entry of the Order at issue[1] to file the petition, *see* Pa.R.A.P. 3331(a); Pa.R.A.P. 1512(b)(3); (b) the Order at issue was filed on October 30, 2014, rendering a filing deadline of November 10, 2014;[2] and (c) OAG filed the petition on November 10, 2014.

## PARTY SEEKING REVIEW

2.      The Petitioner is the Office of Attorney General of the Commonwealth of Pennsylvania ("OAG").

## GOVERNMENT UNIT RESPONSIBLE FOR
## DETERMINATION SOUGHT TO BE REVIEWED

3.      Respondent is the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury, the Honorable William R. Carpenter ("the Supervising Judge").

## DETERMINATION SOUGHT TO BE REVIEWED

4.      OAG seeks this Court's review of the Supervising Judge's Order dated October 30, 2014, which denies OAG's motion for reconsideration of the Order entered by the Supervising Judge dated August 27, 2014 *as amended twice thereafter* on September 17, 2014. *See* copy of the October 30, 2014 Order, attached as Exhibit A.

---

[1] The Order at issue rendered final a previously-entered order that was amended twice. *See infra.*

[2] Because the 10th day following October 30, 2014 was Sunday, November 9, 2014, the filing deadline is the next business day, Monday, November 10, 2014. *See* 1 Pa.C.S.A. § 1908.

5.    In other words, the determination sought to be reviewed encompasses *four related and interconnected orders*:

    a.    the August 27, 2014 Order, which states, *inter alia*, that: (i) OAG shall refrain from any involvement in or access to the investigative efforts of the Special Prosecutor in Notice No. 123; (ii) OAG and its employees shall have no access to the transcripts, exhibits, and other information pertaining to Notice No. 123; (iii) OAG employees shall refrain from engaging in or soliciting any act of obstruction, intimidation, or retaliation against any witness summoned by the Special Prosecutor in Notice No. 123; and (iv) any person who engages in an act of obstruction, intimidation, or retaliation against a witness summoned by the Special Prosecutor in Notice No. 123 may be prosecuted pursuant to 18 Pa.C.S.A. § 4955;[3]

    b.    the September 17, 2014 Order, which amended the August 27, 2014 Order to permit a second hearing -- this one with the ostensible involvement of OAG -- to be conducted on the subject of "allegations of obstruction, witness intimidation, and/or retaliation;"[4]

    c.    another September 17, 2014 Order, which amended the August 27, 2014 Order and indicated, *inter alia*, that only the following persons are subject to the prohibition of obstruction, intimidation, or retaliation of any witness and criminal prosecution therefore: (i) any person who has been sworn to Grand Jury secrecy; (ii) any person who has or had access to any Grand Jury information; and (iii) any person associated with the J. Whyatt Mondesire investigation and proceedings;[5]

    d.    the October 30, 2014 Order, *which rendered final* the amended protective order.

*See* copies of the August 27, 2014 Order and the two September 17, 2014 Orders, attached as Exhibits B, C, and D, respectively.

---

[3] For purposes of clarity and ease of reference, this Order is referred to hereinafter as "the initial protective order."

[4] Prior to the entry of the initial protective order, the Supervising Judge conducted an *in camera ex parte* hearing that excluded OAG and its employees completely.

[5] For purposes of clarity and ease of reference, the initial protective order as amended by the two September 17, 2014 Orders is referred to hereinafter as "the amended protective order."

3

## STATEMENT OF OBJECTIONS TO THE DETERMINATION

### Background

6.    On June 6, 2014, the *Philadelphia Daily News* published an article describing a review by OAG of a prior Grand Jury investigation. *See* copy of the on-line version of the article, attached as Exhibit E.

7.    The Supervising Judge appointed Thomas Carluccio, Esquire as Special Prosecutor to investigate this development pursuant to Notice of Investigation No. 123 and authorized him to use the resources of the Thirty-Fifth Statewide Investigating Grand Jury.

8.    OAG, which conducts all other investigations in the Thirty-Fifth Statewide Investigating Grand Jury, has made every effort to accommodate the Special Prosecutor's needs and has cooperated with him fully.[6]

9.    On August 26, 2014, with no prior notice to OAG or any of its individual employees, with no specific allegations or explanation, and with no opportunity for OAG to respond to any allegations of misconduct, the Supervising Judge issued the initial protective order under the authority of 18 Pa.C.S. § 4954 (along with a related sealing order). *See* Exhibit B.

---

[6] The Special Prosecutor's allegation to the contrary contained in a prior filing in this Court in a related matter is incorrect. By way of example only, prior to issuance of the protective order OAG: (a) bent over backwards to assist the Special Prosecutor in orienting himself to the facilities and process utilized by the Thirty-Fifth Statewide Investigating Grand Jury; (b) performed all scheduling, subpoena issuance, logistical, and clerical tasks requested of it by the Special Prosecutor; (c) ensured that its employees appeared and testified as required by the Special Prosecutor; and (d) on at least one occasion, complied with the specific, direct, and unambiguous instruction of the Special Prosecutor to, *on his behalf,* inform witnesses called by him for his investigation in Notice No. 123 of their rights and obligations under the law. The combined effect of the Supervising Judge's Order that OAG have no involvement in the Special Prosecutor's investigation along with the Special Prosecutor's insistence that OAG employees perform some of his work for him has been to place OAG employees in a patently untenable position.

4

10. As noted *supra*, that Order stated, *inter alia*, that: (a) OAG shall refrain from any involvement in or access to the investigative efforts of the Special Prosecutor in Notice No. 123; (b) OAG employees shall have no access to the transcripts, exhibits, and other information pertaining to Notice No. 123; (c) OAG employees shall refrain from engaging in or soliciting any act of obstruction, intimidation, or retaliation against any witness summoned by the Special Prosecutor in Notice No. 123; and (d) any person who engages in an act of obstruction, intimidation, or retaliation against a witness summoned by the Special Prosecutor in Notice No. 123 may be prosecuted pursuant to 18 Pa.C.S.A. § 4955.

11. OAG moved for reconsideration of the initial protective order, and argument on the motion was conducted on September 16, 2014.

12. At the time of that argument, OAG was informed for the first time that an *ex parte, in camera* "hearing" had been conducted and that the initial protective order had issued as a result.

13. On September 17, 2014, the Supervising Judge issued an Order granting in part OAG's motion for reconsideration, granting a hearing on "the subject of...allegations of obstruction, witness intimidation, and/or retaliation," but not establishing a date for said hearing. (Exhibit C at 1).

14. The Order failed to specify any person or conduct that was at issue in connection with the allegations.

15. The Order failed to explain, elaborate, or otherwise provide a context for the phrase "allegations of obstruction, witness intimidation, and/or retaliation."

16. The Order failed to identify the source of the vague allegations.

17. Also on September 17, 2014, the Supervising Judge issued another Order granting in part OAG's motion for reconsideration, this one amending Paragraphs 2 and 5 of the initial protective order to indicate that "only" the following persons are subject to the initial protective order's prohibition on obstruction, intimidation, or retaliation against witnesses in the Special Prosecutor's investigation as well to the penalty of prosecution for violation of 42 Pa.C.S.A. § 4955:

> 1. Any person who has been sworn to Grand Jury secrecy;
>
> 2. Any person who has or had access to any Grand Jury information;
>
> 3. Any person associated with the J. Whyatt Mondesire proceedings and investigation.

(Exhibit D at 1).

18. The foregoing amended language is not limited to any particular grand jury or grand jury information -- past, present, or future.

19. The amended protective order applies to and directly affects hundreds of OAG employees past and present residing throughout the Commonwealth, innumerable individuals not affiliated in any manner with OAG, as well as the Attorney General and her predecessors.

20. People who have been sworn to grand jury secrecy include the Attorney General, OAG employees, employees of other law enforcement agencies who participate in grand jury investigations, court reporters, and members of the grand jury.

21. People who have had access to grand jury information include not only the foregoing persons, but also witnesses to grand jury investigations and their counsel.

22. The initial protective order was issued pursuant to 18 Pa.C.S.A. §4954, which permits "[a]ny court with jurisdiction over any criminal matter" to issue protective orders "*after a hearing and in its discretion, upon substantial evidence.*"

6

23. The Supervising Judge directed the Special Prosecutor to serve the initial protective order on OAG only (Exhibit B at 2 ¶ 6) and did not provide for service on all of the persons subject to its terms.

24. Notwithstanding the fact that many persons unaffiliated with OAG are subject to the protective order, the Supervising Judge explicitly prohibited the disclosure of the contents of the protective order to anyone outside OAG under penalty of contempt.

25. On September 19, 2014, OAG filed in this Court an Application for Special Relief pursuant to 42 Pa.C.S.A. §§ 502, 726 and Pa.R.A.P. 3309.

26. On October 2, 2014, this Court dismissed the Application for Special Relief as moot based on the indication that there would be a hearing, and directed that the hearing take place.

27. Subsequently, the Supervising Judge scheduled the hearing requested by OAG for October 17, 2014.

28. On October 17, 2014, two months after the initial protective order had been issued, OAG and the Special Prosecutor appeared before the Supervising Judge for the hearing as directed by the Supreme Court and as required by 18 Pa.C.S. § 4954.[7]

29. The Office of Attorney General attempted to comply with the mandate of the Supreme Court and engage in a hearing as understood under the plain meaning of the word "hearing."

---

[7] Despite request, OAG has been denied a copy of the transcript for the October 17, 2014 "hearing." Accordingly, the factual representations contained herein regarding what transpired at the proceeding are necessarily -- and regrettably -- based solely on the recollections of the individual employees of OAG who were present at the proceeding.

30. To that end, OAG sought leave of the Supervising Judge to subpoena Frank G. Fina, Esquire ("Fina") and E. Marc Costanzo, Esquire ("Costanzo"), whom OAG understood to be the alleged victims/accusers of intimidation in connection with Notice No. 123.

31. OAG sought to question Fina and Costanzo to ascertain the nature and extent of the intimidation that they have alleged, as well as to test the veracity and credibility of their accusations.

32. The Supervising Judge denied that request.

33. When the Court refused OAG the opportunity to question its apparent accuers on the record, OAG asked the Court for a copy of transcript for the *ex parte in camera* hearing that preceded the issuance of the initial protective order in an alternate attempt to gain an understanding of the genesis of the protective order.

34. The Supervising Judge denied that request.[8]

35. Having been denied the opportunity to question the alleged victims as well as the opportunity to review a transcript of the prior hearing, the attorneys representing OAG at the hearing *were precluded from ascertaining the factual basis for the protective order.*

36. Finally, OAG counsel sought leave of the Judge to call as a witness the Special Prosecutor, who was present for the *ex parte, in camera* hearing and presumably heard the testimony of Fina and Costanzo.

37. The Supervising Judge denied that request.

---

[8] Notably, the Supervising Judge had previously attached the relevant transcript to a pleading he had filed in the Supreme Court, which in turn made available to OAG. When the Supervising Judge discovered, two days later, that OAG had received the transcript from the Supreme Court, he ordered OAG to return the copy or delete it prohibited OAG from talking about or using the contents of the transcript. In essence, OAG was directed by the Supervising Judge to erase the memories of any OAG employee who had lawfully seen the transcript and to engage in an ongoing pretense that the contents of the transcript had not been disclosed and were unknown.

8

38. OAG attempted to subpoena and question a journalist with first-hand personal knowledge regarding: (a) the reason for the timing of the Right-to-Know Law ("RTKL") requests relating to the email accounts of Fina and Costanzo submitted to OAG; and (b) the source of the information that triggered that request.

39. This particular testimony would be probative of whether there was a connection between the RTKL requests relating to the email accounts of Fina and Costanzo on the one hand and the testimony of Fina and Costanzo in Notice No. 123 on the other.

40. That connection is apparently at issue given that the October 30, 2014, Order specifically relies on the factual finding that, "The timing of the Right-to-Know Request naming Frank Fina and Mark Costanzo among others were submitted to the Attorney General's Office at the time they were subpoenaed and/or scheduled to testify." (Exhibit A at 1-2).

41. Rather than permit OAG to fully develop the record on this issue, the Supervising Judge rejected OAG's attempt to subpoena the witness and chose instead to ground his protective order in untested inferences.

42. The foregoing deprivation of witnesses and foundational information by the Supervising Judge prevented OAG from proceeding in any meaningful way: it had no way of determining precisely what allegations had been leveled, whether rebuttal was necessary, and if so what witnesses to call and what questions to ask.

43. Hamstrung by the Supervising Judge's restrictive rulings,[9] OAG was limited to the presentation of a single witness, a Chief Deputy Attorney General, who testified about the pornographic content of certain emails discovered on OAG computer equipment.

_____

[9] The Supervising Judge's finding in its October 30, 2014 Order that "the Attorney General called only one witness..." (Exhibit A at 3) is misleading because it omits the salient fact that the Judge repeatedly denied OAG's counsel's requests to present other witnesses' testimony.

9 ·

44.     On October 30, 2014, the Supervising Judge entered an Order denying OAG's motion for reconsideration of the amended protective order. *See* Exhibit A.

**Objections**

45.     The statutory provision on which the Supervising Judge relied reads as follows:

Any court with jurisdiction over any criminal matter may, *after a hearing and in its discretion, upon substantial evidence*, which may include hearsay or the declaration of the prosecutor that a witness or victim has been intimidated or is reasonably likely to be intimidated, issue protective orders, including, but not limited to, the following:

(1) An order that a defendant not violate any provision of this subchapter or section 2709 (relating to harassment) or 2709.1 (relating to stalking).

(2) An order that a person other than the defendant, including, but not limited to, a subpoenaed witness, not violate any provision of this subchapter.

(3) An order that any person described in paragraph (1) or (2) maintain a prescribed geographic distance from any specified witness or victim.

(4) An order that any person described in paragraph (1) or (2) have no communication whatsoever with any specified witness or victim, except through an attorney under such reasonable restrictions as the court may impose.

18 Pa.C.S. § 4954.

46.     By its terms, Section 4954 grants to the court with jurisdiction the discretion to enter a protective order and to decide the terms of a protective order, such that review of a protective order would be for an abuse of discretion. *See Commonwealth v. Sandusky*, 70 A.3d 886, 897 n.9 (Pa. Super. 2013).

47.     An abuse of discretion will be found when a lower court "has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly

unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014) (citation omitted).

48. To the extent that this case presents a question of law, such as the requirement of a hearing, the Court's standard of review is *de novo* and the scope of review is plenary. *Id.*

49. The Supervising Judge abused his discretion because the protective order violates the state and federal due process rights of the Pennsylvania Attorney General, hundreds of OAG employees, and innumerable people not affiliated with OAG.

50. In the words of this Honorable Court:

> The due process clauses of the United States and Pennsylvania constitutions *"embody the principle of fundamental fairness, entitling every individual to be free from arbitrary or oppressive government conduct."* This Court has found that the guarantees associated with the due process clause of the federal constitution are "generally coextensive with those under the Pennsylvania Constitution."

*Commonwealth v. Wallace*, 97 A.3d 310, 320 (Pa. 2014) (citations omitted) (emphasis added).

51. The essential elements of "due process of law" are "notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause." *Fiore v. Com., Bd. of Finance and Revenue*, 633 A.2d 1111, 1114 (Pa. 1993).

52. As a matter of fundamental procedural due process, an individual may not be deprived of a constitutionally protected interest without a hearing, and a hearing requires notice and an opportunity to be heard; it follows that the opportunity to be heard must be at a meaningful time and **in a meaningful manner.** *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Commonwealth v. Maldonado*, 838 A.2d 710, 714 (Pa. 2003).

11

53. OAG was not provided with prior notice that there had been an allegation of misconduct and/or request for issuance of a protective order in connection with the Special Prosecutor's investigation.

54. Although the protective order purports to apply to "any person" who "has been sworn to grand jury secrecy,'" has or had access to any grand jury information," and/or is "associated with the J. Whyatt Mondesire proceedings and investigation," notice of this protective order was provided *after the fact* and *only to the governmental agency OAG*.

55. The order proscribes behavior and threatens criminal sanctions upon countless unidentified individuals both within and without OAG, yet not a single one of them has been served with notice of the order.[10]

56. The protective order was conceived and initially filed in a remarkably partisan fashion, the product of a one-sided *in camera, ex parte* proceeding that deprived those who were targeted and eventually subjected to the order of *any* opportunity to address the allegations that provoked the Supervising Judge to enter the order.

57. Rather than fully develop a factual record in a disinterested and even-handed fashion, the Supervising Judge inexplicably accepted the covert allegations of OAG's accusers at face value.

---

[10] There is no reasonable basis for concluding that every person encompassed by the protective order is likely to engage in intimidating activity or retaliatory conduct based on testimony before the Grand Jury, especially since (a) the vast majority of OAG employees have no contact with the Grand Jury and would be completely unaware of the Special Prosecutor's investigation, (b) even among those employees who have contact with the Grand Jury, most would be completely unaware of the Special Prosecutor's investigation (as just one example, it is difficult to imagine that a Medicaid Fraud investigator in Pittsburgh would have any knowledge of, or interest in, a "leak" investigation involving the Norristown Grand Jury), and (c) there have been no reports of any contact with witnesses apart from the two incidents involving OAG agents discussed *infra.*

58.     Although the Supervising Judge subsequently acquiesced to OAG's request for a hearing after the fact, the process eventually afforded to OAG was hollow and meaningless.

59.     As recounted *supra*, OAG was prohibited from accessing the transcript of the initial *ex parte* proceeding and was denied knowledge of the specific factual allegations which formed the basis for the protective order.

60.     The deprivation of this information by the Supervising Judge prevented OAG from proceeding in any meaningful way:  it had no way of determining precisely what allegations had been leveled, whether rebuttal was necessary, and if so what witnesses to call and what questions to ask.

61.     In addition, the Supervising Judge: (a) precluded OAG from calling the purported victims/accusers as witnesses and probing the nature, veracity, and credibility of their claims; and (b) rejected OAG's attempt to subpoena and question a journalist with first-hand personal knowledge directly relevant and probative to an apparent allegation of witness intimidation.

62.     The Supervising Judge denied OAG, its employees, and the others affected a constitutionally adequate hearing on the subject of the protective order.

63.     To date, OAG is still unaware of the precise nature of any allegation of misconduct giving rise to the issuance of the protective order, and has been left to speculate in that regard.[11]

---

[11] OAG is aware generally of:  (a) an allegation that two agents behaved in an inappropriate manner towards Fina and Costanzo at the OAG's grand jury suite on August 26, 2014; and (b) an allegation that recent Right to Know Act submissions by the press to OAG are linked to the Special Prosecutor's investigation.  The former appears to be a basis for the protective order because the order was issued the day after Fina and Costanzo appeared, i.e. August 27, 2014. The latter appears to be a basis for the protective order because the Supervising Judge alludes to it in his October 30, 2014 Findings of Fact and Conclusions of Law. *See* Exhibit A.  Any such contact between the witnesses and the agents cannot reasonably constitute intimidation given that OAG agents work on the premises where the grand jury suite is located and because both

64. The foregoing constitutes the kind of "arbitrary or oppressive government conduct" that is prohibited by the Pennsylvania and United States Constitutions. *See Wallace*, 97 A.3d at 320.

65. The order itself is intolerably vague: OAG employees and others are prohibited from engaging in "obstruction," "intimidation," and "retaliation" in connection with the Special Prosecutor's investigation, but because the nature of that investigation is entirely secret, the terms "obstruction," "intimidation," and "retaliation" exist in a vacuum that renders them utterly cryptic.

66. The order supplies no discernable context for its prohibition; without such context, a person subject to the order cannot know what action might constitute an infraction.

67. Such an order violates the notion of fundamental fairness in which our system of justice is deeply rooted. *See Commonwealth v. Burno*, 94 A.3d 956, 966 (Pa. 2014).

68. The order also infringes on the First Amendment rights of all affected.

69. "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate...the order must be tailored as precisely as possible to the exact needs of the case." *Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175, 183 (1968).

---

Attorney Fina and Attorney Costanzo are career prosecutors who have worked with, directed, and supervised OAG agents on many occasions. The protective order constitutes an abuse of discretion because any conduct of the agents cannot reasonably be construed as an act of intimidation, obstruction, or retaliation. Moreover, the conduct of the agents cannot reasonably be attributed to every employee of OAG. The Protective Order also constitutes an abuse of discretion because there is no evidence that the agents' supervisors were aware that they would engage in intimidation, obstruction, or retaliation, or that they had engaged in such conduct in the past, and so the conduct of the agents cannot reasonably be attributed to OAG as a whole.

14

70. The Supervising Judge's protective order sweeps broadly and appears to encompass speech relating to any person, subject, or event associated with the Special Prosecutor's investigation.

71. The Supervising Judge has apparently banned *communication* both within and without OAG regarding Fina, Costanzo, the J. Whyatt Mondesire proceedings, and other unknown and unknowable matters relating to the investigation.

72. Because only the Supervising Judge and Special Prosecutor know the nature of the investigation, the persons subject to the protective order must curtail virtually all speech out of fear that they will unwittingly commit a violation.

73. The protective order constitutes an abuse of discretion because the scope of the order, in terms of both the persons subject to the order and the conduct covered by the order, is far broader than necessary to protect any witness before the Grand Jury.

74. Finally, the protective order violates the Separation of Powers Doctrine of our federal and state constitutions because it improperly infringes on OAG's ability to fulfill its constitutional law enforcement mandate.

75. By way of illustration only, to the extent that perjury or obstruction of the administration of law has been committed by witnesses or others in connection with the Special Prosecutor's investigation, the order purports to render OAG powerless to investigate and prosecute those responsible.

76. To the extent that grand jury material has been leaked to the public from the Special Prosecutor's investigation in violation of grand jury secrecy rules, the order purports to constrain OAG from investigating and prosecuting those responsible.

15

77. *To the extent that witnesses in the Special Investigation may have committed crimes or other misconduct unrelated to Notice 123, the order purports to eliminate OAG's power to investigate and prosecute.*

78. Finally, the Protective Order constitutes an abuse of discretion because persons who violate the Order are subjected to the jurisdiction of the Court for purposes of a prosecution under 18 Pa.C.S. § 4955, which permits, *inter alia*, prosecution for other, substantive offenses and for contempt of court, and allows for a warrantless arrest, 18 Pa.C.S. § 4955(a)(1), (a)(2), (b), and there is no substantial evidence supporting the exercise of such jurisdiction.

## STATEMENT OF RELIEF SOUGHT

79. OAG requests this Court to enter an Order granting this Petition for Review and vacating the Orders entered by the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury on August 27, 2014, September 17, 2014, and October 30, 2014.

## CONCLUSION

WHEREFORE, the Pennsylvania Office of Attorney General, through Kathleen G. Kane, Attorney General, respectfully requests that this Honorable Court enter an Order granting this Petition for Review and vacating the Orders entered by the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury on August 27, 2014, September 17, 2014, and October 30, 2014, or grant such other relief as the Court may deem appropriate and proper.

Respectfully submitted,

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: November 10, 2014

## VERIFICATION

The facts recited in the foregoing Petition for Review are true and correct to the best of my knowledge and belief. This statement is made with knowledge that a false statement is punishable by law under 18 Pa. C.S. § 4904(b).

By: _____
KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: November 10, 2014

18

# EXHIBIT "A"

IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, PENNSYLVANIA

IN RE: · : SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC. DKT. 2012
THE THIRTY-FIVE STATEWIDE :
: MONTGOMERY COUNTY COMMON PLEAS
INVESTIGATING GRAND JURY : M.D. 1424-2014
:
: NOTICE NO. 123

## SEALING ORDER

AND NOW, this 30th day of October, 2014, it is hereby ORDERED, that the

attached Order of October 30 , 2014 be filed under seal with the Clerk of Courts of

Montgomery County until further Order of this Court.

BY THE COURT:

_____
WILLIAM R. CARPENTER,        J.
**Supervising Judge**

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

| | |
|---|---|
| IN RE: | : SUPREME COURT OF PENNSYLVANIA |
| | : NO. 176 M.D. MISC DKT. 2012 |
| THE THIRTY-FIVE STATEWIDE | : |
| | : MONTGOMERY COUNTY COMMON PLEAS |
| INVESTIGATING GRAND JURY | : M.D. 1424-2014 |
| | : |
| | : NOTICE NO. 123 |

## ORDER

AND NOW, this 30th day of October, 2014, after a Hearing on the "MOTION OF THE OFFICE OF ATTORNEY GENERAL FOR RECONSIDERATION OF PROTECTIVE ORDER DATED AUGUST 27, 2014" (as amended); said Motion is DENIED.

BY THE COURT:

_____

WILLIAM R. CARPENTER,        J.
Supervising Judge

**Copies sent on October 30, 2014**
**By First Class Mail to:**
Attorney General Kathleen Kane
Erik L. Olsen, Esquire
Laura A. Ditka, Esquire
Thomas E. Carluccio, Esquire

# IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIVE STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC DKT. 2012
:
: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 1424-2014
:
: NOTICE NO. 123

## FINDINGS OF FACT AND CONCLUSION OF LAW

**FINDINGS OF FACT:**

Prior to the issuance of the Protective Order:

1. The identity of anyone subpoenaed by the Special Prosecutor was widely known within the Attorney General's Office.
2. The time and location of those witnesses appearing before the Grand Jury was also widely known within the Attorney General's Office.
3. The Attorney General was also acquiring copies of the Notes of Testimony presented by the Special Prosecutor to the Grand Jury, in a situation where the Attorney General's Office was the subject of the investigation.
4. Grand Jury witnesses were confronted as they arrived to testify before the Grand Jury. They were subjected to conduct of an intimidating nature.
5. Subsequent to the issuance of the Protective Order the above conduct has been abated.
6. The Grand Jury operates within one of the office buildings of the Attorney General. Grand Jury scheduling and issuance of subpoenas are necessarily done with the clerical employees of the Attorney General. Accordingly the Attorney General and her employees know when, where and which witnesses are appearing before the Grand Jury.
7. Here the Attorney General and her employees are the subject of the investigation into the leaking of secret Grand Jury information to the newspapers.
8. This Court has been furnished with substantial evidence, information and testimony in camera that fully supports the issuance of and the maintaining of the Protective Order.
9. The Court conducted a hearing on the Attorney General's Request to Vacate the Protective Order on October 17, 2014. At that hearing, the Attorney General called only one witness who in no way provided any reason or just cause to vacate the Protective Order.

10. The timing of the Right-to-Know Request naming Frank Fina and Mark Costanzo among others were submitted to the Attorney General's Office at the time they were subpoenaed and/or scheduled to testify.
11. In her "Motion to Quash Grand Jury Subpoena" the Attorney General through privately retained counsel submitted that because she was not sworn to secrecy with regard to prior Grand Juries "…she could not as a matter of law be in Contempt of Court with regard to any disclosure related to that Grand Jury proceeding."
12. This Court finds based upon substantial evidence as a fact that:
    A. The Protective Order is necessary to protect the secrecy of the Statewide Investigating Grand Jury proceedings;
    B. The Protective Order is necessary to maintain and ensure the integrity of the Grand Jury process and;
    C. The Protective Order is necessary and appropriate to deter Grand Jury witness intimidation and retaliation.

## CONCLUSIONS OF LAW:

The Protective Order is necessary and appropriate. The Attorney General has shown no cause to vacate the Protective Order or to amend it further.

**BY THE COURT:**

**WILLIAM R. CARPENTER,** **J.**
**Supervising Judge**

# EXHIBIT "B"

## IN THE COURT OF COMMON PLEAS
### MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIVE STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC. DKT. 2012
:
: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 1424-2014
:
: NOTICE NO. 123

## SEALING ORDER

AND NOW, this 27th day of August, 2014, it is hereby ORDERED, that the attached Order of August 27, 2014 be filed under seal with the Clerk of Courts of Montgomery County until further Order of this Court.

### BY THE COURT:

**WILLIAM R. CARPENTER,           J.**
**Supervising Judge**

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIVE STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC DKT. 2012
:
: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 1424-2014
:
: NOTICE NO. 123

## ORDER

AND NOW, this 27th day of August, 2014, it is hereby ORDERED, pursuant to 18 Pa.C.S.§ 4954 (relating to protective orders), that:

1. The Office of the Attorney General, except upon specific authorization by this Court or the Special Prosecutor, shall refrain from any involvement in, or access to, the investigative efforts of the Special Prosecutor.

2. Employees of the Office of the Attorney General shall refrain from engaging in, or soliciting, any act of obstruction, intimidation or retaliation against any witness summoned by the Grand Jury in the Special Prosecutor's investigation.

3. All transcripts of Grand Jury testimony shall be given only from the stenographer or their employer directly to the Supervising Judge and the Special Prosecutor, no copy shall be given to the Attorney General's Office.

4. Employees of the Office of the Attorney General shall not have access to transcripts of proceedings before the Grand Jury or Supervising Judge, exhibits, or other information pertaining to the Special Prosecutor's investigation. All information related to the work of the Special Prosecutor shall be kept in the custody of the Special Prosecutor and Supervising Judge.

5. Any person, including employees of the Office of the Attorney General, who engage in any act of obstruction, intimidation or retaliation against a witness summoned by the Grand Jury in the Special Prosecutor's investigation may be prosecuted as set forth in 18 Pa.C.S.§ 4955 (relating to violation of orders) and any other applicable provisions of the Crimes Code of Pennsylvania.

6. The Special Prosecutor shall serve a copy of this Order upon the Office of the Attorney General.

7. The contents of this Order are sealed, and shall not be disclosed (either verbally or in writing) by the Office of the Attorney General to any individual outside of the Office of the Attorney General under penalty of contempt of court.

**BY THE COURT:**

WILLIAM R. CARPENTER,     J.
**Supervising Judge**


**Copies sent on August 27, 2014**
**By First Class Mail to:**
Kathleen G. Kane, Pennsylvania Attorney General
Thomas E. Carluccio, Esquire

# EXHIBIT "C"

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIFTH STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC. DKT. 2012
:
: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 2644-2012
:
:
: NOTICE NO. 123

## ORDER

AND NOW, this 17th day of September, 2014, it is hereby ORDERED that the attached,

filed on September 17th, 2014, be and is hereby sealed.

_____
WILLIAM R. CARPENTER
Supervising Judge
Thirty-Fifth Statewide Investigating
Grand Jury

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIVE STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC DKT. 2012

: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 1424-2014

: NOTICE NO. 123

## ORDER

AND NOW, this 17th day of September, 2014, in the exercise of its discretion after an in camera hearing and a finding of substantial evidence, this Court issued a Protective Order;

And upon consideration of the Motion for Reconsideration filed by the Office of Attorney General relating to the Order of Court issued August 27, 2014, and after Argument,

IT IS ORDERED that a further hearing related to the issuance of a protective order pursuant to 18 Pa.C.S. § 4954 shall be conducted on a date to be agreed upon by the Attorney General and the Special Prosecutor in the Chambers of the Supervising Judge in the Grand Jury suite. The subject of the hearing is allegations of obstruction, witness intimidation, and/or retaliation.

BY THE COURT:

_____
WILLIAM R. CARPENTER,           J.
Supervising Judge

Copies sent on September 17, 2014
By First Class Mail to:
Thomas E. Carluccio, Esquire
James Barker, Esquire

# EXHIBIT "D"

# IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIFTH STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC. DKT. 2012
:
: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 2644-2012
:
: NOTICE NO. 123

## ORDER

AND NOW, this 17th day of September, 2014, it is hereby ORDERED that the attached , filed on September 17th, 2014, be and is hereby sealed.

WILLIAM R. CARPENTER
Supervising Judge
Thirty-Fifth Statewide Investigating
 Grand Jury

# IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:

THE THIRTY-FIVE STATEWIDE

INVESTIGATING GRAND JURY

: SUPREME COURT OF PENNSYLVANIA
: NO. 176 M.D. MISC DKT. 2012
:
: MONTGOMERY COUNTY COMMON PLEAS
: M.D. 1424-2014
:
: NOTICE NO. 123

## ORDER

AND NOW, this 17th day of September, 2014, in the exercise of its discretion after an in camera hearing and a finding of substantial evidence, this Court issued a Protective Order;

And upon consideration of the Motion for Reconsideration filed by the Office of Attorney General relating to the Order of Court issued August 27, 2014,

IT IS ORDERED that the Motion is GRANTED in part as to Paragraphs 2 and 5 of said Order, and the following persons only shall be subject to Paragraphs 2 and 5 of said Order:

1. Any person who has been sworn to Grand Jury secrecy.

2. Any person who has or had access to any Grand Jury information.

3. Any person associated with the J. Whyatt Mondesire proceedings and investigation.

Additionally, Paragraph 7 of said Order is modified to allow communication regarding the Order with counsel for a person subject to the Order, for purposes of appeal, and for any other, similar purpose required by law.

**BY THE COURT:**


WILLIAM R. CARPENTER,      J.
Supervising Judge


Copies sent on September 17, 2014
By First Class Mail to:
Thomas E. Carluccio, Esquire
James Barker, Esquire

# EXHIBIT "E"

Monday, November 10, 2014

Member Login: **Sign In** | **Register** | f t 8

61° °John Bolaris' Forecast »
Philadelphia, PA

**philly°com**

Search    Subm    *The Inquirer*  DAILY NEWS

🏠 | News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING  NEWS VIDEO  VOICES/BLOGS  PHILADELPHIA  NEW JERSEY  POLITICS  EDUCATION  OPINION  OBITUARIES  NATION/WORLD  WEATHER  TRAFFIC
LOTTERY



# State A.G. probed Philly NAACP leader Mondesire's finances 5 years ago

Share | Tweet | | Reddit | Email



*J. Whyatt Mondesire, former President of the Philadelphia Chapter of the NAACP on August 10, 2009. (David Maialetti / Staff Photographer)*

**CHRIS BRENNAN,** *Daily News Staff Writer brennac@phillynews.com, 215-854-5973*

LAST UPDATED: Thursday, June 5, 2014, 9:45 PM

**DAILY NEWS** STATE ATTORNEY General Kathleen Kane is reviewing a 2009 grand-jury investigation of J. Whyatt Mondesire, former head of the NAACP in Philadelphia, and one of his employees, according to documents obtained by the *Daily News*.

Mondesire's employee, Harriet Garrett, and her daughter pleaded guilty in 2010 to stealing nearly $220,000 in state grant money for a job-training program. Garrett was sentenced to a minimum of six months in jail and ordered to pay restitution. Her daughter got 18 months' probation.

A 2009 memo written by then-Deputy Attorney General William Davis Jr. says investigators "uncovered what appeared to be questionable spending" of state money by Mondesire.

Kane, a Democrat, is now trying to determine what happened with the Mondesire investigation. Gov. Corbett, a Republican, was the attorney general at the time.

---

MORE COVERAGE





*Latest News Video*





 

**More videos:**

*Most Viewed News Stories:*

 Teen pulls Philly cop from burning squad car

 Bouncers shoot man at Phila. strip club

 Another teacher assaulted at Bartram

 Kane's car crash derailed testimony again

Merchants say cigarette tax is a business-killer

**Police probe shooting at upper Montco complex**
**Christie chief of staff subpoenaed**



Mondesire, 64, says he was never questioned and denies any financial wrongdoing.

The 2009 Davis memo detailed for his bosses what had been uncovered about Mondesire and Garrett, who worked at the *Philadelphia Sunday Sun*, a weekly newspaper Mondesire publishes.

A nonprofit called Next Generation Community Development Corp., which is operated by Mondesire, held a state-government grant for a jobs-training program in 2004 and 2005, but handed it off to Garrett, who ran another nonprofit called Creative Urban Education Systems, or CUES, according to the Davis memo.

Mondesire was listed as chairman of the CUES board, the memo noted, while Garrett served as the treasurer for Next Generation's board.

Davis wrote his memo to then-Chief Deputy Attorney General Frank Fina and then-Senior Deputy Attorney General E. Marc Costanzo.

Corbett, as attorney general, named Fina in 2006 to head a new public-corruption unit and Costanzo to work on cases for the unit in the Philadelphia region.

Fina and Costanzo now work in a similar unit for District Attorney Seth Williams.

In the memo, Davis wrote:

* Next Generation's bank-account records, obtained with a grand-jury subpoena, showed deposits of $1.3 million in government grants in a one-year period.

Another $521,000 in the account came from political campaigns, rent payments and the intermingling of money from the *Sunday Sun*, which is owned and operated by Mondesire, the memo said.

* Next Generation paid $2,273 to the Philadelphia Club, a private and exclusive club in Center City.

* Next Generation spent "tens of thousands," writing checks to pay Mondesire's American Express bill for "clothes, food, lodging gas and entertainment" and a loan from Mellon Bank. There were also checks written to Mondesire and to "cash."

* Next Generation wrote checks for $169,960 to Charles and Claudia Tasco and their company, C&C Construction. (Charles Tasco is the son of City Councilwoman Marian Tasco, a friend and political ally of Mondesire's for more than three decades.)

* $6,431 in CUES money was given to Mondesire for what Garrett called consulting. That type of expense was not allowed, according to the rules of the grant.

* In "various correspondence" between Garrett and Mondesire discovered by investigators, she questioned payments of more than $70,000 he made to Claudia Tasco.

* CUES paid $1,099 for health insurance for Mondesire.

***Travel Deals***



$160-$185 – SC: 4-Star Hilton Head Island Resort, Save 30%

See all travel deals »

LISTED BY **TRAVELZOO**
*Some taxes, fees additional

***Weekly Circulars***



RACK ROOM SHOES:
Fall for Boots!
VALID UNTIL NOV 19



TARGET USA:
Buy Two, Get One Free
All Video Games
THIS WEEK ONLY

See More Circulars »

*Also on Philly.com*

BUSINESS:



Pizza Hut revamp: Curry crusts, spinach topping

HEALTH:



The 5 best exercises for runners

SPORTS:



New winter agenda for Phillies

ENTERTAINMENT:



Stephen A. Smith to broadcast from UPenn

FOOD:



Watch 'Bar Rescue' make over a South St. bar

JOBS:



How should I manage my workload while I'm on vacation?

*Stay Connected*

Get the latest Philly.com Daily Headlines newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member? ○ Yes ○ No

A DAILY NEWS ORIGINAL  DAILY NEWS
FOR THE COMPLETE DAILY NEWS EXPERIENCE, BECOME A MEMBER!
JOIN OR LOGIN NOW >

\* Davis wanted to question Mondesire - and possibly subpoena him for sworn grand-jury testimony - about Garrett, CUES and Next Generation.

**Never questioned**

Mondesire, a former *Inquirer* reporter who served as the top aide to the late U.S. Rep. Bill Gray, said no one from the A.G.'s Office ever questioned him.

"We didn't use any money for personal gain," Mondesire said.

He said that he has not seen the A.G. Office's documents and twice declined an offer from the *Daily News* to review them.

Mondesire said C&C Construction worked on four properties, including the NAACP headquarters and his newspaper office, where the Next Generation non-profit is also located.

"We bought supplies with my American Express card for construction," he said.

"They never asked me a single question back in 2009. We rehabbed the buildings. We spent money buying stuff for the buildings, construction and paying off developers."

Garrett declined to comment about the investigations. Her daughter did not respond to requests for comment.

The May 2010 news release about Garrett's arrest featured Corbett laying out the charges.

Corbett did not respond this week to two questions: Was he briefed on the Mondesire investigation and did he play a role in deciding what happened with that probe?

Mondesire was suspended by the NAACP's national headquarters in April after he feuded publicly with board members about the finances of the local chapter and Next Generation.

Those board members - Sid Booker, Donald "Ducky" Birts and the Rev. Elisha Morris - also were suspended.

Booker and Morris, who say they are still Next Generation board members, are now asking a Common Pleas judge to force Mondesire to show them the nonprofit's financial records.

As a judge considers that request, Kane's staff is reviewing what became of the 2009 Mondesire probe.

David Peifer, who heads the A.G.'s Bureau of Special Investigations, on March 21 interviewed Michael Miletto, the special agent who investigated Garrett and Mondesire.

The *Daily News* obtained a transcript of that taped interview.

Miletto told Peifer that he subpoenaed Next Generation's bank account, the transcript shows.

"When I did that, I found that there was a whole bunch of money that appeared to me to be donations to the NAACP, not [Mondesire], and they were going into Next Generation's account and they were being used for [Mondesire's] lifestyle - much of it," Miletto told Peifer.

Miletto said he was taken off the case after Fina and Costanzo were told about the probe, according to the transcript.

Miletto said "criminal activity was just ignored" after that. He added that two accountants who had worked for Mondesire had provided taped statements, with one asking for immunity and the other asking for protection.

Fina and Costanzo declined to comment about the Mondesire investigation, citing the secrecy of grand-jury proceedings.

Davis, now in private practice, also declined to comment, citing the same restriction.

Miletto, who still works for the A.G.'s office, also declined to comment.

Peifer referred questions to Kane's communications staff.

J.J. Abbott, a spokesman for Kane, declined to comment.

**The Kane-Fina feud**

Fina and Costanzo have a complicated and controversial relationship with Kane.

Kane criticized Corbett's tenure as attorney general when she ran for office in 2012, specifically targeting the Penn State child-abuse scandal that sent former assistant football coach Jerry Sandusky to prison.

Kane's staff is now conducting an extensive review of that investigation.

Fina led the Sandusky probe.

Kane, on Feb. 5, issued a statement noting that her office's Sandusky review had been underway for one year, adding that delays in the undertaking "will be described in more detail when the report is made public."

A month later, the *Inquirer* reported that Kane declined to pursue an investigation previously led by Fina and Costanzo, starting in 2010, that used Philadelphia lobbyist Tyron Ali as a confidential informant to tape conversations with four Philly state representatives and a former Traffic Court judge. On the tapes, the representatives and judge accept cash or gifts from Ali.

Kane has said Fina dropped 2,033 criminal counts against Ali, who had been charged with stealing $430,000 from a state program, 24 days before she was sworn into office.

She said that "extraordinarily lenient" deal "crippled the chance of this case succeeding in prosecution."

Fina, in a letter published by the *Inquirer* a week after the first story ran, called on Kane to explain her decision.

The *Inquirer* also published a letter that day from Fina's boss, Williams, critical of Kane.

Kane eventually turned over the Ali case file to Williams, who is now examining whether charges can be brought against the

four representatives and the Traffic Court judge, who is currently on trial in an unrelated federal corruption case.

On Twitter: @ChrisBrennanDN

Blog: ph.ly/PhillyClout.com

**CHRIS BRENNAN**
*Daily News Staff Writer brennac@phillynews.com,
215-854-5973*

| Share | Tweet | | Reddit | Email |

Reprints & Permissions »

MORE FROM THE WEB

**Type 2 Diabetes: Lowest possible A1c without significant hypoglycemia** *(HealthCentral)*

**You Have One Guess...Which State Boasts the Most Malls in a 25-Mile Radius?** *(New Jersey Tourism)*

**American Couple Accused of Trafficking, Imprisoned in Qatar** *(Yahoo News with Katie Couric)*

**This Company Used a Dry Erase Surface to Fix a Meeting Table** *(Post-it® Brand)*

**New Site Calculates How Much You'll Get from Social Security** *(Smart Asset)*

**Supreme Court delivers blow to public unions** *(Fortune)*

MORE FROM PHILLY.COM

**Wreckage of small plane found off St Maarten**

**SEPTA: Transit cop masturbated on subway**

**Drug cartels find Argentina attractive transit way**

**Another member of Chaka Fattah's inner circle flips**

**Feds: Pa. woman stole dead mother's benefits for 17 years**

**Merchants say cigarette tax is a business-killer**

**Sila**
heating & air conditioning

$89

AdChoices ▷

**philly◦com**

News | Sports | Entertainment | Business | Food | Lifestyle | Health

*Classifieds:*

Jobs | Cars | Real Estate | Rentals | Marketplace | Celebrations | Print Offers Online | Weekly Circulars

*Site Services:*

Advertise on Philly.com | Rates and Specs | Mobile Site | Apps

**The Inquirer**

The Inquirer Digital Edition

Subscriber Services

Subscribe

Newspapers in Education

**DAILY NEWS**

Daily News Digital Edition

Subscriber Services

Subscribe

*Partners:*

**Philly DealYo**

**Parade Magazine**

About Philly.com | Contact Us | Terms of Use & Privacy Statement | Copyright 2014

© Copyright 2014 Interstate General Media, LLC

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving one copy of the foregoing Petition for Review

upon the persons and in the manner indicated below:

*Via U.S. First-Class Mail,*
*Postage pre-paid:*

The Honorable William R. Carpenter
Court of Common Pleas of Montgomery County
Montgomery County Courthouse
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-5902
(Supervising Judge)

Thomas E. Carluccio, Esquire
Plymouth Greene Office Campus
1000 Germantown Pike, Suite D3
Plymouth Meeting, PA 19462-2484
(484) 674-2899
(Special Prosecutor)

Ann Thornburg Weiss, Clerk of Courts
Montgomery County Clerk of Courts Office
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-3346
(Clerk of Courts)

By: **KATHLEEN G. KANE**
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: November 10, 2014

Received In Supreme Court

NOV 1 0 2014

Middle

19

Filed In Supreme Cour

NOV 1 0 2014

Middle

UNSEALED PER ORDER OF
THE COURT DATED
AUGUST 26, 2015

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : | No. ___ MM 2014 |
| Petitioner | : | |
| V. | : | |
| | : | |
| SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY, | : | **FILED UNDER SEAL** |
| Respondent | : | |

---

## MOTION FOR LEAVE TO FILE PETITION FOR REVIEW WITH ATTACHED BRIEF UNDER SEAL

---

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SUPREME COURT OF PENNSYLVANIA:

AND NOW, comes the Pennsylvania Office of Attorney General by Kathleen G. Kane, Attorney General of the Commonwealth of Pennsylvania who files this Motion for Leave to File its Petition for Review with attached brief in support under seal, and in support thereof avers as follows:

1.     Concurrent with the filing of this Motion, Petitioner, Office of Attorney General of the Commonwealth of Pennsylvania ("OAG") by Kathleen Kane, Attorney General, is filing a Petition for Review and supporting brief pursuant to 42 Pa.C.S.A. § 722(5) and Pa.R.A.P. 3331(a)(3).

Received In Supreme Court

NOV 1 0 2014

Middle

2.    Of necessity, the petition recites matters occurring before the Grand Jury and/or matters subject to Sealing Orders signed by the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury.

WHEREFORE, the Pennsylvania Office of Attorney General, through the Attorney General, respectfully requests that this Honorable Court enter an Order granting this Motion for Leave to File Petition for Review with Attached Brief under Seal and sealing this Motion, the Petition for Review and supporting brief pursuant to 42 Pa.C.S.A. § 722(5) and Pa.R.A.P. 3331(a)(3), and any future documents filed in this matter pending further Order of Court.

Respectfully submitted,

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: November 10, 2014

## VERIFICATION

The facts recited in the foregoing Petition for Review are true and correct to the best of my knowledge and belief. This statement is made with knowledge that a false statement is punishable by law under 18 Pa. C.S. § 4904(b).

By: _Kathleen G Kane_
KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: November 10, 2014

3

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving one copy of the foregoing
MOTION FOR LEAVE TO FILE PETITION FOR REVIEW
WITH ATTACHED BRIEF UNDER SEAL
upon the persons and in the manner indicated below:
*Via U.S. First-Class Mail,*
*Postage pre-paid:*

The Honorable William R. Carpenter
Court of Common Pleas of Montgomery County
Montgomery County Courthouse
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-5902
(Supervising Judge)

Thomas E. Carluccio, Esquire
Plymouth Greene Office Campus
1000 Germantown Pike, Suite D3
Plymouth Meeting, PA 19462-2484
(484) 674-2899
(Special Prosecutor)

Ann Thornburg Weiss, Clerk of Courts
Montgomery County Clerk of Courts Office
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-3346
(Clerk of Courts)

By: _____
KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: November 10, 2014

Received in Supreme Court

NOV 1 0 2014

Middle

4

UNSEALED PER ORDER
OF THE COURT DATED
AUGUST 26, 2015

## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : | No. ___ MM 2014 |
| Petitioner | : | |
| V. | : | |
| | : | |
| SUPERVISING JUDGE OF THE | : | FILED UNDER SEAL |
| THIRTY-FIFTH STATEWIDE | : | |
| INVESTIGATING GRAND JURY, | : | |
| Respondent | : | |

---

### BRIEF IN SUPPORT OF PETITION FOR REVIEW

---

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-6348

Date: November 10, 2014

## I. INTRODUCTION

The Pennsylvania Office of Attorney General ("OAG") respectfully requests that this Honorable Court review, and ultimately vacate, the determination of the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury ("the Supervising Judge") encompassed by the four related and interconnected Orders dated August 27, 2014, September 17, 2014, and October 30, 2014 (collectively, "the protective order"). As addressed more fully below, the protective order egregiously violates the state and federal constitutional rights of hundreds of individuals, contravenes statutory law, reflects an outrageous manipulation and exploitation of the Commonwealth's statutory grand jury process, and ignores the direct and unambiguous mandate previously communicated by this Court to the Supervising Judge to conduct a meaningful evidentiary hearing on the question of whether the protective order is necessary and proper.

The protective order violates the state and federal due process rights of the Pennsylvania Attorney General, hundreds of OAG employees, and innumerable people not affiliated with OAG. Although the order purports to apply to "any person" who "has been sworn to grand jury secrecy,"" has or had access to any grand jury information," and/or is "associated with the J. Whyatt Mondesire proceedings and investigation" ("the affected persons"), notice of this broadly-sweeping protective order was provided *only to the governmental agency OAG.* The order proscribes behavior and threatens criminal sanctions upon countless unidentified individuals both within and without OAG, yet not a single one of them has been served with notice in their capacities as individuals.

The protective order was conceived and initially filed in a remarkably partisan fashion, the product of a one-sided *in camera ex parte* proceeding that deprived those who were targeted and eventually subjected to the order -- many of them career officers of the Court sworn to uphold the law -- of *any* opportunity to be heard on the explosive allegations that provoked the Supervising

2

Judge to enter the order. Rather than fully develop a factual record in a disinterested and even-handed fashion, the Supervising Judge inexplicably accepted the covert allegations of OAG's accusers at face value.

Although the Supervising Judge subsequently acquiesced to OAG's request for a hearing after the fact, the process eventually afforded to OAG was hollow and meaningless. OAG was prohibited from accessing the transcript of the initial *ex parte* proceeding and was denied knowledge of the specific factual allegations which formed the basis for the protective order. The deprivation of this information by the Supervising Judge prevented OAG from proceeding in any meaningful way: it had no way of determining precisely what allegations had been leveled, whether rebuttal was necessary, and if so what witnesses to call and what questions to ask.

At the "hearing," the Supervising Judge also precluded OAG from calling its accusers as witnesses and probing the nature, veracity, and credibility of their accusations. The Judge rejected OAG's attempt to subpoena and question a journalist with first-hand personal knowledge regarding: (1) the reason for the timing of the Right-to-Know Act ("RTKA") requests relating to the email accounts of Frank Fina ("Fina") and Marc Costanzo ("Costanzo") submitted to OAG which would have contradicted the *ex parte* testimony of Frank Fina and Marc Costanzo that the release of emails was a retaliatory action against both men by the Office of Attorney General. Since this particular testimony would have been probative as to whether there was any connection between the RTKA requests and the testimony of Fina and Costanzo in Notice No. 123, the Supervising Judge's decision is incomprehensible.[1]

---

[1] The October 30, 2014 Order specifically relies on the factual finding that, "The timing of the Right-to-Know Request naming Frank Fina and Mark Costanzo among others were submitted to the Attorney General's Office at the time they were subpoenaed and/or scheduled to testify." (10/30/14 Order at 1-2).

3

No constitutionally adequate hearing has ever been conducted by the Supervising Judge. For unknown reasons, he has refused to allow meaningful testing of the allegations cleverly and cowardly advanced by accusers who prefer to operate in the shadows, trafficking in calumny and muckraking rather than testifying forthrightly in the light of day.

The order itself is intolerably vague: OAG employees and others are prohibited from engaging in "obstruction," "intimidation," and "retaliation" in connection with the Special Prosecutor's investigation, but because the nature of that investigation is entirely secret, the terms "obstruction," "intimidation," and "retaliation" exist in a vacuum that renders them utterly cryptic. The order supplies no discernable context for its prohibition, rendering the prohibition itself both incomprehensible and perilous for those caught in its web. Without context, a person subject to the order cannot know what action might constitute an infraction.

Not only does this situation violate the notion of fundamental fairness, but it infringes on the First Amendment rights of all affected. The protective order is currently so broad that it encompasses speech by the persons affected relating to any person, subject, or event associated with the secret investigation. Without appropriate constitutional analysis or justification, the Supervising Judge has apparently banned *communication* both within and without OAG regarding Fina, Costanzo, the J. Whyatt Mondesire proceedings, and other unknown and unknowable matters as it relates to the investigation. Because only the Supervising Judge and Special Prosecutor know the nature of the investigation, the persons affected must curtail virtually all speech out of fear that they will unwittingly violate the protective order.

Finally, the protective order violates the Separation of Powers Doctrine of our federal and state constitutions because it improperly infringes on OAG's ability to fulfill its constitutional law enforcement mandate. By way of illustration only: (1) to the extent that perjury or obstruction of the

4

administration of law has been committed by witnesses or others in connection with the Special Prosecutor's investigation, the order purports to render OAG powerless to investigate and prosecute those responsible; (2) to the extent that grand jury material has been leaked to the public from the Special Prosecutor's investigation in violation of grand jury secrecy rules, the order purports to constrain OAG from investigating and prosecuting those responsible; and (3) *to the extent that witnesses in the Special Investigation may have committed crimes or other misconduct unrelated to Notice 123, the order purports to eliminate OAG's power to investigate and prosecute.*

Ultimately, the protective order turns the law on its head. Contrary to the averments of the Special Prosecutor, the Attorney General never has and never will seek to release pornographic emails "as retaliation against certain witnesses who have testified before the grand jury." The Attorney General's decision to serve the public interest by identifying egregious prior misconduct within OAG and the identities of those public servants involved *has absolutely no nexus whatsoever to the Special Prosecutor's investigation.* In truth, the protective order is the product of the maliciously ingenious, craven, and contemptible (and so far successful) efforts of Fina and Costanzo to cynically manipulate and exploit the Supervising Judge, the Special Prosecutor, and the grand jury process in order to avoid being held accountable for misconduct and violation of the public trust during their tenures at OAG. To date, OAG has been denied a fair hearing on this point.

## II. <u>STATEMENT OF JURISDICTION</u>

This Court has jurisdiction over the petition for review pursuant to 42 Pa.C.S.A. § 722(5) and Pa.R.A.P. 3331(a)(3).

## III. <u>SCOPE AND STANDARD OF REVIEW</u>

Appellate court review of a protective order entered pursuant to 18 Pa.C.S. § 4954 examines whether the court that entered the order abused its discretion. *See Commonwealth v. Sandusky,* 70

5

A.3d 886, 897 n.9 (Pa. Super. 2013). An abuse of discretion will be found when a lower court "has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014) (citation omitted).

To the extent that this case presents a question of law, such as the requirement of a hearing, the Court's standard of review is *de novo* and the scope of review is plenary. *Id.*

## IV. TIMELINE

**Jan 15, 2013** – Kathleen G Kane is sworn in as Attorney General of Pennsylvania.

**February 4, 2013** - Attorney General Kane announces the appointment of Professor Geoffrey Moulton to lead an internal after action review of the prosecution of Gerald Sandusky.

**October 2013** – Special Agent Braden Cook devises a complex process to recover Office of Attorney General emails related to the Sandusky case to aid in the review of the Sandusky prosecution.

███████████████████████████████████████████████

███████████████████████████████████████████

**November 2013** – The email recovery process begins.

**February 5, 2014** – Press article in the Center Daily Times reveals that emails thought to be permanently removed are recovered.

**March 2014** - Frank Fina orally demands all of his emails, those related and unrelated to the Sandusky prosecution that were generated during the Sandusky investigation and prosecution time frame be recovered and turned over to him.

**March 11, 2014** – Frank Fina serves second motion for Miscellaneous Relief on Office of Attorney General demanding access to all of his own emails and asks to be informed prior to the Office of

6

Attorney General responding to any Right to Know Requests that name him.

**March 21, 2014** – Special Agent In Charge Peifer after being contact by Special Agent Milletto, interviewed and produced a report of said interview.

**March 22, 2014** – The email recovery process is completed.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

**May 29, 2014** – Special Prosecutor appointed to investigate Office of Attorney General for leak of a 2009 Grand Jury case.

**June 6, 2014** - Philadelphia Daily News article published reporting on OAG review of 2009 grand jury investigation. *See* Exhibit C.

**June 9, 2014** - Braden Cook of Office of Attorney General begins the process of culling Frank Fina's pornographic emails. When completed the Office of Attorney General makes available to Mr. Fina and his counsel all of the recovered emails that they previously sought a court order to obtain. To date neither Mr. Fina nor his counsel has reviewed the emails.

**June 9 – 10, 2014 (approximately)** - Moulton Review of the Sandusky Case turned over to Frank Fina.

**June 20, 2014** – News reports the Attorney General will release Moulton Review on June 23, 2014.

**June 23, 2014**- Moulton Review of the Sandusky Case released to the Public.

**July 7, 2014 – August 13, 2014** - Office of Attorney General receives Right to Know Requests from the Pittsburgh Tribune Review, Philadelphia Daily News, The Morning Call and the Philadelphia

Inquirer for copies of emails depicting sexually explicit images and/ or videos exchanged by current and former staff of the Office of Attorney General.

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

**August 26, 2014** - Frank Fina and Marc Costanzo testify before Grand Jury.

**August 27, 2014** – Following an *in camera ex parte* hearing Frank Fina and Marc Costanzo obtain a Protective Order from Judge Carpenter against the Office of Attorney General.

**August 28, 2014** – Frank Fina makes a Motion for Protective Order with Judge Krumenacker prohibiting the Office of Attorney General from responding to right to know requests as the emails were discovered during an internal review and are protected by the secrecy provisions of the Investigating Grand Jury Act.

**August 31, 2014** - Article in Philadelphia Inquirer identifies OAG as the subject of the Special Prosecutor's investigation of grand jury leaks. *See* Exhibit B.

**September 16, 2014** – Office of Attorney General moves for reconsideration of the Protective Order and argument on the motion was conducted that day.

**September 17, 2014** – Supervising Judge Carpenter modifies the Protective Order but and grants a hearing but fails to set a date for the hearing.

████████████████████████████████████████████

**September 19, 2014**- Judge Krumenacker determines he does not have jurisdiction to block the release of the emails and lifts the stay and unseals the Opinion and Order.

**September 19, 2014** – Office of Attorney General in the instant matter files an Application for Special Relief Pursuant to 42 Pa.C.S. §§502,726, Pa R.A.P. 3309.

8

**September 23, 2014-** Office of Attorney General releases emails for all involved with the exception of Frank Fina and Marc Costanzo who had obtained a protective order.

**October 2, 2014-**Supreme Court decides issue is moot as Supervising Judge has issued an order for a hearing and will await results of said hearing.

**October 6, 2014 –** Office of Attorney General asks Supervising Judge to allow subpoenas for complaining witnesses Fina and Costanzo and that request is denied. Judge Carpenter enters an order denying the Office of Attorney General's request to subpoena Marc Costanzo and Frank Fina.

**October 8, 2014 –** Hearing regarding Protective Order. Hearing cancelled rescheduled for October 9, 2014.

**October 9, 2014 –** Hearing for Protective Order again cancelled rescheduled for October 17, 2014.

**October 14, 2014 -** Article in Philadelphia Inquire outlines Grand Jury investigation and discusses protective order with information that appears to be from the *in camera ex parte hearing*. The information referenced in the article was not made available to Office of Attorney General, however, was clearly available to the news reporter. *See* Exhibit D.

**October 16, 2014 –** Office of Attorney General contacted by Supervising Judge and told to withdraw subpoena that had been issued for October 17, 2014 hearing. OAG serves subpoena for reporter Brad Bumsted of the *Pittsburgh Tribune-Review* for the purpose of developing the record in Notice 123 to demonstrate the falsity of the allegations of Fina and Costanzo as the basis for the protective order. Contrary to published reports, the purpose of this was not to determine the reporter's source of information but rather to establish the lack of candor of Fina and/or Costanzo in representations apparently made to the Supervising Judge and Special Prosecutor. *See* Exhibit E.

**October 17, 2014 -** OAG withdraws a subpoena for reporter Brad Bumsted of the *Pittsburgh Tribune-Review*.

9

**October 17, 2014** – Hearing on Protective Order held in Montgomery County. Office of Attorney was denied access to complaining witnesses, transcript of *in camera ex parte* hearing or Special Prosecutor.

**October 30, 2014** - Supervising Judge issues Order with accompanying Findings of Fact and Conclusions of Law denying motion for reconsideration of amended protective order and rendering final protective order as amended.

**November 3, 2014** - OAG receives October 30, 2014 Order which was sent via regular mail rather than email as is customary.

**November 9, 2014** - A Philadelphia Inquirer article is published which, relying on "sources" and "people with knowledge of the case", outlines dates the Attorney General had been scheduled to appear before the Grand Jury and the reason(s) she was unable to appear. *See* copy of article, attached as Exhibit C. This story, along with others referenced above, purports to contain information occurring "before the Investigative Grand Jury" and, therefore, is in violation of Grand Jury secrecy rules.

## V. PROCEDURAL HISTORY

On June 6, 2014, the Philadelphia Daily News published an article describing a review of a prior Grand Jury investigation by the Pennsylvania Office of Attorney General. The article indicated that the Daily News had obtained a copy of a 2009 internal memorandum drafted by a former Deputy Attorney General regarding the merits of potential charges to be filed and a copy of the transcript of an interview of the lead Agent on the investigation dated March 21, 2014. While neither item is itself a matter occurring before the Grand Jury, the documents may have recited or summarized matters occurring before the Grand Jury. The lower court, as Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury, appointed a Special Prosecutor to investigate any leak of Grand

10

Jury information. This investigation would use the resources of the Thirty-Fifth Statewide Investigating Grand Jury. The Office of Attorney General has attempted to cooperate in the investigation to the best of its ability, despite the fact that current and/or former members of the Office may be targets of the investigation.

On August 27, 2014, the Court issued a protective order pursuant to 18 Pa.C.S. §4954. The Office of Attorney General was not informed of the allegations that gave rise to the Protective Order before it was issued, nor was the Office given the opportunity to address or contest the allegations in this first instance. Section 4954 permits "[a]ny court with jurisdiction over any criminal matter" to issue a protective order "after a hearing and in its discretion, upon substantial evidence." The Order directs the Office of Attorney General to refrain from involvement in the investigative efforts of the Special Prosecutor. It requires all employees of the Office of Attorney General, approximately 800 people, to refrain from engaging in or soliciting obstruction, intimidation or retaliation against any witness summoned by the Grand Jury and cautions that anyone who engages in such conduct may be prosecuted under 18 Pa.C.S. §4955 and/or any other applicable provision of the Crimes Code. The Order prohibits the Office of Attorney General from receiving transcripts of testimony before the Grand Jury and bars employees of the Office of Attorney General from access to transcripts, documents, or other information related to the Special Prosecutor's investigation. Finally, the Order prohibits the disclosure of its contents to anyone outside the Office, under penalty of contempt.

Based on the possible repercussions of the Protective Order, the Office of Attorney General filed a motion for reconsideration that was granted, in part.

As amended by Orders of Court issued September 17, 2014, the Protective Order allowed for the scheduling of a hearing on matters as to which the Court had already made findings pursuant to an *ex parte* "hearing." The Protective Order, as amended, also purports to limit the number of

11

persons subject to the Protective Order to any person subject to Grand Jury secrecy, any person who has or had access to Grand Jury information, and any person involved in a specified investigation. Because the amendment of the Protective Order did not provide adequate relief, in that the people covered by the Protective Order still would number in the hundreds and the Office of Attorney General still was not provided with fair notice as to the allegations on which the Protective Order is based, the Office of Attorney General sought relief in the Supreme Court of Pennsylvania. The Supreme Court dismissed the Petition as moot based on the scheduling of a hearing and directed that the hearing take place. On October 17, 2014, the Office of Attorney General and the Special Prosecutor appeared before the Supervising Judge for the "hearing" as directed by the Supreme Court and as required by 18 Pa.C.S. § 4954. This "hearing" took place nearly two months after issuance of the Protective Order.

The Office of Attorney General attempted to comply with the mandate of the Supreme Court and engage in a hearing as understood under the plain meaning of the word "hearing." To that end, the Office of Attorney General asked leave of the Court to subpoena Mr. Fina and Mr. Costanzo to ascertain the nature and extent of the intimidation that they allege. That request was denied. It should be noted that the OAG only asked leave to subpoena those witnesses as they are the purported "victims" of intimidation leading to the protective order and the OAG did not want any service to be perceived as intimidation.

When the Court refused the Office of Attorney General the opportunity to explore the alleged intimidation with the complaining witnesses, the Office of Attorney General asked the Court for a copy of the in camera hearing transcript. Again the Court denied the request. It should be noted that the Court attached the transcript in a pleading to the Supreme Court, who then forwarded it to the Office of Attorney General. When the Court discovered that the Office of Attorney General had

12

received the transcript, two days after its receipt, the Office of Attorney General was ordered to return the copy or delete it, and was prohibited from talking about or using the contents of the transcript. The Office of Attorney General was essentially ordered to wipe clean the minds of anyone who had seen the transcript and to engage in a pretense that the contents were unknown. As the lawyers representing the Office of Attorney General in the hearing had not read the transcript, they were thus precluded from ascertaining the factual basis of the Order. The Court denied a motion to review the transcript.

Having been denied the opportunity to question the complaining witnesses and being denied the opportunity to review a transcript of the prior hearing, the Office of Attorney General was working in a factual vacuum. The last available option was to ask the Court if the Office of Attorney General could call Special Prosecutor Carluccio, who was present for the in camera hearing and presumably heard the testimony of Fina and Costanzo. The Office of Attorney General was hoping that through him they could learn the nature of the facts that resulted in a Protective Order. Again the Court denied the request by the Office of Attorney General.

Given the failure of the lower court to furnish any relief or even an appropriate hearing, the Office of Attorney General believes that it has no alternative other than to petition this Court for the necessary and appropriate relief, i.e. the vacation of the lower courts August 27, 2014 Protective Order.

## VI. ARGUMENT

For the reasons set forth below, the Office of Attorney General submits that the "hearing" conducted and the Protective Order entered by the lower court are in violation of not only the federal and state Constitutions, but also the statute granting the authority for issuance of the Protective Order.

13

*1.    The Protective Order violates the due process rights of the Office of Attorney General and hundreds of individuals because no constitutionally adequate hearing has been held.*

On August 27, 2014, without notice to the Office of Attorney General or any individual within that Office, the lower court issued the aforementioned Protective Order against the Office of Attorney General.    This Order covers literally hundreds of employees of the Office of Attorney General as well as other individuals outside the office and unabashedly violates the fundamental First Amendment rights of those subject to it, despite the complete absence of any showing that these restrictions are truly necessary to further a compelling state interest.    The net result of this Order is to plunge the entire staff of the Commonwealth's flagship law enforcement agency into a nightmarishly bizarre limbo wherein they are not only prohibited from discussing matters of great importance to themselves, the Office, and the public, but are deprived of any meaningful guidance on what they may or may not do under the terms of the Order that restricts them, because they are prohibited even from discussing the very Order to which they are subject, under pain of contempt.

It is the position of the Office of the Attorney General that the Protective Order is unlawful because it was issued prior to any hearing and without notice to the Office of Attorney General or to any of the hundreds of individuals affected by the Order, including individuals who are not even employed by the Office of Attorney General.  Also, there is no substantial evidence that any person in the employ of the Office of Attorney General intimidated any witness who testified before the Grand Jury.  Finally it is the contention of the Office of the Attorney General that it was the clear intention of the Supreme Court that a hearing was necessary in order to flush out the facts and that the "hearing" afforded by Judge Carpenter was a hearing in name only and

14

the Office of Attorney General was prohibited from conducting a meaningful review of the facts.

The statutory provision on which the Court relied reads as follows:

> Any court with jurisdiction over any criminal matter may, after a hearing and in its discretion, upon substantial evidence, which may include hearsay or the declaration of the prosecutor that a witness or victim has been intimidated or is reasonably likely to be intimidated, issue protective orders, including, but not limited to, the following:
>
> (1) An order that a defendant not violate any provision of this subchapter or section 2709 (relating to harassment) or 2709.1 (relating to stalking).
>
> (2) An order that a person other than the defendant, including, but not limited to, a subpoenaed witness, not violate any provision of this subchapter.
>
> (3) An order that any person described in paragraph (1) or (2) maintain a prescribed geographic distance from any specified witness or victim.
>
> (4) An order that any person described in paragraph (1) or (2) have no communication whatsoever with any specified witness or victim, except through an attorney under such reasonable restrictions as the court may impose.

18 Pa.C.S. § 4954.

By its terms, § 4954 grants to a court with jurisdiction the discretion to enter a protective order and to decide the terms of a protective order, such that review of a protective order would be for an abuse of discretion. *See Commonwealth v. Sandusky*, 70 A.3d 886, 897 n.9 (Pa. Super. 2013). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014) (citation omitted).

Even assuming that such a restrictive Order could properly be entered under the appropriate

15

circumstances, it would surely be necessary to scrupulously follow the most stringent procedures to ensure that the Order was truly necessary and appropriate. As a matter of fundamental procedural due process, an individual may not be deprived of a constitutionally protected interest without a hearing, and a hearing requires notice and an opportunity to be heard; it follows that the opportunity to be heard must be at a meaningful time and in a meaningful manner. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Commonwealth v. Maldonado*, 838 A.2d 710, 714 (Pa. 2003).

In this instance, by contrast, the procedures followed were egregiously lacking and offered no protections whatsoever for those whose rights were about to be infringed, instead running roughshod over any notion of due process or fundamental fairness. The lower Court has afforded the Office of Attorney General no opportunity to be heard and has deprived the Office of Attorney General of basic and essential right to interview, subpoena, or call necessary witnesses to attempt to make its case. In what is a nearly unprecedented occurrence, the lower Court denied the Office of Attorney General the opportunity to truly make a case. This denial of any semblance of due process is a clear violation of constitutional Protections and no Order should trample the rights of one party to in a headlong rush to grant the relief sought by the opposing party. The Order was issued based on testimony from an *in camera*, *ex parte* hearing. At this original proceeding, the Office of Attorney General was afforded no opportunity to question witnesses, test the veracity of their statements, or present evidence to rebut the testimony which the office could have proven.

When the Office of Attorney General asked for subpoenas for the complaining witnesses in preparation for the subsequent "hearing" on the matter, they were denied. When the Office of Attorney General attempted to subpoena a witness that may have information regarding the basis for the order the lower Court instructed the Office of Attorney General to withdraw the subpoena

16

and then suggested that the issuance of a subpoena was contemptuous and perhaps criminal.[2] In light of the handicaps that were imposed on the Office of Attorney General, the "hearing" that was actually held was, at best, perfunctory and, at worst, a charade. In fact, in Judge Carpenter's Order of October 30, 2014, denying OAG's Motion to Vacate the Protective Order, made a finding of fact that OAG produced only one (1) witness but failed to acknowledge that he denied OAG's right to call additional witnesses.

During argument on the Office of Attorney General's motion for reconsideration, the Court indicated that a hearing already had taken place, apparently referring to the occasion on which it entertained the *in camera, ex parte* claims of two former employees of the Office of Attorney General, Frank G. Fina, Esquire, and E. Marc Costanzo, Esquire. Such a procedure is by no means the "hearing" required to satisfy due process before fundamental rights can be infringed. Essentially, the Court has determined that the unsubstantiated representations of a witness in an *in camera ex parte* "hearing" warrants the issuance of an order that affects the fundamental rights of literally hundreds of people who have no relation whatsoever to the matter at issue. In this case, those people include: the Office of Attorney General; every member of the Criminal Law Division of the Office of Attorney General, many of whom work hundreds of miles away in places like Pittsburgh or Erie and who have no connection whatsoever to the Special Prosecutor's investigation or the persons involved in that investigation; every person sworn to Grand Jury secrecy, which would include attorneys who represent witnesses in separate investigations, court reporters, etc., who—again—have no connection

---

[2] As noted above, reporter Brad Bumsted was expected to testify regarding the lack of candor on the part of Fina and/or Costanzo in representations made to the Supervising Judge and Special Prosecutor. If permitted to testify consistent with conversations with OAG employees, reporter Bumsted would have categorically denied the occurrence of events described by Fina and/or Costanzo.

17

whatsoever to this investigation; and any person "associated with" the underlying investigation, which would include witnesses, investigators, Mr. Fina and Mr. Costanzo, and even the former Supervising Judge.

None of these people, apart from Frank Fina and Marc Costanzo, were ever given notice and an opportunity to be heard. Moreover, there was no challenge to the testimony of the complaining witnesses; it was simply accepted on its face and adopted. The Court has indicated that it is relying on *Commonwealth v. Hood*, 872 A.2d 175 (Pa. Super. 2005), which allowed an ex parte hearing in support of a protective order allowing witnesses to remain unnamed in a first-degree murder prosecution. *Hood* involved a first degree murder prosecution, not the intimidation of a witness. The issue before the Court in *Hood* was whether the defendant was denied his federal and state constitutional right to counsel when the Commonwealth was permitted to conceal the identity of key witnesses prior to trial, as many of the eyewitnesses to a heinous murder were understandably reluctant to testify. The Superior Court held that there was no violation of constitutional rights as the defendant was told of the witnesses at the time of trial and given ample opportunity to investigate their statements and to cross-examine the witnesses. Thus information was provided to the defendant before the ultimate issue of fact was decided and before he suffered any penalty. This Court in the case at hand has decided the ultimate issue of fact and assessed a penalty, all without providing the relevant information to the Office of the Attorney General. If *Hood* requires the ultimate disclosure of information in a murder case where witnesses' lives are at risk, then certainly the OAG is entitled to the relevant information where two seasoned prosecutors, neither of whom could be characterized as meek or timid, were made to feel "uncomfortable."

To suggest that the Office of Attorney General was actually afforded a meaningful hearing is absurd and factually inaccurate. What the Court afforded the Office of Attorney General was the

18

opportunity to appear in Court, but not the opportunity to actually present its case. The Office of Attorney General would have been forced to violate a core tenant of legal advocacy by attempting to elicit testimony from witnesses without knowing their relevance to the issue before the court. In denying the Office of Attorney General a hearing in any true sense of the word, the Court has defied the wishes of the Supreme Court and has again disregarded constitutional protections afforded to the Office of Attorney General and its employees in favor of holding a proceeding that was a closer approximation a Stalinist show trial than a fair proceeding under the laws of this Nation and this Commonwealth.

2. *The Court's manner of proceeding has violated the Separation of Powers Doctrine because the Office of Attorney General cannot fulfill its law enforcement function.*

Because, consistent with the Protective Order, the Office of Attorney General cannot take any action that relates in any way to the Special Prosecutor's investigation, it cannot fulfill its function as a law enforcement entity. The Attorney General is the chief law enforcement officer of the Commonwealth. 71 P.S. § 732-206(a). Despite this position, she and her appointed deputies cannot investigate leaks of matters occurring before the Grand Jury. As but one example, the *Philadelphia Inquirer* recently published information relating to an encounter between a friend of Attorney Fina and an employee of the Office of Attorney General, indicating that the Protective Order is based on that encounter. A reporter has indicated that the paper has the "motion" for the Protective Order, apparently referring to the transcript to which the Office of Attorney General has been denied access. *See* Exhibit D. In other words, the leaks of matters occurring before the Grand Jury are ongoing, and the Office of Attorney General's hands are tied. In a bizarre twist, it would appear that the media has greater access to information in a leak investigation than the parties involved. Instead of the Office of Attorney General performing its statutory and constitutional function, the Special

19

Prosecutor, at the direction of the Court, has assumed sole responsibility for this Executive function. *See generally Robinson Twp. v. Commonwealth*, 83 A.3d 901, 991 (Pa. 2013). The Protective Order is unconstitutional for this additional reason.

The Office of Attorney General also cannot investigate and flush out any crimes that may have been committed regarding information provided to the Supervising Judge. As the Office of Attorney General has no access to the facts it is impossible for the chief law enforcement officer of the state to ensure that the information provided to the Court is true and correct.

*3. Substantial evidence of witness intimidation cannot have been provided to the Court.*

The Office of Attorney General, having, essentially no knowledge of the factual basis of the Protective Order, submits that substantial evidence of witness intimidation cannot have been provided to the Court. While merely guessing at the facts, the Office of Attorney General questioned some employees known to have been in and around the Grand Jury Suite on the day in question. In the answer to the Application for Special Relief, the Special Prosecutor referred to contact between agents of the Office of Attorney General and Frank Fina and Marc Costanzo. The Grand Jury suite is located in the same building and on the same floor as the Norristown offices of the Office of Attorney General; contact with the witnesses would be virtually unavoidable. On the day of their testimony, Frank Fina and Marc Costanzo encountered Special Agent Michael A. Miletto on their way to the Grand Jury room. Agent Miletto was involved in the investigation that is the subject of the Special Prosecutor's inquiry and has previously testified before the Grand Jury. The precise nature of the encounter between Agent Miletto and Attorneys Fina and Costanzo is unclear. The Office of Attorney General has been prohibited from learning the facts surrounding the encounter, but Agent Miletto denies that any act of obstruction, intimidation, or retaliation occurred on August 26, 2014, or that any act of his could reasonably be construed as such. The Office of

20

Attorney General had planned on presenting employees for testimony to refute intimidation but could not do so when denied the basic factual basis of the intimidation allegations by the Court.

To this, it should be added that both Frank Fina and Marc Costanzo are highly experienced prosecutors who have not only associated with law enforcement officers on a regular basis, but have supervised many law enforcement officers, including agents of the Office of Attorney General. Neither would be intimidated by an elevator ride with agents. The fact that the conduct of the agents did not deter either attorney from testifying shows that neither was, in fact, intimidated.

In the answer to the Office of Attorney General's Application for Special Relief, the Special Prosecutor referred repeatedly to the disclosure of emails containing pornographic content or attachments. In fact, the reference was repeated approximately twenty (20) times. The Special Prosecutor also states in his answer that the *ex parte* hearing was held on August 25, 2014 before the two (2) witnesses testified *before* the Grand Jury on Tuesday, August 26, 2014. Recently, there has been considerable media coverage relating to the release of information about the exchange of such emails by members and former members of the Office of Attorney General under prior administrations. These emails were discovered during a review of the investigation and highly publicized prosecution of Gerald A. Sandusky for sexual contact with underage boys and at the insistence of the complaining witness, Frank Fina.

During that review, the Office of Attorney General sought a number of disclosure orders from the Honorable Norman A. Krumenacker III, who was specially appointed to handle matters relating to the Sandusky investigation. Some of those disclosure orders related to interviews of Frank Fina. As a part of that process, Mr. Fina insisted that not only his emails found within the context of the Sandusky review be turned over to him, but all emails that he had sent and received during that time period be recovered and turned over. The Office of Attorney General believed the total email history

21

unnecessary and Attorney Fina sought a court order to recover all emails. Those emails had been deleted from the archived electronic records of the Office of Attorney General. However, the Office of Attorney General was able to retrieve the emails. While reviewing the emails, the Office of Attorney General learned that the pornographic emails existed. Attorney Fina suddenly lost interest in the emails; he and his counsel failed to appear at the Office of Attorney General to review the material they fought so hard to obtain.

While considering what to do with the emails and consulting human resources experts and lawyers in the Civil Law Division, the Office of Attorney General began to receive requests for records under the Right to Know Law. In order to be fair, the Office of Attorney General then sought the opinion of outside counsel regarding its Right to Know Law responsibilities. Shortly thereafter, Attorney Fina sought and obtained from Judge Krumenacker an order prohibiting the release of the emails pending a determination by Judge Krumenacker as to whether he had jurisdiction to block the release permanently. The public interest in the emails began to rise and Attorney Fina then sought a protective order, apparently stating that the emails were a ploy to keep him and Attorney Costanzo from testifying before the Grand Jury. By the time that Judge Krumenacker determined that he did not have jurisdiction, Attorney Fina had obtained his Protective Order implicitly barring release of the emails. During that time, the independent counsel determined that the emails were not records subject to the Right to Know Law but that the Attorney General had the discretion to release them if she determined that the disclosure would be in the public interest. The Attorney General in fact made that determination and has released the emails with the exception that any reference to Mr. Fina and Mr. Costanzo was omitted.

It is without question that it is of interest to the public that a Chief Deputy Attorney General, overseeing the prosecution of sexual offenses, was sending emails of pictures of duct tape with a

22

caption, "Duct tape turns no, no, no to MMMMMM". It is without question that emails titled "Men in Training" which photographically depict a prepubescent girl hold her underpants open while an even younger boy looks down her pants are of interest to the public. It is further without question that a video clip emailed where five men holding the limbs of one woman put a champagne bottle into her vagina as it is exploding and then one man drinks the liquid from her vaginal area is of interest to the public. Emails of this nature are of great interest to a public who would like to believe that prosecutors, supervising and prosecuting sexual offenses, are not mocking nonconsensual sexual acts or finding humor in minors used for sexual innuendo.

A review of this situation does not show any attempt to retaliate. Instead, it appears to be an elaborate scheme to keep from the public eye bad and unforgiveable behavior. The Office of Attorney General cannot know the subject of Attorney Fina's testimony because it does not have access to that testimony. As far as can be discerned, Attorney Fina would be a background witness based on his knowledge of the investigation about which there may have been a leak. There is no reason for retaliation from the Office of Attorney General. Attorney Fina did not work for the Office of Attorney General at the time in which information was allegedly leaked. The Grand Jury process is being manipulated to protect Attorney Fina and keep his own misconduct out of the view of an interested and deserving public.

The Court has issued a Protective Order despite the absence of any connection between the emails and the Special Prosecutor's investigation. In fact, a number of prominent persons have been seriously impacted while Attorney Fina has been granted immunity, despite the absence of any reasonable inference that disclosure of the emails relates to his Grand Jury testimony. The fact is that the emails were discovered at the insistence of Attorney Fina, and to suggest that the OAG has devised a conspiracy to use the emails to silence Attorney Fina is illogical and not supported by fact.

23

Attorney Fina is alone responsible for the recovery of the emails that are of interest to the public and are in no way related to the Grand Jury inquiry. It was he who insisted that the emails be recovered and it is he who continues to use Court action to keep them secret. The end result of Fina's machinations is not only that the Office of Attorney General has been prohibited from fully informing the citizens of this Commonwealth about a matter of great public interest and importance, but also that the information that the Office has been permitted to release is incomplete, thus giving the public an inaccurate and skewed impression of the conduct that actually took place.

## VII. CONCLUSION

For the foregoing reasons, the Pennsylvania Office of Attorney General respectfully requests that this Honorable Court vacate the protective order of the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury encompassed by the four related and interconnected Orders dated August 27, 2014, September 17, 2014, and October 30, 2014.

Respectfully submitted,

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

Office of Attorney General
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

November 10, 2014

24

# EXHIBIT "A"

52° John Bolaris' Forecast »
Philadelphia, PA

**philly⦿com**

Search          Subm    The Inquirer DAILY NEWS

🏠 | News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING NEWS VIDEO VOICES/BLOGS PHILADELPHIA NEW JERSEY POLITICS EDUCATION OPINION OBITUARIES NATION/WORLD WEATHER TRAFFIC LOTTERY

Show Ad ⌄

# State A.G. probed Philly NAACP leader Mondesire's finances 5 years ago

Share  Tweet          Reddit   Email



J. Whyatt Mondesire, former President of the Philadelphia Chapter of the NAACP on August 10, 2009. (David Maialetti / Staff Photographer)



Toy?
It's Tech!

Miniscule projector with Maximum Mobility and Viewing Enjoyment!

LG Minibeam
PH300

**CHRIS BRENNAN,** *Daily News Staff Writer brennac@phillynews.com, 215-854-5973*

LAST UPDATED: Thursday, June 5, 2014, 9:45 PM

**DAILY NEWS** STATE ATTORNEY General Kathleen Kane is reviewing a 2009 grand-jury investigation of J. Whyatt Mondesire, former head of the NAACP in Philadelphia, and one of his employees, according to documents obtained by the *Daily News*.

Mondesire's employee, Harriet Garrett, and her daughter pleaded guilty in 2010 to stealing nearly $220,000 in state grant money for a job-training program. Garrett was sentenced to a minimum of six months in jail and ordered to pay restitution. Her daughter got 18 months' probation.

A 2009 memo written by then-Deputy Attorney General William Davis Jr. says investigators "uncovered what appeared to be questionable spending" of state money by Mondesire.

Kane, a Democrat, is now trying to determine what happened with the Mondesire investigation. Gov. Corbett, a Republican, was the attorney general at the time.

MORE COVERAGE
**Police probe shooting at upper Montco complex**
**Christie chief of staff subpoenaed**

*Latest News Video*


Raw: Daredevils Walk Tightrope at Victoria Falls AP

**More videos:**


*Most Viewed News Stories:*


Bouncers shoot man at Phila. strip club


Teen pulls Philly cop from burning car


Another teacher assaulted at Bartram


Kane's car crash derailed testimony again


US bishops struggling to adapt to pope

**Travel Deals**



**$249 & up -- Ends 11/16:**
Caribbean Cruise Sale
w/Upgrades
See all travel deals »

LISTED BY **TRAVELZOO**
'Some taxes, fees additional

**Weekly Circulars**



**TARGET USA:**
Buy Two, Get One Free
All Video Games
THIS WEEK ONLY



**STAPLES:**
Make More Happen For
Less
THIS WEEK ONLY

See More Circulars »

Mondesire, 64, says he was never questioned and denies any financial wrongdoing.

The 2009 Davis memo detailed for his bosses what had been uncovered about Mondesire and Garrett, who worked at the *Philadelphia Sunday Sun*, a weekly newspaper Mondesire publishes.

A nonprofit called Next Generation Community Development Corp., which is operated by Mondesire, held a state-government grant for a jobs-training program in 2004 and 2005, but handed it off to Garrett, who ran another nonprofit called Creative Urban Education Systems, or CUES, according to the Davis memo.

Mondesire was listed as chairman of the CUES board, the memo noted, while Garrett served as the treasurer for Next Generation's board.

Davis wrote his memo to then-Chief Deputy Attorney General Frank Fina and then-Senior Deputy Attorney General E. Marc Costanzo.

Corbett, as attorney general, named Fina in 2006 to head a new public-corruption unit and Costanzo to work on cases for the unit in the Philadelphia region.

Fina and Costanzo now work in a similar unit for District Attorney Seth Williams.

In the memo, Davis wrote:

* Next Generation's bank-account records, obtained with a grand-jury subpoena, showed deposits of $1.3 million in government grants in a one-year period.

Another $521,000 in the account came from political campaigns, rent payments and the intermingling of money from the *Sunday Sun*, which is owned and operated by Mondesire, the memo said.

* Next Generation paid $2,273 to the Philadelphia Club, a private and exclusive club in Center City.

* Next Generation spent "tens of thousands," writing checks to pay Mondesire's American Express bill for "clothes, food, lodging gas and entertainment" and a loan from Mellon Bank. There were also checks written to Mondesire and to "cash."

* Next Generation wrote checks for $169,960 to Charles and Claudia Tasco and their company, C&C Construction. (Charles Tasco is the son of City Councilwoman Marian Tasco, a friend and political ally of Mondesire's for more than three decades.)

* $6,431 in CUES money was given to Mondesire for what Garrett called consulting. That type of expense was not allowed, according to the rules of the grant.

* In "various correspondence" between Garrett and Mondesire discovered by investigators, she questioned payments of more than $70,000 he made to Claudia Tasco.

* CUES paid $1,099 for health insurance for Mondesire.

* Davis wanted to question Mondesire - and possibly subpoena him for sworn grand-jury testimony - about Garrett, CUES and Next Generation.



*Also on Philly.com*

BUSINESS:
 GM ordered switches nearly 2 months before recall

HEALTH:
 The 5 best exercises for runners

SPORTS:
 Sanchez has chance to be great

ENTERTAINMENT:
 Stephen A. Smith to broadcast from UPenn

FOOD:
 Rockhill: Pizza and steaks return to a Cherry Hill landmark

JOBS:
 How should I manage my workload while I'm on vacation?

*Stay Connected*

Get the latest Philly.com Daily Headlines newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member? O Yes  O No


A DAILY NEWS ORIGINAL DAILY NEWS
FOR THE COMPLETE
DAILY NEWS EXPERIENCE,
BECOME A MEMBER!
JOIN OR LOGIN NOW >

**Never questioned**

Mondesire, a former *Inquirer* reporter who served as the top aide to the late U.S. Rep. Bill Gray, said no one from the A.G.'s Office ever questioned him.

"We didn't use any money for personal gain," Mondesire said.

He said that he has not seen the A.G. Office's documents and twice declined an offer from the *Daily News* to review them.

Mondesire said C&C Construction worked on four properties, including the NAACP headquarters and his newspaper office, where the Next Generation non-profit is also located.

"We bought supplies with my American Express card for construction," he said.

"They never asked me a single question back in 2009. We rehabbed the buildings. We spent money buying stuff for the buildings, construction and paying off developers."

Garrett declined to comment about the investigations. Her daughter did not respond to requests for comment.

The May 2010 news release about Garrett's arrest featured Corbett laying out the charges.

Corbett did not respond this week to two questions: Was he briefed on the Mondesire investigation and did he play a role in deciding what happened with that probe?

Mondesire was suspended by the NAACP's national headquarters in April after he feuded publicly with board members about the finances of the local chapter and Next Generation.

Those board members - Sid Booker, Donald "Ducky" Birts and the Rev. Elisha Morris - also were suspended.

Booker and Morris, who say they are still Next Generation board members, are now asking a Common Pleas judge to force Mondesire to show them the nonprofit's financial records.

As a judge considers that request, Kane's staff is reviewing what became of the 2009 Mondesire probe.

David Peifer, who heads the A.G.'s Bureau of Special Investigations, on March 21 interviewed Michael Miletto, the special agent who investigated Garrett and Mondesire.

The *Daily News* obtained a transcript of that taped interview.

Miletto told Peifer that he subpoenaed Next Generation's bank account, the transcript shows.

"When I did that, I found that there was a whole bunch of money that appeared to me to be donations to the NAACP, not [Mondesire], and they were going into Next Generation's account and they were being used for [Mondesire's] lifestyle - much of it," Miletto told Peifer.

Miletto said he was taken off the case after Fina and Costanzo were told about the probe, according to the transcript.

Miletto said "criminal activity was just ignored" after that. He added that two accountants who had worked for Mondesire had provided taped statements, with one asking for immunity and the other asking for protection.

Fina and Costanzo declined to comment about the Mondesire investigation, citing the secrecy of grand-jury proceedings.

Davis, now in private practice, also declined to comment, citing the same restriction.

Miletto, who still works for the A.G.'s office, also declined to comment.

Peifer referred questions to Kane's communications staff.

J.J. Abbott, a spokesman for Kane, declined to comment.

**The Kane-Fina feud**

Fina and Costanzo have a complicated and controversial relationship with Kane.

Kane criticized Corbett's tenure as attorney general when she ran for office in 2012, specifically targeting the Penn State child-abuse scandal that sent former assistant football coach Jerry Sandusky to prison.

Kane's staff is now conducting an extensive review of that investigation.

Fina led the Sandusky probe.

Kane, on Feb. 5, issued a statement noting that her office's Sandusky review had been underway for one year, adding that delays in the undertaking "will be described in more detail when the report is made public."

A month later, the *Inquirer* reported that Kane declined to pursue an investigation previously led by Fina and Costanzo, starting in 2010, that used Philadelphia lobbyist Tyron Ali as a confidential informant to tape conversations with four Philly state representatives and a former Traffic Court judge. On the tapes, the representatives and judge accept cash or gifts from Ali.

Kane has said Fina dropped 2,033 criminal counts against Ali, who had been charged with stealing $430,000 from a state program, 24 days before she was sworn into office.

She said that "extraordinarily lenient" deal "crippled the chance of this case succeeding in prosecution."

Fina, in a letter published by the *Inquirer* a week after the first story ran, called on Kane to explain her decision.

The *Inquirer* also published a letter that day from Fina's boss, Williams, critical of Kane.

Kane eventually turned over the Ali case file to Williams, who is now examining whether charges can be brought against the four representatives and the Traffic Court judge, who is currently on trial in an unrelated federal corruption case.

**On Twitter:** @ChrisBrennanDN

Blog: ph.ly/PhillyClout.com

**CHRIS BRENNAN**
*Daily News Staff Writer brennac@phillynews.com,*
*215-854-5973*

# EXHIBIT "B"



# Special prosecutor probes Pa. Attorney General's Office

Share | Tweet | | | Reddit | Email



Pa. Attorney General Kathleen G. Kane faces questions over how her office handled secret records. A special prosecutor has issued subpoenas to her office, others. MICHAEL BRYANT / Staff Photographer, file

**Craig R. McCoy and Angela Couloumbis,** *Inquirer Staff Writers*

LAST UPDATED: Sunday, August 31, 2014, 1:08 AM

**The Inquirer** A special prosecutor is investigating whether the office of Pennsylvania Attorney General Kathleen G. Kane leaked confidential grand jury material to a newspaper in a bid to strike back at former prosecutors in the office who had been critical of her, according to several people familiar with the matter.

The special prosecutor has issued several subpoenas to Kane's office and others to explore how secret records became public this year about a 2009 investigation by the Attorney General's Office involving Philadelphia political activist J. Whyatt Mondesire, the sources said.

Though there have been periodic inquiries into grand jury leaks in the past, this appears to be first time the state attorney general or top staffers in the office have come under scrutiny.

Advertisement

 Here are 25 of the most gorgeous cheerleaders on NFL sidelines.

 Shop Brilliant Earth's beyond conflict free diamond rings, antique rings, and fine jewelry!

 Top 10 Richest Women In The World

 If you owe less than $625,000 on your home, use the President's Refi Program to save up to $3,000/Yr

 The 40 MPG Cars of 2014

 29 of The Most Well Endowed in Hollywood!

*Latest News Video*



More videos:

 

*Most Viewed News Stories:*



**MORE THAN 50,000 DIFFERENT MOVIES AND SHOWS.**

***Travel Deals***



**$249 & up -- Ends 11/16:**
Caribbean Cruise Sale
w/Upgrades

See all travel deals »

LISTED BY **TRAVELZOO**
'Some taxes, fees additional

***Weekly Circulars***



**BUY TWO**

**TARGET USA:**
Buy Two, Get One Free
All Video Games
THIS WEEK ONLY



**MAKE more HAPPEN FOR LESS**

**STAPLES:**
Make More Happen For
Less

Reached for comment late Saturday afternoon about reports of the leak probe, J.J. Abbott, a Kane spokesman, referred those questions to Renee Martin, Kane's acting communications director. Martin did not return phone calls.

It is unclear who commissioned the investigation, nor was The Inquirer able to determine the special prosecutor's name. But typically, sources said, such a decision would need approval from the Pennsylvania Supreme Court.

A person who violates grand jury secrecy rules may be found guilty of contempt of court and sentenced to up to six months in prison.

The leak inquiry was prompted by a Philadelphia Daily News article in June that drew heavily upon a 2009 internal memo prepared as part of a grand jury investigation that summarized the status of the Mondesire probe.

The newspaper story questioned whether top prosecutors in the office at the time, including then-Chief Deputy Attorney General Frank G. Fina, had pursued the Mondesire probe aggressively.

Over the last year, Kane, a Democrat, has been locked in an increasingly bruising battle with Fina and other former prosecutors and investigators who worked under her Republican predecessors over how certain high-profile cases were handled.

Critics have faulted Kane for her decision to shut down a sting launched by Fina that sources and investigative documents say captured five Philadelphia Democratic officials taking cash payments or gifts.

The Daily News article based on the leak seemed to suggest Fina and other former state prosecutors had fallen short in pursuing a case against Mondesire.

Fina did not return telephone calls seeking comment for this article. In a previous interview, he adamantly denied any suggestion that he did not aggressively pursue the Mondesire investigation, as has the lead prosecutor who was assigned to that probe.

No charges were filed in that case. Mondesire, a longtime leader of the NAACP in Philadelphia, has denied any wrongdoing.

In a twist, the special prosecutor's leak investigation has intersected with a separate and seemingly unrelated legal fight involving many of the same combatants in another matter: the exchange of sexually explicit e-mails among former and current state officials.

The messages, shared on state computers and sometimes through government e-mail accounts, are said to have contained pornographic images, jokes, cartoons, and other private messages, according to people familiar with them.


Bouncers shoot man at Phila. strip club


Kane's car crash derailed testimony again


US bishops struggling to adapt to pope


Merchants say cigarette tax is a business-killer


Pa. official's complicated life as a lesbian

***Also on Philly.com***

BUSINESS:


GM ordered switches nearly 2 months before recall

HEALTH:


The 5 best exercises for runners

SPORTS:


Sanchez has chance to be great

ENTERTAINMENT:


Stephen A. Smith to broadcast from UPenn

FOOD:

THIS WEEK ONLY

**See More Circulars »**

Not all the recipients are known. By some accounts, some of the material was circulated among scores of officials, from homicide investigators in the Attorney General's Office to state prosecutors and other state officials, including top Pennsylvania jurists.

The Inquirer and other news organizations have filed Right-to-Know requests with the Attorney General's Office seeking information about those e-mails, but a judge has blocked the office from deciding whether they can be released.

The e-mails have become an issue in connection with the leak inquiry, with some Kane critics arguing that Kane's office is using the threat of their release as a way to silence criticism, sources told The Inquirer.

In an article published Saturday, the Pittsburgh Tribune-Review reported that the Attorney General's Office, in response to that newspaper's Right-to-Know request, had said a judicial stay barred the office from saying whether it could release the e-mails.

Martin, Kane's chief spokeswoman, told the Pittsburgh newspaper she could not reveal the name of the judge or the court that issued the stay.

That a judge has issued a temporary stay suggests that legal fight is ongoing.

The leak investigation by the special prosecutor was launched after a June 6 article in the Daily News that Kane was reviewing a 2009 grand jury investigation into the finances of Mondesire, former head of the NAACP Philadelphia chapter, and of one of his employees.

The article cited a 2009 memo written by then-Deputy Attorney General William Davis Jr. to Fina and then-Senior Deputy Attorney General E. Marc Costanzo. Among other things, the memo said investigators had "uncovered what appeared to be questionable spending of state money by Mondesire." The article also listed examples of the alleged questionable spending Davis had included in the memo.

The Daily News article said Kane wanted to find out what happened with the investigation. Mondesire said state prosecutors never interviewed him.

In an interview with The Inquirer this summer, Davis said it was false to suggest Fina had impeded the probe.

The Daily News article reported that a top Kane aide had in March interviewed an investigator with the Attorney General's Office who had worked on the Mondesire case. The Daily News obtained a tape of that interview. In it, the paper reported, the investigator said he had been taken off the case after he told Fina and Costanzo about his work.

Davis, in the interview with The Inquirer, said that the agent in question had been replaced and that the probe had continued. "It wasn't dropped," Davis said.



make over a South St. bar

JOBS:



How should I manage my workload while I'm on vacation?

*Stay Connected*

Get the latest Philly.com Daily Headlines newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member? ○ Yes ○ No

AN INQUIRER ORIGINAL | The Inquirer

DISCOVER THE IMPROVED INQUIRER
MORE YOU
LEARN MORE ▷

For Fina and other former prosecutors and investigators in the Attorney General's Office, and for Kane and her top command, the quarrel over the alleged grand jury leaks, the handling of the Mondesire case, and the sexually explicit e-mails is the latest skirmish in a war that dates to Kane's 2012 bid for office.

In that race, Kane sharply criticized Fina's leadership of the investigation into serial child sex abuser Jerry Sandusky. She suggested political consideration delayed the probe into the former assistant football coach at Pennsylvania State University.

She also hired a former federal prosecutor to reinvestigate the Sandusky case. In a recent report, that ex-prosecutor said he found no evidence the probe had been delayed for political reasons but said the investigation might have moved more quickly.

In her first months in office, Kane also secretly shut down a probe Fina began that sources and investigative documents say caught five elected officials, all Philadelphia Democrats, on tape taking cash, money orders, or, in one case, a $2,000 bracelet.

After The Inquirer this year revealed Kane's decision to end the sting, she said the investigation had been carried out poorly and was possibly tainted by racial targeting. All five caught on tape are African American.

Fina vigorously defended the investigation. His current boss, Philadelphia District Attorney Seth Williams, has taken on the case.

In recent years, judges have approved a series of probes to get to the bottom of leaks, such as information that became public in news stories about the separate investigations into former casino operator Louis DeNaples and Sandusky.

Judge Barry Feudale jailed a former investigator with the Attorney General's Office for leaks related to an investigation into prison conditions in Lackawanna County.

Feudale jailed him for the maximum time permitted at the time for that form of contempt of court, 15 days. After Feudale complained vigorously that such a penalty was too mild, the possible maximum was increased to its current six months.

---

acouloumbis@phillynews.com

717-787-5934

@AngelasInk

---

Craig R. McCoy and Angela Couloumbis
*Inquirer Staff Writers*

---

# EXHIBIT "C"

# philly°com

Search    Subm    The Inquirer DAILY NEWS

🏠 | News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING NEWS VIDEO VOICES/BLOGS PHILADELPHIA NEW JERSEY POLITICS EDUCATION OPINION OBITUARIES NATION/WORLD WEATHER TRAFFIC LOTTERY

Show Ad ⌄

# Kane's car crash derailed testimony a second time

Share | Tweet | | Reddit | Email | 253 COMMENTS



The 1999 Jeep that Attorney General Kathleen Kane's SUV hit early on the morning of Oct. 21 in Dunmore, Lackawanna County. DAVID SWANSON / Staff Photographer



**Craig R. McCoy and Angela Couloumbis,** *Inquirer Staff Writers*
LAST UPDATED: Sunday, November 9, 2014, 1:10 AM

**The Inquirer** The early-morning car accident that left Pennsylvania Attorney General Kathleen G. Kane with a concussion last month occurred hours before she was scheduled to testify in a grand jury investigation into possible improper leaks by her office, according to people with knowledge of the case.

It was the second time this fall Kane canceled plans to take the stand, the sources said.

Kane was scheduled to appear that morning in a Montgomery County courtroom, where a special prosecutor is examining how confidential records about a 2009 investigation run by her Republican predecessors became public.

Her testimony has been rescheduled for later this month, the sources said. The grand jury expires within a few weeks, they said.

MORE COVERAGE
**Wolf likely will face difficult dealings with GOP**

Renee Martin, Kane's spokeswoman, declined to discuss any matter related to the grand jury. She has said her office cannot even confirm or deny the existence of one.

*Travel Deals*

Advertisement


Women have been urged to cease posting these kinds of photos on social media.


Find out how Wells Fargo Advisors work with you to help you reach your goals.


Top 10 Richest Women In The World


Odd Trick "Fights" Diabetes


The 40 Sexiest And Most Revealing Celebrity Selfies And Twitter Pics of All Time!


Shop Brilliant Earth's beyond conflict free diamond rings, antique rings, and fine jewelry!

*Latest News Video*



More videos:

 

*Most Viewed News Stories:*


Teen pulls Philly cop from burning car


Bouncers shoot man at Phila. strip club



**$249 & up — Ends 11/16:**
Caribbean Cruise Sale
w/Upgrades

See all travel deals »

LISTED BY **TRAVELZOO**
'Some taxes, fees additional

---

*Weekly Circulars*

---



**TARGET USA:**
Buy Two, Get One Free
All Video Games
THIS WEEK ONLY

---



**JCPENNEY:**
Get an Extra 20% Off with
Your JCP Credit Card and
Coupon
EXPIRES TOMORROW

---

See More Circulars »

She did say that Kane, 48, was recuperating and working from her home in Clarks Summit, about 10 miles north of Scranton, and that her doctors had forbidden her to travel. Martin said that she did not know when Kane was expected to return to work in Harrisburg but that the attorney general was connected with the office by computer and phone. She added: "It's not affecting how work is done here."

The Inquirer has reported that lawyer Thomas E. Carluccio is the special prosecutor for the grand jury sitting in Montgomery County. His appointment was authorized by Chief Justice Ronald D. Castille. In his position, Carluccio is examining an alleged leak to the Philadelphia Daily News about a 2009 grand jury inquiry into the finances of activist J. Whyatt Mondesire, former head of the Philadelphia NAACP.

Violating grand jury secrecy rules can be punished by up to six months in prison.

The Daily News story questioned whether Frank G. Fina and another ranking prosecutor in the Attorney General's Office had pursued the Mondesire probe aggressively. No charges were filed against Mondesire.

Fina has been locked in an increasingly bitter and public battle with Kane over how cases were handled.

As part of Carluccio's probe, his investigators have subpoenaed Kane and other officials on her staff.

Kane's first planned appearance was canceled because she had a scheduling conflict, the sources say. It was rescheduled for Oct. 21.

Just before 7 that morning, the SUV carrying Kane and her security detail hit an empty parked car in Dunmore, a small town near Scranton, according to a police report. The vehicle that was hit - a 1999 Jeep - had dents on one side when an Inquirer photographer took photos of it last week.

The two agents with Kane at the time were Patrick Reese and Robert Ruddy. Both had been Dunmore police officers before Kane hired them last year. Reese had been the police chief, Ruddy a veteran officer.

According to the police report, Ruddy was driving and Reese was in the front passenger seat.

The accident report by Dunmore police, released by Martin on Oct. 31, said the crash occurred when the driver of the SUV lost sight of the dark, rain-slicked road as his iPad slipped off the seat.

There was disagreement about whether Kane was wearing a seat belt.

The report said Kane and the men were wearing shoulder and seat belts. But Martin said Kane was not belted in and struck her head on impact. The cost of the damage to her car was estimated at $964, state records show.

None of the three was taken to a hospital by emergency medical personnel, according to the police report. Kane did go to the emergency room, and subsequently visited her doctor, Martin said.

Kane's office did not release information about the accident until The Inquirer asked about it 10 days after the crash.



Another teacher assaulted at Bartram



Kane's car crash derailed testimony again



US bishops struggling to adapt to pope




00:03 02:14

*Also on Philly.com*

**BUSINESS:**



The 10 worst cars of all time

**HEALTH:**



The 5 best exercises for runners

**SPORTS:**



Sanchez has chance to be great

**ENTERTAINMENT:**



Stephen A. Smith to broadcast from UPenn

**CRAIG LABAN**



Bardot: Sophisticated, if a bit faux, French fare **ⅠⅠ**

**JOBS:**



How should I manage my workload while I'm on vacation?

*Stay Connected*

Get the latest Philly.com Daily Headlines newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member? ○ Yes ○ No

Martin said the office didn't report the crash because it considered it a minor matter that did not affect the office's performance.

She said she also expected Dunmore police to issue the news. That didn't happen. Dunmore Police Chief Sal Marchese didn't return calls from The Inquirer. He told the Scranton Times-Tribune there was "no particular reason" for not issuing the news.

Martin said last week all the participants were recovering. "We thank everyone for their concerns," she said in a statement.



---

acouloumbis@phillynews.com

717-787-5934 @Angelasink

# EXHIBIT "D"

Monday, November 10, 2014

Member Login: **Sign In** | **Register**  f  t  g

52°  John Bolaris' Forecast »
Philadelphia, PA

**philly°com**

Search          Subm

News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING  NEWS VIDEO  VOICES/BLOGS  PHILADELPHIA NEWS  NEW JERSEY  POLITICS  EDUCATION  OBITUARIES  NATION/WORLD  WEATHER  TRAFFIC
LOTTERY



What wine goes with

*venison?*

Click here to find out with our

**PAIRING GUIDE**

*Happier Holidays*
FINE WINE & GOOD SPIRITS

Please enjoy responsibly.

Close Ad ✕

# Sources: Porn scandal misses Kane's main target

Share  Tweet  Reddit  Email    190 COMMENTS



Pennsylvania Attorney General Kathleen Kane and (Staff, file/ Michael Bryant and AP Photo/Bradley C Bower)



**GALLERY: Sources: Porn scandal misses Kane's main target**

**Craig R. McCoy and Angela Couloumbis,** *Inquirer Staff Writers*
LAST UPDATED: Monday, October 13, 2014, 1:08 AM
POSTED: Monday, October 13, 2014, 12:05 AM

**The Inquirer** HARRISBURG - Attorney General Kathleen G. Kane's unprecedented move to expose the swapping of pornographic e-mails on state time has so far cost four men their jobs, put another at risk of being stripped of his state post, and left three others deeply embarrassed.

All of them may be collateral damage.

So far, Kane has not landed a major blow on the man who sources say has long been her main target: former state prosecutor Frank Fina.

In fact, she's been muzzled from doing so.

MORE COVERAGE
**Porn scandal risk to Corbett campaign?**

Advertisement

 Here are 25 of the most gorgeous cheerleaders on NFL sidelines.

 29 of The Most Well Endowed in Hollywood!

WELLS FARGO ADVISORS  Changing jobs or retiring? Get a free guide to understand your 401(k) options.

 The 40 Sexiest And Most Revealing Celebrity Selfies And Twitter Pics of All Time!

 Shop Brilliant Earth's beyond conflict free diamond rings, antique rings, and fine jewelry!

 Controversy over new skinny pill – Is it too strong for store shelves?...

*Latest News Video*



More videos:

  

*Most Viewed News Stories:*



$249 & up – Ends 11/16:
Caribbean Cruise Sale
w/Upgrades

See all travel deals »

LISTED BY **TRAVELZOO**
*Some taxes, fees additional

---

*Weekly Circulars*



**SPORTS AUTHORITY:**
Take Advantage Of The
Winter Warmth Event!
THIS WEEK ONLY



**TARGET USA:**
Buy Two, Get One Free
All Video Games
THIS WEEK ONLY

See More Circulars »

The story behind the e-mails is far more tangled than what has become public: that eight men, all with ties to Fina, have been named by Kane as sending or receiving X-rated e-mails in a widening scandal that has also touched a state Supreme Court justice.

It involves a secret leak investigation, closed-door legal arguments, a protective order, and allegations of threats - all against a backdrop of a two-year battle between Kane and Fina that has become deeply personal, if not ugly.

Fina is a career prosecutor known for high-profile public-corruption cases at the Attorney General's Office. He now works for Philadelphia District Attorney Seth Williams.

Kane is the former assistant district attorney in Lackawanna County who emerged from political obscurity to become the first woman and Democrat elected as Pennsylvania's top prosecutor.

Both declined to comment for this story.

Numerous people with knowledge of their quarrel - including sources close to both - have said Fina participated in the exchange of X-rated e-mails.

According to the same sources, Kane was intent on making that fact public.

She wanted to expose what she believed was an entrenched misogynistic culture in the Attorney General's Office when Fina was a ranking prosecutor and before she took charge, people close to her say.

But in late summer, Fina obtained a ruling from a Montgomery County judge barring Kane from citing his name publicly in almost any fashion, according to several sources familiar with the ruling.

Judge William R. Carpenter, overseeing a grand jury in the eastern part of the state, granted the order after Fina argued to the judge that Kane's office was using the threat of tying him to the sexually explicit e-mails to intimidate and silence him and others, the sources said.

Fina cited an encounter in which he said a Kane aide had threatened his friend and former colleague Christopher Carusone, warning that if Fina kept criticizing Kane, "a lot people could get hurt," according to two people familiar with the allegation.

Sources close to Carusone say the aide, David Tyler, told him: "Tell your boy to stop" - words Carusone took as a threat against Fina.

Carusone and Tyler declined to comment for this article.

There is no dispute that the two men encountered each other in August in Harrisburg and discussed what was then the still publicly undisclosed cache of porn e-mails.

But a person close to Tyler rejected any suggestion he had threatened anyone. Instead, the source said, Tyler was trying to defuse tensions between the sides and complained that Fina had been exacerbating it by telling others the e-mails would implicate a wide circle of people.


Teen pulls Philly cop from burning car


Bouncers shoot man at Phila. strip club


Kane's car crash derailed testimony again


US bishops struggling to adapt to pope


Temple student shot outside frat party

*Also on Philly.com*

BUSINESS:


The 10 worst cars of all time

HEALTH:


The 5 best exercises for runners

SPORTS:


Sanchez has chance to be great

ENTERTAINMENT:


Stephen A. Smith to broadcast from UPenn

FOOD:


Rockhill: Pizza and steaks return to a Cherry Hill landmark

JOBS:

How should I manage my workload while I'm on vacation?

Kane's allies have dismissed the allegation involving Tyler as false and an attempt by Fina to sully her as Carpenter, a Republican, presides over a grand jury investigation examining Kane and her aides.

The Inquirer has reported that Carpenter this summer appointed a special prosecutor, Montgomery County lawyer Thomas E. Carluccio, also a Republican, in a leak inquiry.

Carluccio is seeking to determine whether Kane's office improperly leaked grand jury material critical of Fina to the Philadelphia Daily News for a June story that raised questions about Fina's role in a case five years ago.

The leak inquiry carries high stakes: Any person who violates grand jury secrecy rules may be found guilty of contempt of court and sentenced to up to six months in prison.

**Campaign criticism**

Kane ignited the war in 2012, when she made a central theme of her campaign criticism of how Fina's team in the Attorney General's Office conducted the investigation into serial sex abuser Jerry Sandusky. She strongly suggested that Gov. Corbett - a Republican who as attorney general had been Fina's boss - ordered it slowed for political gain.

A review she later commissioned said Fina's team might have arrested Sandusky sooner, but found no evidence that politics played a role in the case.

Though the review failed to back up Kane's campaign rhetoric, it gave her a new and unexpected source of ammunition in the feud: Forensic computer work found that Fina, among dozens of others, had traded explicit photos and videos between 2008 and 2012 on state time on state computers.

The X-rated e-mails were among other messages that included jokes, cartoons, and political commentary. It was not illegal, but it was a violation of office policy.

The dispute between Kane and Fina escalated greatly in March when The Inquirer reported that Kane had secretly ended a sting investigation begun by Fina that sources said had caught five Philadelphia Democrats on tape accepting cash or gifts.

Kane called the sting "half-assed." Fina called her "embarrassing to law enforcement."

Throughout, Fina was publicly backed up in his defense of the Sandusky probe by old colleagues, including State Police Commissioner Frank Noonan, former top state prosecutor Richard Sheetz, and former agent Randy Feathers, the case's lead investigator.

All three later landed on the list of eight Kane named as having received pornographic e-mails while working in the Attorney General's Office under Corbett or other Republicans.

Also among them was Carusone, a prosecutor who, with Fina, was a key player in the Attorney General's Office's public corruption cases and who later became Corbett's secretary of legislative affairs.



*Stay Connected*

Get the latest Philly.com Daily Headlines newsletter delivered to your email. Sign up now!

Enter email address to sign up

Already a philly.com member? ○ Yes ○ No



AN INQUIRER ORIGINAL | The Inquirer

**DISCOVER THE IMPROVED INQUIRER** MORE YOU

LEARN MORE ▷

The others she named were E. Christopher Abruzzo, who became Corbett's environmental secretary; Glenn Parno, a top lawyer for Abruzzo; Patrick Blessington, a former member of Fina's anticorruption team who now works with him as a Philadelphia prosecutor; and Kevin Harley, Corbett's onetime spokesman in the Attorney General's Office and Governor's Office.

The fallout since that Sept. 25 bombshell has been pronounced.

Abruzzo and Parno resigned their government positions the week after the e-mail release. Sheetz stepped down as a prosecutor in Lancaster County. Corbett has asked Feathers to give up his position on the state parole board, a demand Feathers has thus far ignored.

Last week, Carusone lost his job with a major Philadelphia law firm, though neither he nor the firm would discuss why.

Carusone's attorney, Robert J. Donatoni of West Chester, said Carusone could not speak to reporters because he was "cooperating with the special prosecutor."

Donatoni would not elaborate but did say:

"In my view and that of others, Chris has the reputation of being a first-rate lawyer and has paid an enormous price for his cooperation. Chris is hopeful that the entire truth about what happened to him and his family will be revealed through the legal process."

Noonan, whom Corbett appointed to head the state police, has kept his job. The governor said there was no evidence Noonan opened the sexually explicit e-mails.

And last week, Supreme Court Justice Ronald Castille urged his colleagues to take action after seeing e-mails that indicate Justice Seamus McCaffery had sent sexually explicit images to an agent in the Attorney General's Office and to McCaffery's brother, a Philadelphia Common Pleas Court judge.

**Name is leaked**

At one point, it appeared the long-rumored e-mail scandal might pass without notice.

Late in the summer, Fina had asked another judge, Norman A. Krumenacker, to block any release on grounds that the material was covered by the grand jury secrecy of the Sandusky case, sources said. After days of deliberation, the judge rejected Fina's argument.

Despite the rulings by Krumenacker and Carpenter, Fina's name leaked out anyway in media accounts of those who had viewed the e-mails.

Still, Kane's office seemed uncertain whether she would release anything.

On Sept. 23, in fact, her office gave The Inquirer and other newspapers a legal opinion stating that the retrieved e-mails and the information about them the papers had asked to see were not public records and that Kane was not legally bound to release them.

Two days later, Kane abruptly changed course and called in reporters to look at roughly 75 pornographic photos and videos.

The presentation lasted about 90 minutes.

In explaining why she singled out that group of eight for release, her office obliquely referred to constraints that blocked it from naming Fina.

"There are restrictions - upon which we cannot elaborate - which currently prohibit us from revealing the names of some other people who participated in this activity," a statement from her office read.

As many as 30 current prosecutors and agents also were in the porn e-mail loop, according to Kane's office. Her spokeswoman, Renee Martin, said that all faced discipline but that union contracts and state law mandated secrecy for those involved in disciplinary actions.

Summing up, Martin issued a statement saying the office was guided by certain basic principles of human relations management.

One such key, she said, was "respect for the reputations and privacy of current employees."

---

cmccoy@phillynews.com

215-854-4821 @CraigRMcCoy

# EXHIBIT "E"

# TRIBLIVE | News

Western Pennsylvania's top news and sports source

Search

Home | News | Investigative  Neighborhoods  State  Politics  U.S./World  Sports  Opinion/The Review  Business  A&E  Lifestyles  Obituaries

Columnists  Allegheny  Armstrong  Beaver  Butler  Fayette  Indiana  Somerset  Washington  Westmoreland  Health News  On the Grid
Education  Pennsylvania  Blogs  Contact Us

Google +
Reddit
Blogger
Fark



Larger text  Smaller text | Order Photo Reprints

## Judge blocks grand jury summons for Trib's Harrisburg correspondent

By Andrew Conte
Thursday, Oct. 16, 2014, 12:12 p.m.

The judge presiding over a statewide grand jury blocked an appearance Friday before the panel by Tribune-Review state Capitol correspondent Brad Bumsted, the newspaper's attorney said.

Judge William R. Carpenter, who is supervising the grand jury and whose signature appears on the subpoena issued Wednesday night, told the Trib he did not know about the subpoena until he talked with a reporter.

Carpenter declined to discuss the grand jury and referred questions to Chief Deputy Attorney General Laura A. Ditka, who issued the summons. She later informed the Trib's lawyer, Ron Barber, that Carpenter told her she was not authorized to subpoena Bumsted.

Carpenter returned a call to the Trib on Thursday and asked a reporter to read the subpoena to him.

Asked how the grand jury could issue a subpoena bearing his signature without his knowledge, Carpenter said, "That's what I'm going to try to figure out."

Ditka declined to comment, citing grand jury restrictions.

Barber said Pennsylvania's strong shield law protects reporters from having to testify about their sources. The Pennsylvania law, in effect since 1978, is based on a law adopted in 1937.

"The shield law in Pennsylvania is very broad and very powerful," Barber said.

By issuing the subpoena to Bumsted, the grand jury threatened to pull him into an increasingly ugly feud among prosecutors in the capital and Philadelphia.

Carpenter appointed a special prosecutor, Thomas Carluccio, to investigate allegations of information leaks from the office of Attorney General Kathleen Kane, The Philadelphia Inquirer has reported .

Caluccio could not be reached for comment. Kane's spokesman declined to comment, citing grand jury secrecy rules.

The grand jury investigation might be linked to reports about a 2009 case involving a Philadelphia political activist, who was not prosecuted, as well as the release of information about pornographic emails that circulated in the Attorney General's Office under Kane's predecessor, Gov. Tom Corbett.

Bumsted broke the story of the emails' existence in late August.

Former Chief Deputy Attorney General Frank Fina, who prosecuted high-profile corruption cases, asked a judge to block release of the racy emails. Fina heads a public corruption unit in the Philadelphia District Attorney's Office.

Pennsylvania is among 39 states with specific shield laws protecting journalists, said Gregg Leslie, legal defense director of the Reporters Committee for Freedom of the Press in Virginia. The federal government does not have a specific law protecting journalists.

Pennsylvania's law protects reporters from having to identify confidential sources or give up notes and story drafts, said Melissa Melewsky, media law counsel for the Pennsylvania NewsMedia Association.

"We have a really strong shield law in Pennsylvania, and it's been interpreted robustly by the courts, with regard to identifying confidential sources," Melewsky said. "As long as (Bumsted) promised confidentiality and has kept it, the law says he cannot be compelled to reveal the identity of his confidential sources."

Prosecutors often see reporters as a "shortcut" to discover information, but journalists' ability to protect sources is key to their job as government watchdogs, said Gene Policinski, chief operating officer of the Newseum Institute in Washington and senior vice president of its First Amendment Center.


Trib Total Media writer Brad Bumsted

Searching for a JOB?
JOBS.TRIBLIVE  MONSTER


WE ARE Grateful FOR YOUR SUPPORT Neighbors Helping Neighbors A donation of just $17.25 will help us feed a family of four this holiday. DONATE NOW


You Need It. We Got It.
Place Your Classified Ad Here
TRIB TOTAL MEDIA  Get it right. Now.

VIDEO                    More Videos


Play Video
Tomlin Jets post game
00:00                    00:52

Tomlin Jets post game
Tomlin Jets post game

A star at any position
In this WPXI Skylights Spotlight, the Trib's Kevin Gorman highlights Central Valley senior and Pitt recr...

Penguins on hot streak
The best Penguins talk with Ken Laird, Guy Junker and Chris

Daily Photo Galleries

3-Question Trib Poll

How much coffee do you drink every day?

O  None
O  One cup
O  Two cups

"The concept of a shield law is that it's really government's job to police its own house," he said, "and they shouldn't be relying on journalists to do that."

Andrew Conte is a Trib Total Media staff writer. Reach him at 412-320-7835 or drewconte@tribweb.com.

Sunday - Nov. 9, 2014

○ More than two cups a day

Submit

UNSEALED PER ORDER OF
THE COURT DATED
AUGUST 26, 2015

IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, PENNSYLVANIA

IN RE:                              : SUPREME COURT OF PENNSYLVANIA
                                    : NO.171 M.D. MISC. DKT. 2014
THE THIRTY-FIVE STATEWIDE           :
                                    : MONTGOMERY COUNTY COMMON PLEAS
INVESTIGATING GRAND JURY            : M.D. 1424-2014
                                    :
                                    : NOTICE NO. 123

## SEALING ORDER

AND NOW, this 1st day of December, 2014, it is hereby ORDERED, that the

attached Filing of December 1, 2014 be filed under separate seal with the Supreme Court

until further Order of Court.

BY THE COURT:

_____
WILLIAM R. CARPENTER,          J.
**Supervising Judge**

|  |  |  |
|---|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : : : | SUPREME COURT OF PENNSYLVANIA NO.171 M.D.D MISC. DKT. 2014 |
| Petitioner | : : | MONTGOMERY COUNTY COMMON PLEAS M.D. 2644-2012 |
| v. | : : |  |
| SUPERVISING JUDGE OF THE THIRTY-FIVE STATEWIDE INVESTIGATING GRAND JURY, | : : : : | **FILED UNDER SEAL** |
| Respondent | : |  |

## RESPONSE OF SPECIAL PROSECUTOR
## TO THE PETITION FOR REVIEW OF ORDERS ENTERED
## BY THE SUPERVISING JUDGE OF THE 35TH INVESTIGATING GRAND JURY
## DATED: AUGUST 27,2014; SEPTEMBER 17, 2014; AND OCTOBER 30, 2014
### OF OFFICE OF THE ATTORNEY GENERAL

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SUPREME COURT OF PENNSYLVANIA:

**AND NOW**, comes Thomas E. Carluccio, Special Prosecutor to the Investigatory Grand Jury ("Respondent") hereby responds to the *Petition for Review of Orders Entered by the Supervising Judge of the 35th Investigating Grand Jury Dated: August 27, 2014; September 17, 2014; and October 30, 2014* filed by the Movant, the Office of the Attorney General (the "OAG"), and states in support thereof as follows:

### JURISDICTION

1.  Admitted.

2.  Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

## PARTY SEEKING REVIEW

2. Admitted. [1]

## GOVERNMENT UNIT RESPONSIBLE FOR
## DETERMINATION SOUGHT TO BE REVIEWED

3.   Admitted.

## DETERMINATION SOUGHT TO BE REVIEWED

4.   Admitted.

5(a)-(d)   Admitted in part and Denied in part.  It is admitted that the four (4) Orders

referenced by Petitioner:

    (i)   8/27/14 Protective Order (the "Protective Order"), and accompanying Sealing Order- **Exhibit B**;

    (ii)   9/17/14 Order for Hearing in Response to the OAG Motion for Reconsideration of the Protective Order ("Order for Hearing"), and the scheduling of such Hearing at the convenience of the interest parties, and accompanying Sealing Order – **Exhibit C**;

    (iii)   9/17/14 Order Amending the Protective ("Amended Protective Order") adopting certain limitations in scope of the Protective Order in response to the OAG's Motion for Reconsideration, and accompanying Sealing Order – **Exhibit D**;

    (iv)   10/30/14 Order denying OAG's Motion for Reconsideration of the Protective Order, together with Findings of Fact and Conclusions of Law, and accompanying Sealing Order –

---

[1]   The numbering of paragraphs in this pleading adopt the misnumbered paragraphs of Petitioner's pleading for ease in review by the Court.

*Exhibit A*

All of the foregoing Orders of the Court are documents which speak for themselves, and any attempts to paraphrase their import, is strictly denied.

## STATEMENT OF OBJECTIONS TO THE DETERMINATION

### A. Background

6. Admitted.

7. Admitted.

8. Admitted in part and Denied in part. It is admitted that for a period of time, the OAG provided reasonable accommodations to the requested needs of the Special Prosecutor, and worked in a collaborative manner with him in addressing the Grand Jury's activities in seeking to fulfill its stated charge. However, it is denied that the characterization presented in the footnote to this paragraph provide a full disclosure of the issues of concern which warranted the Protective Order being issued by the Supervising Judge. By way of further answer, the footnote correctly identifies particular accommodations that were extended to the Special Prosecutor by the OAG. However, to the contrary, due to events more fully developed in New Matter below, the Special Prosecutor later learned of events and received stated concerns of subpoenaed witnesses that their identities and the date and time of their scheduled testimony had been breached and communicated to one or more persons outside the ambit of the Grand Jury. Upon further investigation, the Special Prosecutor reasonably maintained significant concerns that such breaches emanated from the OAG. Of

particular concern was that, such restricted information was included with information pertaining to the OAG's uncovering emails of questionable character together with vague representations that there was a nexus between the subpoenaed witnesses and such emails. As such, consequential information suggested to the Special Prosecutor that members of the state news media may have been alerted by person(s) within the OAG of such questionable nexus and encouraged by design to file what are commonly referenced as "Right to Know Requests" pertaining to information that is subject to grand jury secrecy associated with both the underlying 35th Investigating Grand Jury together with a preceding grand jury.

9. Admitted. By way of further answer, the Supervising Judge issued the initial protective order on August 26, 2014 Order in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011).

10. Admitted in part and Denied in part. It is admitted the Supervising Judge issued is Protective Order of August 26, 2014, a document which speaks for itself and any attempts to paraphrase its import here, is strictly denied.

11. Admitted.

12. Denied. Respondent lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this Paragraph, and therefore deny the same. To the extent that the import of the allegations of this paragraph imply that an *ex-parte, in camera* Hearing was improperly convened and conducted by the Supervising Judge -- such allegation is expressly denied. To the contrary the very essence of grand jury proceedings demands secrecy. Indeed, the need for grand jury secrecy is especially relevant within the context of the underlying 35th Grand Jury investigation

which must responsibly seek the invocation of measures to protect witnesses from intimidation, harassment and/or retaliation.

13. Admitted. the Protective Order, is a document which speaks for itself and any attempts to paraphrase its import here, is strictly denied.

14. Admitted. Although Petitioner references a single Order of 9/17/14, in fact there where actually two (2) Orders made on such date -- the Order for Hearing and the Amended Protective Order. It is admitted that both Orders omitted to specify any person or conduct that was in issue associated with allegations of improper witness identification, witness intimidation and/or retaliation. As stated, such omissions are entirely proper in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011).

15. Admitted in part and Denied in part. It is admitted that the Order for Hearing (9/17/14 Order) omitted to explain, elaborate or otherwise provide a context for the concern associated with allegations of obstruction, witness intimidation and/or retaliation. It is asserted that such omissions are proper under law and indeed are in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011).

16. Admitted. It is admitted that the such omission of the source(s) who made allegations of obstruction, witness intimidation and/or retaliation is/ are proper under law and indeed are in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011). By way of further answer, it would have been improper for the

Supervising Judge to identify the source of the allegations represented by the Special Prosecutor to warrant the relief provided under the Protective Order.

17. Admitted in part and denied in part. Admitted that the Supervising Judge issued his Amended Protective Order in response to the OAG's Motion For Reconsideration of the Protective Order. The Amended Protective Order is a writing that speaks for itself, and any characterization of its import is denied.

18. Denied. The Amended Protective Order is a writing that speaks for itself, and any characterization of its import is denied.

19. The Respondent is without knowledge or information sufficient to form a belief as to the truth of the averments contained in this paragraph pertaining to the number of persons to which the Amended Protective order may or is applicable.

20. Admitted

21. Admitted.

22. Admitted in part and Denied in part. It is admitted that the Protective Order was issued pursuant to 18 Pa.C.S.A. §4954. However, it is denied that this statutory reference accurately reflects the Supervising Judge's authority is limited to that quoted. It is well established in numerous court decisions that proceedings before a grand jury are protected by a general rule of secrecy. See *Commonwealth v. Kilgallen*, 379 Pa. 315, 108 A.2d 780 (1954); *Commonwealth v. Kirk*, 340 Pa. 346, 17 A.2d 195 (1941), *Commonwealth v. Schwartz*, 178 Pa. Superior Ct. 434, 115 A.2d 826 (1955); and *Commonwealth v Brownmiller*, 141 Pa. Superior Ct. 197,14 A.2d 907 (1940). Respondent's position here is substantiated by the recent opinion issued by the Hon. Judge Castille in *In Re Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.23d 491 , wherein he

commented upon and quoted from *In re Twenty-Fourth Statewide Investigating Grand Jury*, 589 Pa 89, 907 A.2d. 505 (Pa, 2006), as follows:

"[A]lthough grand jury witnesses are generally permitted to disclose their testimony to others, the supervising judge may prohibit such disclosure "for cause shown." 42 Pa.C.S. §4549(d). This Court has adopted procedural rules to ensure the secrecy of such proceedings...The very power of the grand jury, and the secrecy in which it must operate, call for a strong judicial hand in supervising the proceedings. The seminal role of the supervising judge of a grand jury was recognized by this Court in *In re Twenty-Fourth Statewide Investigating Grand Jury*, 589 Pa 89, 907 A.2d. 505 (Pa, 2006): 'We are cognizant that the substantial powers exercised by the investigating grand juries, as well as the secrecy in which the proceedings are conducted, yield[] the potential for abuses are reflected in the statutory scheme of regulation, [**504] which recognizes the essential role of the judiciary in supervising grand jury functions.' " *In Re Dauphin County Fourth Investigating Grand Jury, supra* p. 317-318.

23. Admitted in part and Denied in part. It is admitted that the Special Prosecutor was directed to serve the Protective Order on the OAG (see ¶6 of the Protective Order). Any representation or characterization that the Special Prosecutor failed to fully and properly serve the Protective Order upon all applicable person(s) is denied.

24. Admitted. It is admitted that the Protective Order provided, in part, that the contents of the Protective order shall not be disclosed, either verbally and/or in writing, by the OAG to an persons outside the OAG under penalty of contempt. (see ¶7 of the Protective Order). [3]

25. Admitted.

26. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

27. Admitted.

---

[3] The Special Prosecutor would agree to have the Protective Order unsealed if this Hon. Court deems it appropriate in order to eliminate any confusion arising from the public misrepresentation (s) regarding the import of the Protective Order.

28. Admitted in part and Denied in part. It is admitted that a Hearing was conducted in furtherance of the Motion for Reconsideration by the OAG. The representation that the Hearing was directed by the Supreme Court is denied. Indeed, such statement on the part of the OAG is in direct contradiction to their prior statement in paragraph 26 that the Supervising Judge directed the Hearing on the motion for Reconsideration to take place. Moreover, there is no nefarious set of events undermining the OAG's rights to a Hearing. As stated, the Supervising Judge agreed to the Hearing upon the OAG's Motion, and further agreed such Hearing would be conducted upon the mutually agreeable scheduling of such Hearing. Representations made in Footnote #7 accompanying this paragraph represent a misrepresentation of the facts for self-serving purposes and are denied, for the reasons described above.

29. Admitted. It is admitted that an *in camera* Hearing was conducted on 10/17/14 before the Supervising Judge in which the OAG participated (the "Reconsideration Hearing"). Any characterizations on what is meant by the phrase "attempted to comply" are so vague, that Respondent is at a loss on what is plead, such that it can responsibly respond. By way of further answer, the OAG was afforded by the Supervising Judge with multiple opportunities at the 10/17/14 Hearing to present evidence, and except for irrelevant matters associated with questionable emails sought to be entered, the OAG was encouraged to call witnesses in support of its Petition, but elected to present no evidence and called only one witness. Any reference that the OAG had a right to cross exam witnesses within the context of the *in camera* Hearing for reconsideration of the Protective Order is contrary to law.

30. Admitted in part and Denied in part. It is admitted that the OAG sought leave to subpoena Frank G. Fina, Esq. and E. Marc Costanzo, Esq. for their appearance and testimony at the

Reconsideration Hearing. Respondent lacks insufficient knowledge or information to form a belief as to what the OAG "understood" to be the substance of claims of witness intimidation, harassment and/or retaliation, and as such the truth of such allegation is therefore denied.

31. Denied. Respondent lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this Paragraph, and therefore deny the same.

32. Admitted. It is admitted that the Supervising Judge denied the OAG's request to subpoena Fina and Costanzo relative to the reconsideration Hearing. By way of further answer, the decision of the Supervision Judge was proper under law in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011). that the Supervising Judge denied the OAG's request for leave to subpoena Fina and Costanzo.

33. Admitted in part and Denied in part. It is admitted that the Supervising Judge denied the OAG's request to review a copy of the transcript of the 8/25/2014 *ex parte - in camera* Hearing that preceded the issuance of the Protective Order (the "*Ex Parte* Hearing Transcript"). A copy of the aforesaid transcript is attached hereto and marked **Exhibit A**. [4] It is further admitted that such attempt on the part of the OAG represented a thinly veiled attempt to gain by an alternate route possible information into the claims of improper witness identification, and witness intimidation, harassment and/or retaliation. (Both Fina and Costanzo are career attorneys who served in the OAG until recently.) It is denied whether one or more of the subpoenaed testimony of Fina and/or Costanzo, and/or the *Ex Parte* Hearing Transcript would have provided any enlightenment on the subject matter to the OAG. Moreover, the decision of the Supervision Judge to deny the OAG the

---

[4] Note, Exhibit A represents witness testimony under seal, and not available to the Petitioner, OAG.

aforesaid transcript was proper under law in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011).

34. Admitted in part and Denied in part. It is admitted that the Supervising Judge denied the OAG request for a copy of the *Ex Parte* Hearing Transcript. The denial is asserted to be proper under law in accordance with the Rules of Court, and consistent with prevailing case law. By way of further answer footnote #8 accompanying this paragraph contains information and references to the state of mind of OAG staff and personnel, such that Respondent lacks sufficient knowledge or information to form a belief as to the truth of such allegations of this Paragraph, and therefore deny the same.

35. Denied. It is denied that the OAG was denied an opportunity to question alleged victims whose testimony served as a basis for warranting the Protective Order is contrary to law , to which the OAG is keenly aware. To the contrary, the *ex-parte, in camera* Hearing conducted by the Supervising Judge was in accordance with statutory law and prevailing case law. [5]

36. Admitted.

37. Admitted. It is admitted that the Supervising Judge denied the request for leave to call the Special Prosecutor to testify relative to the Reconsideration Hearing. Such action on the part of the OAG represented yet another attempt to gain information regarding claims of improper witness identification, and witness intimidation, harassment and/or retaliation which served as the basis for the Protection Order. It is asserted that the OAG was well aware that there was no merit in making

---

[5] Of interest, the transcripts of the *ex-parte, in camera* Hearing was in-fact made available to the OAG in error. The OAG admittedly reviewed the subject transcripts prior to appreciating their being deemed subject to grand jury secrecy. Upon learning of the improper disclosure, the transcripts remain in the possession of the OAG, despite demands of the Supervising Judge for their return.

the request for leave to call the Special Prosecutor because the request was not permitted under the Rules of Court nor consistent with prevailing case law.

38. Admitted. It is admitted that the OAG attempted to subpoena a journalist (among others) to the Reconsideration Hearing before the Supervising Judge in Court Room C of the Montgomery County Court House. Such actions on the part of the OAG effectively demonstrates an abuse of power on the part of the OAG in seeking to subpoena witnesses through the utilization of subpoenas reserved for the sole official business of the 35th Grand Jury under the signature of the Supervising Judge. It is respectfully submitted that the OAG was fully aware in taking this action that it maintained no authority to use the subject subpoenas as it did; but nevertheless elected to ignore law. To further demonstrate the willful conduct of the OAG to evade legal procedures in place pertaining to the deliberations of grand jury system, one need only review the actual language appearing on the subject subpoenas which reads *"You are ORDERED to appear as a **witness** before the PENNSYLVANIA STATEWIDE INVESTIGATING GRAND JURY..."* Even under a liberal defense for the OAG's misuse of the subject subpoenas it is irrefutable that the Reconsideration Hearing did not involve testimony **before** the Statewide Investigating Grand Jury, but rather before the Supervising Judge. Further, the Statewide Investigating Grand Jury was not even sitting at all that week. It is asserted that the act of utilizing the subject subpoenas here represent a blatant, willful abuse of power in the OEG's demonstrated disregard of the law pertaining to the use of the subpoenas.

39. Denied. Respondent lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this Paragraph, and therefore deny the same.

40. Denied. It is noted that the allegations in this Paragraph are purely speculative in nature,

and do not plead legal claims, facts or events to which a response is required. Further, Respondent lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this Paragraph, and therefore deny the same.

41. Denied. The Supervising Judge permitted the OAG to present evidence and witness testimony in support of its Petition at the Reconsideration Hearing. Any claim or characterization that the Supervising Judge failed to afford the OAG the ability to meet its burden of proof regarding the merits of its Petition at the Reconsideration Hearing is denied. To the contrary, the OAG is all too familiar with the rules of procedure and prevailing case law which limits the scope of their presentation of witnesses, facts and events at the Reconsideration Hearing, and to assert otherwise undertakes the promotion of a disingenuous position.

42. Denied. It is denied that the OAG was deprived by the Supervising Judge in presenting its case in support of its Petition for Reconsideration. To the contrary, the Supervising Judge permitted the OAG to present evidence and witness testimony in support of its Petition at the Reconsideration Hearing. Any claim or characterization to the contrary is denied. By way of further answer, the OAG did present a witness, elected to present no evidence (but for irrelevant evidence associated with questionable emails), and failed to directly address its concerns before the Supervising Judge at the Reconsideration Hearing.

43. Denied. It is denied that the OAG was limited to calling one witness in support of its Petition for reconsideration. To the contrary the Supervising Judge afforded the OAG all opportunity permitted under law to introduce evidence and witness testimony at the Reconsideration Hearing. Further footnote #9 associated with this paragraph is misleading in suggesting that its failure to call more than one witness was entirely due to an abuse of discretion on the part of the

Supervising Judge. To the contrary, the Supervising Judge's determination that the subpoenas for testimony of potential witnesses Fina and Costanzo and permitting the OAG to review the *Ex Parte* Hearing Transcript - were properly prohibited under law; a result to which the OAG could easily have anticipated in that the OAG is conversant with the law relative to such concern. Further, the OAG was not "hamstrung" by the rulings of the Court. Rather the OAG was "hamstrung" by its own improper use of Statewide Grand Jury Subpoenas (see paragraph 38). The OAG could have presented relevant witnesses had it elected to properly subpoena witnesses to the Hearing. Of consequence, the OAG elected to present no evidence nor testimony demonstrating any adverse effect on the operations of the OAG arising from the Protective Order. Such evidence and/or testimony is presumed to be germane to the considerations of which the OAG has complained.

44. Admitted.

## B. Objections

45. Admitted.

46. Admitted in part and Denied in part. It is admitted that *Commonwealth v. Sandusky*, 70 A.3d 886 (Pa.Super. 2013), represents case law which sets forth an abuse of discretion standard – within the context of its facts. Further, nothing within the case opinion of *Sandusky* precluded an *ex-parte, in camera* hearing on the issues involved there. Further, the hearing described in the *Sandusky* opinion to which legal counsel participated in (including defense counsel for Sandusky) did not address a grand jury witness seeking the right to cross-exam another grand jury witness, or evidence subject to grand jury secrecy – all issues in the underlying matter. As such, the opinion in

Sandusky may not be dispositive towards the position of the OAG advanced in this pleading. Finally, any representation, expressed or implied, that the Supervising Judge abused his discretion in making his Protection of Abuse Order is denied.

47. Admitted in part and Denied in part. It is admitted that *Commonwealth v. Alicia*, 92 A.3d 753 (Pa. 2014), represents case law on the parameters in which a judge must properly exercise judicial discretion. Any representation, expressed or implied, that the Supervising Judge abused his discretion in making his Protection of Abuse Order is denied.

48. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

49. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

50. This paragraph contains an accurate quote from *Commonwealth v. Wallace*, 97 A.3d 310, 320 (Pa. 2014) and no response is required.

51. Admitted in part and Denied in part. It is admitted that concerns pertaining to "due process of law" and "notice and opportunity to be heard" are relevant and part of the foundation to our criminal justice system. However, in the underlying matter we are addressing grand jury deliberations, and as such the case law cited is not applicable.

52. Admitted in part and Denied in part. It is admitted that *Commonwealth v. Wallace*, 97 A.3d 310, 320 (Pa. 2014) contains the cited language. However, the cited cases, and *Commonwealth v Maldonado* 838 A.2d 710 (Pa 2003) in particular do not address the publication of witness identification, facts and/or events which would undermine grand jury secrecy, as exist here. As such, their holding is not applicable in the underlying manner, and accordingly their reference as

relevant and material to the legal dispute here is denied.

53. Admitted in part and Denied in part. It is admitted that the OAG was not provided advance notice of alleged misconduct to warrant a Hearing towards the issuance of a protective order. As stated, issuance of protective orders within the context of deliberations of a grand jury arising from an *ex-parte, in camera* hearing is entirely proper under applicable statutory and relevant case law. As such, any inference that it was improper for the issuance of the Protective Order arising from a hearing to which the OAG was not provided advance notice is denied. Moreover, the OAG is not a party to the grand jury proceedings (but rather a called witness to such proceedings) and thus would, in normal course, not receive notice of the subject *ex-parte, in camera* Hearing. Respondent can only deduce from his review of the representations in this paragraph that the OAG asserts it is engaged in a dual role of both witness and a direct or quasi investigating body to the subject leak(s) to the news media of materials subject to the 2009 Grand Jury. Such dual role is not borne out by the direct facts in this matter and is fraught with inherent conflicts that render such dual role lawfully untenable. Put simply, it is illogical to assert that the OAG can be permitted, in any measure, to **investigate itself** for alleged leaks from its office of materials subject to grand jury secrecy.

54. Admitted in part and Denied. It is admitted that the Protective Order and the Amended Protective Order address the prohibitions set forth in this paragraph. For the reasons expounded upon above asserting the Protective Order and the Amended Protective Order were proper and lawful in accordance with statutory and prevailing relevant case law, the allegation that the OAG improperly received notice of these two Orders only after their issuance is denied.

55. Denied. It is reasonably presumed that the attorneys, staff and personnel comprising the

OAG may be properly served with a protective order of the nature addressed in this matter – and as such all such persons have been properly served by delivering a copy of the Protective Order and Amended Protective Order to the OAG – without the administrative maelstrom of serving each and every respective person with the OAG. As such, the allegation that service was insufficient under the circumstances is denied. With regard to footnote #10 associated with this paragraph, it is both reasonable and logical to assume that the OAG can take reasonable measures to educate its attorneys, staff and personnel regarding the prohibitions expressed in the Protective Order and Amended Order, and for such persons to gauge their conduct accordingly. Indeed, it is presumed that the OAG maintains in-place procedures, which are consistently applied, to regularly communicate notices of this nature to OAG attorneys, staff and other personnel through group emails, or by other reasonable means. By way of further answer, the dual import attributed to the representation of this paragraph is that the Protective Order effectively precludes all communications between persons who are witnesses to the 35th Grand Jury and the OAG. To the contrary, the Protective Order does not eliminate all communications, but only those that represent, "… any act of obstruction, intimidation, or retaliation against any witness summoned by the Grand Jury…" Hence, the OAG remains at liberty to communicate with such witnesses, and/or to refer its interest in investigating the alleged leaks of material subject to grand jury secrecy to objective law enforcement agencies which maintain no conflict of interests in the subject matter.

56. Denied. It is denied that the Protective Order was conceived due to partisan conduct and was undertaken in a manner intended to deliberately deprive the OAG of due process rights.

57. Denied. It is denied that the Protective Order was obtained without the benefit of developing a factual record to warrant such judicial action. Further, any representation that the

Supervising Judge undertook making his Protective Order in a manner which ignored the rights of the persons so impacted, and less than an even-handed fashion is categorically denied.

58. Denied. It is denied that the Supervising Judge "acquiesced" to the OAG's request for a hearing. To the contrary, the OAG properly and within its legal right filed a Petition for Reconsideration of the Protective Order. Further, and to be developed in greater detail in New Matter below, the Supervising Judge made it clear that at all times he was open-minded towards any proposed modification of the Protective Order which would ameliorate the stated objections and concerns made by the OAG. Regrettably, the OAG ignored availing itself of such opportunity, and the Supervising Judge independently made his Amended Protective Order in a good-faith effort to accommodate the OAG's concerns regarding the broad application of the Protective Order. The process and methodology afforded the OAG to promote its Petition for Reconsideration is entirely dictated by applicable statutory and relevant prevailing case law, and as such any characterization that the opportunities afforded the OAG to be heard by the Supervising Judge in support of its Petition for Reconsideration as "hollow and meaningless" is baseless, represents a red-herring, ignores the applicable law to which the OAG is most familiar, and is denied.

59. Denied, for those reasons previously stated, with particular attention given the response to paragraph 44 above.

60. Denied. It is denied that the deprivation of information imposed by the Supervising Judge upon the OAG prevented the OAG from proceeding in a meaningful way at the Reconsideration Hearing. To the contrary, the OAG at all times was free to pursue its interests relative to the Protective Order and to engineer the language of the Protection Order, at the invitation of the Supervising Judge, to accommodate the concerns of the OAG in its application to its attorneys, staff

and personnel. It should be noted that the allegations of improper witness identification, and witness intimidation, harassment and/or retaliation were associated with conduct on the part of the OAG. As such, to permit the OAG to confront witness(s) and directly address the introduction of evidence into particulars relating to such alleged misconduct would result in yet a further opportunity to exploit the situation, and thereby compromise (if not undermine altogether) the protections afforded in the grand jury process to promote the free flow of information to the grand jury.

61. Denied for all the reasons that have been recited above.

62. Denied. As stated, the Supervising Judge issued the Protective Order in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011).

63. Denied. Respondent lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this Paragraph, and therefore deny the same. By way of further answer, footnote 11 attached to this paragraph asserts facts and speculations on the part of the OAG for which no response is required.

64. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required. By way of further answer, to the contrary, the OAG proposes actions which elicit an abuse of power in its effort to cross exam witnesses and review transcripts, while only serving in the underlying matter as a witness to the proceedings. The OAG's proposed dual role of being both witness and a direct or quasi investigating body to the subject leak(s) to the news media of materials subject to the 2009 Grand Jury place it in an untenable conflict of interest.

Accordingly, the utilization of a Special Prosecutor and grand jury is precisely the best means of assuring the lack of conflicts of interest in investigating the breach of grand jury secrecy, and the OAG's claims to the contrary are hollow and if adopted would result in fatal impairment if not outright abandonment of the grand jury system. Again, put simply, it is illogical to assert that the OAG can be permitted, in any measure, to **investigate itself** for alleged leaks from its office of materials subject to grand jury secrecy. As such, the procedure in place for the utilization of an investigating grand jury, such as here, is warranted under these circumstances and assures there are no abuses through a blind following of constitutional separation of powers in circumstances such as this. To the extent the OAG asserts it is empowered to undertake an investigation of leaks which may have occurred within the OAG proper and pertain to particulars associated with the operation and/or administration of the 35th Grand Jury, then it is suggested that the OAG again may find itself in an conflict-of-interest, and such investigation is best reserved for other law enforcement agency(ies), such as the F.B.I. to undertake. Hence, the Protective Order in this matter is entirely appropriate and should remain in force.

65. Denied. The terms used in the Order : obstruction, intimidation, retaliation do not exist in a vacuum, and can reasonably be afforded their customary meaning. As such, it is denied that the Protective Order and the subsequent Amended Protective Order are unreasonably vague, such that they have no utility relative to the proceedings of the Grand Jury.

66. Denied. It is denied that the Protection Order and/or Amended Protection Order provides no "discernable context for its prohibition. To the contrary the aforesaid are clear and concise in their text, and the prohibitions thereunder are similarly clear and unequivocal.

67. Denied. The averments contained in this paragraph constitute conclusions of law to which

no responsive pleading is required.

68. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

69. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required. By way of further answer, the Petitioner fails to articulate any rationale for citing the case law here, and as such Respondent has no understanding as to the application of the First Amendment to the Protective Order.

70. Denied. Both the Protective Order and the Amended Protective Order are clear and concise in their text, and the prohibitions thereunder are similarly clear and unequivocal. As such, the Orders are documents which speak for themselves and any attempts to paraphrase or to project a broad interpretation not warranted in this concern, is strictly denied. By way of further answer, apart from First Amendment speech considerations addressed in the preceding paragraph which are illogically applied here, the Protective Order does not prevent communications (e.g. free speech) between the OAG and grand jury witnesses. Rather, the Protective Order properly restrains such speech to maintain the integrity of the 35th Grand Jury, to assure its public duty(ies) are pursued, being in part, providing for the free flow of information to the grand jury for consideration, and maintaining the privacy and confidentiality of witness identities, testimony and evidence. Any representations to the contrary effectively undermine the grand jury system, and thereby destroy the benefits the system affords to law enforcement in serving the general public.

71. Denied. Both the Protective Order and the Amended Protective Order are clear and concise in their text, and the prohibitions thereunder are similarly clear and unequivocal. As such, the Orders are documents which speak for themselves and any attempts to paraphrase or to project

a broad interpretation not warranted in this concern, is strictly denied.

72. Denied. It is denied that virtually all speech of the members comprising the OAG must be curtailed or eliminated altogether upon application of the Protective Order and the Amended Protective Order. It is further denied that the applicable prohibitions are unlawful or otherwise improper. To the contrary the two Orders stand to maintain the integrity of the grand jury process. Indeed, perhaps the OAG, amongst others, stands to benefit the most from actions intended to maintain the integrity of the grand jury process and the necessity for preserving grand jury secrecy.

73. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

74. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

75. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required. Further and of consequence, the Respondent is puzzled with the internal "investigation" the OAG asserts it wishes to pursue into the leak(s) of material pertaining to the Mondesire Grand Jury subject to grand jury secrecy. Specifically, Attorney General Kane together with her privately retained legal counsel, have admitted to her directly or indirectly releasing materials to the Philadelphia Daily News — materials which are the focus of the 35th Grand Jury. As reported in the local media:

> "on Monday, Kane testified for more than two hours before a Montgomery County grand jury examining if she or her office improperly released confidential information to the Philadelphia daily News in June to embarrass a political foe.
>
> Unexpectedly, she acknowledged on her way to testify that her office had released information to a newspaper — but added that she did not believe it was grand jury material.
>
> But [Lanny] Davis, a Washington lawyer who won fame as special counsel to President Clinton in the 1990's argued Tuesday that not all information disclosed by Kane about the 2009 case

was necessarily secret. For instance, he said, summary memos, written years after a probe concluded, could very well be public documents.

.... In an interview, Lanny Davis suggested that because Kane was at home raising two children in 2009, she was not bound by the secrecy laws that bar the release of grand jury information.[6] **Davis said that responsibility did not start until Kane took her oath of office last year, and applies only to subsequent cases. 'It is our legal opinion that there has never been a case decided where a succeeding attorney general has been accused of violating an oath that she never took,'** said Davis, who said the theory was based on legal research by himself and Kane's other attorney, New York defense layer Gerald Shargel." Craig R. McCoy and Angela Couloumbis, *Kane Lawyer Has New Leak Theory, The Philadelphia Inquirer,* Nov.19, 2014, at B-1 and B10.

Another news report provided as follows:

"Before heading into the grand jury last week in Trooper.... Kane told reporters that releasing information to the Philadelphia Daily News **'was done in a way that did not violate statutory or case law regarding grand jury secrecy.'**" Brad Bumsted, *Lead of Grand Jury Information Could Cost Attorney General Kane,* TribLIVE ( Nov.22, 2014), http://triblive.com/opinion/editorials/7199385-74/kane-attorney-general?showmobile=false#axzz3JkDPLtxx

76. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

77. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

78. Denied. The averments contained in this paragraph constitute conclusions of law to which no responsive pleading is required.

## STATEMENT OF RELIEF SOUGHT

79. The relief sought by the OAG, being: (i) a Review of this Honorable Court to the Protective Order, Order Denying a Petition for Reconsideration of the Protective Order and the

---

[6] To corroborate this statement made to the press, Attorney general Kane in Application for Emergency Relief filed with this Honorable Court, provides on page 7 that at the time of the Mondesire Grand Jury (beginning and ending in 2009) she was a stay-at-home mother, and as such, was not involved in any capacity to such proceedings. Further, she took no oath of secrecy with regard to such proceedings.

Amended Protective Order; and (ii) vacating the aforesaid Orders should be denied – for all those reasons set forth above.

# NEW MATTER

80.  Respondent hereby incorporates herein by reference its responses to the Claims reflected in the preceding paragraphs, inclusive, above as though fully set forth at length herein.

81.  Further, Respondent incorporates by reference herein, both: (i) the transcript of testimony and deliberations at the 10/17/2014 Reconsideration Hearing to which the OAG participated, attached hereto and identified as **Exhibit B** [7]; and (ii) the transcript of testimony and deliberations at the Reconsideration Hearing which were conducted through an *ex-parte, in camera* Hearing before the Supervising Judge to which the OAG did not participate, attached hereto and identified as **Exhibit C**. [8]

## I.  General Denial that OAG has Raised Valid Claims to Warrant the Protective Order Be Vacated

82.  Petitioner has failed to allege credible claims warranting this Honorable Court to grant the OAG the relief it seeks in its Petition for Review , in that the OAG has not met its burden in asserting: (i)  the Supervising Judge abused his discretion in conducting the ex-parte, in camera Hearing prior to entering the Protective Order; (ii) the Supervising Judge violated the due process rights of the OAG at the Reconsideration Hearing in denying the OAG with the right to cross-exam witnesses and/or review transcripts of testimony pertaining to the *ex-parte, in camera* Hearing; and

---

[7] Such transcript is deemed secret and under seal of the Court, but available to the Petitioner, OAG here.

[8] The *ex-parte, in camera* transcript representing proceedings to which the OAG did not participate are offered under seal of the Court, but **are to be deemed not available to the OAG**.

(ii) the Protective Order, by its terms impermissibly violates the OAG's First Amendment rights, and by its very existence improperly invades the separation of powers Constitutionally guaranteed the OAG, such that it is unable to undertake its own independent internal investigation into the reported leaks of materials subject to grand jury secrecy – all under THE INVESTIGATING GRAND JURY ACT, 42 Pa.C.S.A. §4541, *et. seq.* and relevant case law relevant thereto.

## II. Concerns Pertaining the Office of Attorney General

### A. Concerns Regarding Development of Right-to-Kknow Requests

83. In early July 2014, the OAG was the recipient of **only general requests** under the RIGHT TO KNOW ACT, which were made shortly after the news media became aware of general concerns that the OAG was being reviewed for a possible role in the leak of materials of a 2009 Grand Jury which were deemed subject to grand jury secrecy.

84. Inexplicably, shortly after the OAG became aware of the subpoenaed status of certain witnesses in mid-August of 2014, the OAG experienced what they characterized as a "flurry of requests" under the RIGHT TO KNOW ACT which **specifically identified** two former staff attorneys at the OAG.

85. In view of the aforestated events, the Special Prosecutor was warranted in believing the confidentiality of his investigation had been compromised due to acts directly or indirectly attributed to the OAG, which served as a foundation for him to bring them to the attention of the Supervising Judge and seek the Protective Order.

### B. The Impairment of Having Limited Witnesses At The Reconsideration Hearing Was Self-Inflicted

86. As stated, the subject Protective Order was entered by the Supervising Judge after a

8/25/14 *ex-parte, in camera* Hearing at which time certain witnesses and the Special Prosecutor presented testimony that witness called to the 35th Grand Jury were subject to intimidation, harassment and feared retaliation.

87. In seeking to have the Protective Order vacated – the OAG participated in a subsequent *in camera* Hearing which was scheduled by the Supervising Judge at the convenience of all interested parties in furtherance of the OAG's Motion for Reconsideration of the Protective Order.

88. At such 10/17/14 Hearing, the OAG was permitted and encouraged by the Supervising Judge to call any and all witnesses it so desired together with the introduction of evidence, proper under law, in support of its Petition for Reconsideration.

89. Notwithstanding, the OAG was prepared and presented only one (1) witness other than the witnesses it sought to cross exam that had participated in the *ex-parte, in camera* Hearing.

90. The OAG offered no witness testimony nor evidence to prove that the Protective Order was having an adverse impact on the operations of the OAG, or that the Attorney General was hindered in any way in carrying out the duties of her office.

91. The OAG was well aware of the parameters established under law by which the Supervising Judge was to address the OAG's petition for Reconsideration of the Protective Order.

92. Despite the disingenuous argument advanced by the OAG to undermine the 8/25/2014 *ex-parte, in camera* Hearing (see Exhibit A), the decision of the Supervision Judge to deny the OAG the aforesaid transcript and use of the subject subpoenas, together with the testimony of the Special Prosecutor was proper under law in accordance with the Rules of Court, and consistent with prevailing case law. See *Commonwealth v. Hood*, 2005 PA Super 93 (2005) and *In Re: Dauphin County Fourth Investigating Grand Jury*, 610 Pa. 296, 19 A.3d 491 (2011).

## C. Positions Assumed By The OAG Represents An Improper Abuse Of Power

93. The Reconsideration Hearing was conducted by the Supervising Judge in reliance in and consistent with the law.

94. The positions taken by the OAG in challenging the conduct of the Supervising Judge are baseless, and of grave concern the OAG is certainly all too familiar with the rules of procedure and prevailing case law pertaining to the issuance of Protective Orders in grand juries which properly seek to preserve the identity of witnesses and thereby provide them with the freedom to testify and provide invaluable information to the grand jury without fear of intimidation, harassment or retaliation.

95. Without conceding the positions of the Respondent stated herein, for purposes of argument if the OAG were permitted to cross examine witnesses reporting acts of intimidation, harassment and/or retaliation due to acts attributed to the OAG, and/or if the OAG was permitted to review transcripts of such witnesses testimony before the Supervising Judge reviewing the need for a protective order – then the OAG would be in a position to learn the identity of such witnesses, which would no doubt have a chilling effect on their continued cooperation with the Special Prosecutor, and perhaps their future testimony before a grand jury.

96. Further, it must be acknowledged that the OAG is a merely a witness before the 35th Grand Jury.

97. Any interest on the part of the OAG to undertake its own parallel investigation into the source of leaks within the OAG which lead to the public disclosure of materials subject to grand jury secrecy pertaining to a 2009 Grand Jury must first overcome conflicts of interests, and certainly

cannot improperly invade and impair the deliberations of the sitting 35th Grand Jury. [9]

98. It is respectfully submitted that the actions of the OAG in pursuing its specious claim that the 8/25/14 Reconsideration Hearing violated its legal rights to confront witnesses (and thereby confirm their identity) served an engineered function to impair the pace of the deliberations of the 35th Grand Jury, and demonstrates a blatant abuse of power.

99. Moreover, for purposes of the Reconsideration Hearing, the OAG sought to compel the testimony of witnesses who participated in the 8/25/14 *ex-parte, in camera* Hearing through the improper use of unauthorized *Statewide Investigating Grand Jury Subpoenas* under the signature of the Supervising Judge.

100. The brazen misuse of the *Statewide Investigating Grand Jury Subpoenas* represents a clear demonstration of assumed unbridled power on the part of the OAG, and a clear abuse of power.

101. To compel the attendance for testimony of Fina and Costanzo, and its later attempts to both: review the *ex-parte, in camera* Hearing Transcript of the Hearing leading to the issuance of the Protective Order; and to have the Special Prosecutor testify - all represented improper attempts on the part of the OAG to obtain on the record testimony and events in support of its position.

### III. Conduct of Attorney General Kane, both individually and in the capacity of her public office has resulted in undermining the pace of deliberations of the 35th Grand Jury and represents an abuse of power

102. Before heading to the Grand Jury, Attorney General Kane issued a bomb-shell

---

[9] As stated in this pleading, Attorney General Kane has pronounced to the news media that she knew the OAG released an internal memo from the 2009 grand jury investigation of a political activist. She must assuredly be aware of the person(s) who delivered the memo to the news media, and particulars associated with such delivery to make the statement (on numerous occasions to multiple members of the news media) that the so-called 'release' "was done in a way that did not violate statutory or case law regarding grand jury secrecy."

pronouncement before press assembled at the facility in which the Grand Jury convenes that she knew her office released to the Philadelphia Daily News an internal memo from a 2009 grand jury investigation and that the material "... was done in a way that did not violate statutory or case law regarding grand jury secrecy."[10]

103. Any claim that the materials subject to grand jury secrecy were released by the independent acts of OAG employees without the knowledge of Attorney General Kane can be dismissed in light of her arguments that she personally could divulge the documents because she was not subject to an oath of secrecy associated with the 2009 Grand Jury.

104. Indeed to quote from the Memorandum of Law in Support of the *Motion to Quash Subpoena*, which Attorney General Kane filed with this Honorable Court in her individual capacity through private legal counsel and not from the Office of the Attorney General, she expressly states:

> "... Attorney General Kane was not sworn to secrecy with regard to the 2009 grand jury proceedings. By statute, only a limited group of individuals are sworn to secrecy with regard to grand jury proceedings, and only those individuals can subsequently , 'be in contempt of court if they reveal any information which they are sworn to keep secret.' 42 Pa. C.S. § 4549(b). Because Attorney General Kane had no involvement whatsoever with the 2009 grand jury proceedings, she could not as a matter of law be in contempt of court with regard to any disclosure related to that grand jury proceeding." (see page 1and 2 of Memorandum of Law in Support of the Motion to Quash, filed 9/29/14)

105. Attorney General Kane has elected to promote her argument within news media that the Protective Order has effectively prevented the OAG from pursuing investigations not only with regard to those leak(s) which are the focus of the 35th Grand Jury, but also by representing a gag order of sorts which prohibit her to identify actors in an investigation which uncovered obscene

---

[10] By a clear reading of the account in the 6/6/14 edition of the Philadelphia Daily News, the leak suggested that former Chief Deputy Frank Fina, who is at odds with Kane, did not aggressively pursue the 2009 investigation leading to indictment of the principal actor being investigated.

email transmissions.

106. Specifically, appearing on the news show Anderson Cooper's 360 on CNN, Attorney General Kane stated she is, "fighting pervasive public corruption and an abuse of power that led to her being targeted in the leak investigation. 'I am shocked at how deep it goes ... [a]nd I am shocked by how powerful it is." *Lack of consistent narrative colors Kane's second year -* Philadelphia Inquirer, 11/23/14.

107. The position advanced by Attorney General Kane that she is not bound by grand jury secrecy to which she did not individually assume an oath of secrecy is chilling, particular with regard to its impact to the criminal justice system in general, and the grand jury system in particular.

108. Query whether a direct witness to a fatal shooting would be agreeable to testify before a grand jury knowing that their identity may be preserved by the OAG administration then in place – but subject to exposure in a later administration of the OAG, because the succeeding Attorney General did not individually take an oath of secrecy for prior grand juries.

109. Further, the natural extension to the OAG argument that vacating the Protective Order will enable the OAG appropriate freedom to pursue its own investigation into leaks associated with the 35th Grand Jury will necessarily result in the disclosure of witness identities and materials presently protected under grand jury secrecy pertaining to the 35th Grand Jury. Such disclosure(s) would render a result which is completely antithetical to the objectives of maintaining secrecy of grand jury proceedings, and thus makes a pointed counter-argument for maintaining the standing Protective Order which effectively maintains the integrity and secrecy of the 35th Grand Jury proceedings.

110. It is respectfully submitted that the recent conduct of Attorney General Kane, both as the

executive head of the OAG and, individually, creates a clear impression of a governmental official engaged in self-preservation rather than committed to getting to the truth of whether there was a leak of material subject to grand jury secrecy and the person(s) who perpetrated such a leak.

111. Further, the public positions taken by Attorney General Kane, individually, call into question whether Attorney General Kane has ignored the full import of her oath of office whereby she assuredly accedes to the obligations and duties of her predecessors in office to maintain the secrecy of prior grand juries and thereby preserve the integrity of the function of the entire grand jury "system."

112. To deny that Attorney General Kane does not accede the obligations and oath of secrecy made by her predecessors is to effectively flip THE INVESTIGATING GRAND JURY ACT, 42 Pa.C.S.A. §4541, *et. seq.* and relevant case law on its ear and upside down.


## IV. Impact of Persons Interviewed and/or to Testify

113. In the course of his duties, several former employees and present employees have come forward and advised the Special Prosecutor of their willingness to be interviewed and/or testify before the 35th Grand Jury into matters associated with the leak(s) attributed to materials subject to the 2009 Grand Jury deemed secret.

114. Such persons have made it clear that they will not proceed, or are reticent, to participate unless they are protected by a Protective Order and formally subjected to a subpoena.

115. It is unequivocally clear that the 35th Grand Jury will be best served by the continuation of the Protective Order.

## V. The Protective Order is working and should remain in place

116. It is respectfully submitted that the leaks of information pertaining to the identities of subpoenaed witnesses, their intimidation and harassment, and real concerns of retaliation are properly and effectively prevented by operation of the Protective Order being in place.

117. It cannot be denied that since the imposition of the Protective Order and later, the Amended Protective Order, administrative affairs of the 35th Grand Jury have been able to proceed without consequential incident, apart from the continued unwarranted machinations of the OAG and Attorney General Kane to obtain an Order to vacate the Protective Order and/or dismiss the 35th Grand Jury .

118. Put simply, the Protective Order is working as intended.

119. The OAG has failed to articulate how the Protective Order adversely impacts its business operations to warrant the Protective Order being vacated.

120. Accordingly, it is respectfully submitted that the best opportunity for the 35th Statewide Investigating Grand Jury to timely finish its investigation is to allow the Protective Order to remain in place – thereby allowing witnesses and others to come freely forward to testify without fear of intimidation and or retaliation.

**WHEREFORE**, Respondent, Thomas E. Carluccio, Esq. the Special Prosecutor of Investigating Grand Jury No. #35does hereby respectfully request that this Honorable Court deny the *Petition for Review of Orders Entered by Supervising Judge of the Thirty-Fifth Statewide*

*Investigating Grand Jury on 8/27/14; 9/17/14 and 10/30/14* – and to permit the Protective Order

and Amended Protective Order to remain in place.

Respectfully submitted,

By: _____
Thomas E. Carluccio, Esquire
Attorney I.D. No. # 81858
Plymouth Greene Office Campus
1000 Germantown Pike, Suite D-3
Plymouth Meeting, PA 19464-2484
(484) 674-2899
*Special Prosecutor of Investigating Grand Jury No. #35*

DATED:   December 1, 2014

# VERIFICATION

I, Thomas E. Carluccio, Esq. as Special Prosecutor to the Investigating Grand Jury No #35 appointed by the Pennsylvania Supreme Court, hereby state that after due diligence and investigation into the operative events underlying the subject matter of the *Petition for Review of Orders Entered by Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury on 8/27/14; 9/17/14 and 10/30/14* (the "Petition") filed of record with the Court by the Office of the Attorney General, I hereby represent that the averments set forth in the foregoing Response to said Petition are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

By: _____
Thomas E. Carluccio, Esquire
Attorney I.D. No. # 81858
Plymouth Greene Office Campus
1000 Germantown Pike, Suite D-3
Plymouth Meeting, PA 19464-2484
(484) 674-2899
*Special Prosecutor of Investigating Grand Jury No. #35*

Exhibits A through C   Remain Under Seal
August 26, 2015

**FILED UNDER SEAL**

**IN THE SUPREME COURT OF PENNSYLVANIA MIDDLE DISTRICT**

**UNSEALED PER ORDER OF THE COURT DATED AUGUST 26, 2015**

PENNSYLVANIA OFFICE OF ATTORNEY GENERAL,

      Petitioner

      v.

SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY,

      Respondent

: No. 171 MM 2014
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## ORDER

**PER CURIAM**

    AND NOW, this 4th day of December, 2014, the Supervising Judge of the Thirty-Fifth Investigating Grand Jury is directed to submit a response to the above petition for review, on or before December 12, 2014.

    This Order is in light of the supervising judge's position, conveyed by his staff in reply to a previous request from the Prothonotary for a response to the petition for review, that an answer submitted by and on behalf of a special prosecutor should also serve as the supervising judge's response. We reject such approach as inconsistent with the values of judicial objectivity and independence, particularly where the special prosecutor's response contains untested factual assertions and unadjudicated accusations of improprieties.

    The supervising judge is to address, in particular, the allegations by the Office of Attorney General that the protective order infringes on its ability to fulfill its constitutional

mandate relative to the investigation and prosecution of criminal offenses. In this regard, this Court desires prompt and certain clarification of the protective order. The supervising judge is also directed to specify the degree to which the protective order is intended to restrict or impact upon any otherwise appropriate public disclosure of information connected with the possession and/or distribution of pornographic images by members of the Office of Attorney General using state computers, which occurred before the present Attorney General took office.

Mr. Chief Justice Castille files a concurring statement.

Mr. Justice Stevens files a concurring statement.

**FILED UNDER SEAL**

**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

**UNSEALED PER ORDER OF
THE COURT DATED
AUGUST 26, 2015**

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : | No. 171 MM 2014 |
| | : | |
| | : | |
| Petitioner | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY, | : | |
| | : | |
| | : | |
| | : | |
| Respondent | : | |
| | : | |

**CONCURRING STATEMENT**

**MR. CHIEF JUSTICE CASTILLE**                **FILED: December 4, 2014**

I join the Court's order directing the Supervising Judge to provide an independent judicial expression in response to the petition of the Office of Attorney General (OAG). See, e.g., Commonwealth v. DeJesus, 868 A.2d 379, 383 (Pa. 2005) (without independent judicial analysis from lower court, appellate court is deprived of explication and guidance on those issues from judicial entity most familiar with matter). I write separately respecting that aspect of the Court's order directing the Supervising Judge to address one particular claim forwarded by OAG: that "the [Supervising Judge's] protective order infringes on [OAG's] ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses." Notably, in its current pleadings, OAG's allegations in this regard purport to speak "by way of illustration only," but the

illustrations in OAG's petition implicate *only* the Special Prosecutor's investigation – an investigation which involves, to some extent, OAG itself. I would suggest to the Supervising Judge that, to discharge his duty of explication under this Court's order, he direct OAG to immediately identify precisely which, if any, of its law enforcement functions, other than a supposed right to investigate witnesses in an ongoing Special Prosecution involving OAG itself, have been impeded by the protective order here. Furthermore, if OAG is so affected in its function *independent* of the Special Prosecution, it would be efficacious to direct OAG to suggest the contours of a narrower order that would address OAG's concerns affecting duties outside the realm of the Special Prosecution.

**FILED UNDER SEAL**

**UNSEALED PER ORDER OF THE COURT DATED AUGUST 26, 2015**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

PENNSYLVANIA OFFICE OF
ATTORNEY GENERAL,

        Petitioner

        v.

SUPERVISING JUDGE OF THE
THIRTY-FIFTH STATEWIDE
INVESTIGATING GRAND JURY,

        Respondent

: No. 171 MM 2014
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## CONCURRING STATEMENT

**MR. JUSTICE STEVENS**         **FILED:**   **December 4, 2014**

I write separately to note my agreement with the thoughtful approach of the Majority that the supervising jurist, the Honorable William R. Carpenter, should be required to provide this Court with a specific response, within a definite time period, as to why appropriate public disclosure of emails, alleged to contain inappropriate and/or pornographic material, is being prevented pursuant to a protective order. Further, Judge Carpenter should be directed to clarify the reasons a protective order was issued as it relates to the Office of Attorney General's (OAG) alleged intimidation of grand jury witnesses.

The need for such an independent, specific explanation is highlighted by the many inconsistencies, which my initial review of the October 17, 2014 transcript has revealed.

For instance, Judge Carpenter denied the OAG's motions to subpoena Mr. Frank Fina and Mr. E. Mark Costanzo, as well as review the transcript of the in camera hearing, on the basis of case law holding that "allowing the presence of the defendant and defense counsel in a protective order hearing would have defeated the purpose of providing protection for these witnesses." N.T. 10/17/2014, reconsideration hearing, at 2-3. However, the special prosecutor, Mr. Thomas E. Carluccio, argued to the court that "[t]he Attorney General's Office is not a defendant. They have not been charged. They are a third party in this investigation." Id. at 7.

In any event, due in part to Judge Carpenter's apparent resistance to provide this Court with a proper explanation for the issuance of the protective orders against the OAG, I would require Judge Carpenter to submit a proper, independent response by December 17, 2014, and in the event he fails to do so, I would direct the portion of the protective order, which is preventing public disclosure of the alleged inappropriate and/or pornographic emails, be vacated.

Moreover, I would direct Judge Carpenter to clarify in his response that, if the protective order is required as it relates to alleged intimidation of grand jury witnesses, what specific conduct it covers. As was alleged by the OAG during the October 17, 2014 hearing, the protective order is "general, broad, and vague," and has the potential to produce a chilling effect as it relates to unrelated ongoing cases involving the OAG and some of the potential grand jury witnesses. Id. at 15-16.

Also, I would not file this order under seal.

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

PENNSYLVANIA OFFICE OF                      :
ATTORNEY GENERAL,                           :        No. 171 MM 2014        **UNSEALED PER**
                          Petitioner        :                               **ORDER OF THE**
          V.                                :                               **COURT DATED**
                                            :                               **AUGUST 26, 2015**
                                            :
SUPERVISING JUDGE OF THE                    :        **FILED UNDER SEAL**
THIRTY-FIFTH STATEWIDE                      :
INVESTIGATING GRAND JURY,                   :
                          Respondent        :

---

**PENNSYLVANIA OFFICE OF ATTORNEY GENERAL'S REPLY TO THE RESPONSE
OF THE SPECIAL PROSECUTOR TO ITS PETITION FOR REVIEW OF ORDERS
ENTERED BY SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE
INVESTIGATING GRAND JURY ON AUGUST 27, 2014, SEPTEMBER 17, 2014, AND
OCTOBER 30, 2014**

---

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SUPREME
COURT OF PENNSYLVANIA:

AND NOW, comes the Office of Attorney General of the Commonwealth of

Pennsylvania, by Kathleen G. Kane, Attorney General of the Commonwealth of Pennsylvania,

and files this reply to the "new matter" put forth by Special Prosecutor Thomas E. Carluccio,

Esq. in his response to the petition for review filed in the above-captioned case. Addressing the

Special Prosecutor's assertions of "new matter" seriatim, and adhering to the paragraph

numbering and organizational scheme included in the pertinent sections of his Response, the

following is averred:

1

## NEW MATTER

80. No response to this averment is required, as it simply incorporates by reference previous averments of the Special Prosecutor. To the extent that a response to those incorporated claims may be deemed necessary, they are denied

81. No response is required to this averment but to the extent one may be deemed necessary, it is denied. By way of further answer, as reflected in Footnote 8 of the Special Prosecutor's averments raising "New Matter", the transcript of testimony taken *in camera* before Judge Carpenter relating to the Protective Order has not been provided to the OAG. Judge Carpenter, ostensibly with the assent of the Special Prosecutor, has routinely denied the OAG access to transcripts of proceedings, thereby hampering OAG's ability to provide appropriate record citations in its appeal for relief before this Court.

## I. GENERAL DENIAL THAT OAG HAS RAISED VALID CLAIMS TO WARRANT THE PROTECTIVE ORDER BE VACATED

82. The Special Prosecutor's averment as stated is denied. Specifically, OAG avers that 1) the Supervising Judge abused his discretion in handing down a series of Protective Orders, in that said Orders are overly broad and fail to indicate which specific individuals are bound by the Orders, nor did the Orders define what conduct on the part of OAG would be violative of said Orders. Specifically, the Orders prohibit "any act of obstruction, intimidation, or retaliation against any witness summoned by the Special Prosecutor in Notice No. 123". It is well to note that OAG would have no knowledge as to which witnesses had been so subpoenaed to appear, given that this information was prohibited from being disclosed to the OAG by Judge Carpenter. Moreover, the breadth of the prohibitions and lack of clarity in defining what conduct is prohibited under the Orders allows for the arbitrary and capricious application of the Protective

2

Orders against OAG. Query, for example, the scenario where a former high-ranking OAG employee has critical information about an unrelated criminal investigation still active within OAG and that former OAG employee has been involved in the Special Prosecutor's current investigation. Any contact by current OAG members with the former employee on an unrelated matter could easily be mischaracterized under the provisions of the aforementioned Orders as being "intimidating" or "retaliatory". Simply put, were current OAG members in a position to require information on an unrelated, pending matter within OAG from Frank Fina, Esq. or Marc Costanzo, Esq., the occurrence of such a conversation alone would be sufficient for either man to claim such contact was designed to intimidate, harass or retaliate, since the protective order is so broad and ill-defined. Now, consider the aforementioned conversation occurring in a scenario where current OAG members must delve into the thought-process, rationale and legal foundation of a decision made by either of the two former OAG members referenced in order to make a decision on a current, open, criminal investigation of national importance. Under the Protective Orders, any current OAG member involved in such conversations would expose themselves to being held in contempt or charged criminally for violating the Protective Orders. Moreover, the entry of the initial Protective Order *ex parte* allowed for false and/or misleading testimony to go unchallenged before the Supervising Judge. OAG has reason to believe the underlying factual allegations and averments which form the basis of the Protective Order are, at best, less than accurate, and, at worst, patently false. 2) The Supervising Judge clearly violated the due process rights of the OAG at the Reconsideration Hearing, in that Judge Carpenter denied OAG the right to compulsory process. *See, Notes of Testimony,* 10/17/14, pp.13-14.[1] 3) The Supervising

---

[1] It is important to note that the October 17th transcript of the Reconsideration was not made available to the OAG until it was attached as an Exhibit in the Special Prosecutor's Response. On pages 13 and 14 of the transcript of the "hearing".on Reconsideration of the Protective Order", after subpoenas requested for Frank Fina and Marc Costanzo were denied by Judge Carpenter, DAG Ditka was asked to present her witnesses and in response, the DAG stated

Judge's protective order sweeps broadly and appears to encompass speech relating to any person, subject, or event associated with the Special Prosecutor's investigation. 4) The protective order violates the Separation of Powers Doctrine of our federal and state Constitutions because it improperly infringes upon OAG's ability to fulfill its constitutional law enforcement mandate to investigate leaks from the Special Prosecutor's Grand Jury or other criminal violations, such as Perjury or False Swearing.

## II. CONCERNS PERTAINING TO THE OAG

### A. Concerns Regarding Development of Right-to-Know Requests

83. Denied. The series of Right-to-Know (RTK) requests filed with OAG by members of the media began on July 7, 2014 and were absolutely not "general" requests. On July 7th, Brad Bumsted of the Pittsburgh Tribune Review filed a RTK request seeking: "Any emails or other documents sent among current and former AG staff reviewed by Special Deputy Geoffrey Moulton". See Exhibit A. Moreover, on July 29, 2014, Steve Esack of The Morning Call filed the following RTK request: "Emails depicting pornographic images, video clips and sexually explicit motivational tools/messages between 2008-2012 among and between employees, including but not limited to the following: Frank Fina, Frank Noonan, Glenn Parno, E. Christopher Abruzzo, Christopher Carusone, Joe McGettigan, Randy Feathers and Tom Corbett." See Exhibit B.

---

she was denied compulsory process and not able to use Grand Jury subpoenas to compel the attendance of witnesses. In response, Judge Carpenter agreed: "You were denied the use of the Grand Jury subpoena. That's what you were denied." Id. At p. 14, ln. 15-16. In essence, the Court prohibited the use of any Grand Jury subpoenas and when asked what vehicle OAG could then use to compel attendance the Court started: "You could have asked somebody". Id. At ln. 19. As a matter of fundamental procedural due process, an individual may not be deprived of a constitutionally protected interest without a hearing, and a hearing requires notice and an opportunity to be heard; it follows that the opportunity to be heard must be at a meaningful time and in a meaningful manner. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Commonwealth v. Maldonado*, 838 A.2d 710, 714 (Pa. 2003).

4

84. Admitted in part, denied in part. It is admitted that numerous RTK requests from July 7, 2014 forward were received by OAG related to emails between a variety of employees of OAG, both current and former. See Exhibit C. The allegation by the Special Prosecutor that "[i]nexplicably, shortly after OAG became aware of the subpoenaed status of certain witnesses in mid-August 2014" the "flurry" of RTK requests began" is vehemently denied and strict proof of said allegation is demanded. As referenced above, the Special Prosecutor's own averments are factually incorrect as they relate to the timeline of RTK requests. The Special Prosecutor firmly states that in mid-August 2014 OAG became aware of his investigation and the RTK requests then began to be filed with OAG. That is simply not true. The first RTK request for emails of current and former employees was received on July 7, 2014. It is clear that the house of cards built by the Special Prosecutor, in secret, without testing of its veracity, is based upon a singular assumption: RTK requests were allegedly harmful to Frank Fina and Marc Costanzo and the disclosure of emails related to either or both may dampen their desire to testify for the Special Prosecutor. The facts simply do not bear out the Special Prosecutor's hypothesis. Furthermore, it is important that this Court is aware that as far back as March 2014, Mr. Fina had requested his emails which had been retrieved in the review of the Jerry Sandusky case, OAG assented to allow Fina access to same, and Fina never availed himself of that offer. On March 11, 2014, Frank Fina served second motion for Miscellaneous Relief on Office of Attorney General demanding access to all of his own emails and asked to be informed prior to the Office of Attorney General responding to any Right to Know Requests that name him. Subsequently, Fina had presented motions to Supervising Judge Norman Krumenacker seeking a Protective Order regarding the very same emails – a Protective Order which was ultimately denied. ████████

██████████████████████████████████████████████

5

██████████████████████████████████████████████████

████████████████████████████████ Judge Krumenacker ruled that he had no authority

over the Office of Attorney General's responses to requests under the Right to Know Law and

Frank Fina's request for relief relating thereto was denied. ██████████████

85. Denied. By way of further answer, the responses herein disprove the conclusions of

the Special Prosecutor. Clearly, this points up the gravamen of the OAG's strenuous

Constitutional objection to the process under which this Special Prosecutor and the Supervising

Judge are conducting their inquiry. Because the basis for the Protective Order has not been

tested, the transcripts have not been disclosed, and the right to subpoena and cross-examine the

complaining witnesses has been denied; there is no ability for the OAG to challenge the marked

inconsistencies in the Special Prosecutor's stated basis for the Protection Order and the Court's

abuse of discretion in granting the Order. The process at play is devoid of judicial objectivity

and countless factual assertions are made without their veracity being tested. The OAG's due

process rights in this inquiry have been disregarded throughout the pendency of these

proceedings. With this Court's understanding of the context and great public interest regarding

the pornographic emails of Mr. Fina, and understanding that since March of 2014 Mr. Fina has

undertaken a concerted effort to shield those emails from public view, it appears that through

these baseless, unsubstantiated Protective Orders, he has at last managed to accomplish before

Judge Carpenter what he could not before Judge Krumenacker – hide these graphic and

demeaning pornographic images. The lack of due process afforded to OAG in the Protective

Order proceedings precluded the Supervising Judge and the parties from testing the veracity of

the claims of Mr. Fina and others, and from exploring the true motives they may have had for

making such claims.

6

**B. The Impairment of Having Limited Witnesses at the Reconsideration Hearing was Self-Inflicted**

86. Denied. By way of further answer, the OAG avers that there was a lack of substantial, credible evidence to support the grant of the Protective Order on August 25, 2014 and the OAG incorporates by reference the responses to the "New Matter" above.

87. It is admitted that a hearing on the OAG's Motion to Reconsider the entry of the Protective Order was scheduled.

88. Denied. By way of further answer, when the Office of Attorney General asked for subpoenas for the complaining witnesses in preparation for the subsequent "hearing" on the matter, they were denied. When the Office of Attorney General attempted to subpoena a witness that it believed may have pertinent information regarding the basis for the order, the lower Court instructed the Office of Attorney General to withdraw the subpoena and then suggested that the issuance of a subpoena was contemptuous and perhaps criminal. In light of the handicaps that were imposed on the Office of Attorney General, the "hearing" that was actually held was, at best, perfunctory and, at worst, a charade. In fact, in Judge Carpenter's Order of October 30, 2014, denying OAG's Motion to Vacate the Protective Order, he made a finding of fact that OAG produced only one (1) witness, but failed to acknowledge that he had denied OAG's right to call additional witnesses and was thus the reason that only one (1) witness was produced.

89. It is admitted that OAG called only one witness at the proceeding and that Judge Carpenter denied OAG the opportunity to call other critical witness such as Mr. Fina and Mr. Costanzo.

7

90. Denied. By way of further answer, the OAG avers that its counsel did, in fact, articulate to Judge Carpenter the adverse impact suffered by the OAG as a result of this broad and baseless Protective Order. *Notes of Testimony*, 10/17/14 pp. 15-16.

91. Denied. By way of further answer, the OAG asserts that the parameters were drawn so narrowly by Judge Carpenter that the "hearing" was a mere façade, in that the OAG was barred from presenting critical evidence.

92. Denied. By way of further answer, the OAG alleges that the lack of due process and right to compulsory process at the Reconsideration Hearing rendered it hollow. Moreover, the reliance on *Commonwealth v. Hood*, 872 A.2d 175 (Pa. Super. 2005) by the Special Prosecutor supports the claims consistently made by the OAG. There must be a right to examine complaining witnesses and to learn their identity. Even the defendant charged with murder in *Hood* was given that modicum of due process. This is far different than what has been afforded to the OAG in the case at bar.

### C. Positions Assumed By The OAG Represent An Improper Abuse of Power

93. Denied. By way of further answer, the OAG avers that Judge Carpenter manner of conducting the Reconsideration Hearing was violative of OAG's due process rights.

94. Denied. The OAG is aware of the law as it relates to the use of Protective Orders, however, such orders must not violate the due process rights of those impacted and must be based upon substantial, credible evince. Such is not the case here.

95. Denied. By way of further answer, the chilling effect is not on the witnesses of the Special Prosecutor, but rather on the criminal justice system as a whole. To allow the conduct that has taken place here, in such broad and sweeping terms, without the benefit of a meaningful

8

hearing and the ability to compel the attendance of witnesses to test the very truth of what purported accusers say is what is at issue here.

96. Denied. The 35th Statewide Grand Jury has been empanelled under the direction and guidance of the OAG, and any crimes which emanate from that Grand Jury, i.e., the numerous leaks that have occurred from the Special Prosecutor's own investigation filed at Notice #123, fall within the jurisdiction of OAG.

97. Denied. By way of further answer, the OAG avers that the Special Prosecutor confuses the position of the OAG. The 35th Statewide Grand Jury has been empanelled under the direction and guidance of the OAG and any crimes which emanate from that Grand Jury, i.e., the numerous leaks that have occurred from the Special Prosecutor's own investigation filed to Notice #123, fall within the jurisdiction of OAG to investigate.

98. Denied. By way of further answer, the OAG avers it is repugnant to suggest that the filing of a lawful petition in the lower court and the Supreme Court seeking to protect the constitutional rights of hundreds of people and raising the issue of the failure of the lower court to recognize the absolute, Constitutionally mandated necessity of separation of powers and due process is somehow an abuse of power. To the contrary, as the duly elected Chief Law Enforcement Officer of the Commonwealth, the filing of petitions is not only a right afforded all citizens but it is the duty of the Attorney General to protect, obey and defend the Constitution of the United States and of the Commonwealth of Pennsylvania.

99. Admitted in part; denied in part. It is admitted the OAG sought to secure the attendance of complaining witnesses Frank Fina and Marc Costanzo at the Reconsideration Hearing. The OAG requested Judge Carpenter to issue subpoenas for both men, in an abundance

9

of caution due to the breadth and lack of clarity of the Protective Order. The OAG's request was denied. The OAG also followed its procedures and normal course of business and issued a subpoena to Brad Bumsted of the Tribune Review. The issuance of the Bumsted subpoena was done in a manner consistent with past practice at OAG and in violation of no procedural rule or statute. It is denied that the OAG's attempts to conduct a due process hearing and compel the attendance of critical witnesses constitute in any way an abuse of power.

100. Denied. By way of further answer, the allegation that the OAG's attempt to participate in a meaningful due process hearing before the Supervising Judge and compel the attendance of critical witnesses is a "brazen misuse" of the Statewide Grand Jury and represents a "clear demonstration of assumed unbridled power" shocks the conscience. This extraordinary accusation, which can result in removal from office, demonstrates a lack of independence on the part of the Special Prosecutor and his lack of knowledge of the constitutional guarantees provided to all citizens of the Commonwealth of Pennsylvania.

101. Denied. By way of further answer, the OAG avers that the transcript of the *ex parte* hearing was sent to the OAG by the Pennsylvania Supreme Court.

### III. Conduct of Attorney General Kane Has Resulted in Undermining the Pace of Deliberations of the Grand Jury

102. Inasmuch as the allegation is unartfully crafted, difficult to understand, and falls far outside of the boundaries of Reconsideration of the Protective Order currently before this Court, no response is required. Further, the transcript of the testimony of Attorney General Kane speaks for itself.

10

103. Inasmuch as the allegation is unartfully crafted, difficult to understand, and falls far outside of the boundaries of Reconsideration of the Protective Order currently before this Court, no response is required.

104. No response required. The Motion to Quash filed by the Attorney General speaks for itself.

105. Denied. Furthermore, Attorney General Kane has consistently sought judicial intervention to redress the unlawful Protective Orders in place as well as other irregularities within the Special Prosecutor's investigation. Moreover, it would be highly unusual for the Special Prosecutor to suggest that Attorney General Kane does not have a 1st Amendment right to speak in response and opposition to the limitations placed upon her and the OAG by the aforementioned orders.

106. Denied. By way of further answer, the OAG submits the entirety of the CNN interview speaks for itself, rather than the excised and interpreted portions thereof put forth by the Special Prosecutor.

107. Denied. By way of further answer, the law regarding Grand Jury secrecy, the testimony of Attorney General Kane, and the circumstances surrounding Notice #123 speak for themselves.

108. No response required

109. Denied. By way of further answer, the Special Prosecutor's averments miss the mark on understanding the concern for leaks within his grand jury investigation. The OAG does not need the Notes of Testimony of the Grand Jury to investigate a leak. Rather, following the

11

Special Prosecutor's averment, he can act with complete immunity from oversight as there would be no ability of the OAG to investigate leaks or other irregularities from its own Statewide Grand Jury. With that backdrop and the abject denial of due process throughout the pendency of the Special Prosecutor's investigation, such a result would clearly shock the conscience and negatively impact the integrity of the Grand Jury process.

110. Denied. By way of further answer, the OAG submits that a review of the procedural history and the repeated efforts of Mr. Fina to shield from public view the graphic and degrading pornographic emails he possessed and distributed provides ample evidence to demonstrate the true rationale for the seeking and issuance of the Protective Orders in question as well the rationale for the Special Prosecutor's averment. The tactic that failed with Judge Krumaenacker was tried again with Judge Carpenter, this time with the aid of the Special Prosecutor. Nothing could be more apparent. What is equally clear from averments such as these is that the Special Prosecutor, by asserting the Attorney General is "engaged in self-preservation rather than [being] committed to getting to the truth of whether there was a leak of material subject to Grand Jury secrecy", shows a lack of the unbiased, independent and impartial attitude that is imperative for the fair pursuit of justice.

111. Denied.

112. Denied. By way of further answer, the law relating to Grand Jury proceedings is clear and speaks for itself.

## IV. IMPACT OF PERSONS INTERVIEWED AND/OR TO TESTIFY

113. The OAG is without sufficient information to formulate a response.

114. The OAG is without sufficient information to formulate a response.

12

115. Denied.

## V. THE PROTECTIVE ORDER IS WORKING AND SHOULD REMAIN IN PLACE

116. Denied.

117. Denied. By way of further answer, the OAG has exercised it constitutional rights to due process and compulsory process and has asserted the Special Prosecutor's investigation violates the separation of powers doctrine.

118. Denied. By way of further answer, the OAG avers the Protective Orders can only be classified as "working" if the goal of said Orders was to run roughshod over fundamental Constitutional principles and to shield from public scrutiny the numerous pornographic emails possessed and distributed by then OAG employees Frank Fina and Marc Costanzo.

119. Denied. By way of further answer, the OAG avers that it is the burden first of Judge Carpenter and the Special Prosecutor to submit "substantial evidence" which warrants the issuance of a Protective Order on an independent Commonwealth agency and its employees. Further, the OAG asserts that the Protective Orders impede the operations of OAG in a variety of areas as referenced above in averment 82. Moreover, the OAG will provide to this Court its response to Judge Carpenter's Order requiring OAG to detail how the Protective Orders have impacted the business of OAG.

120. Denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Petitioner, The Office of Attorney General of the Commonwealth of Pennsylvania, respectfully reiterates its request that this Court vacate the Protective Orders issued by Judge Carpenter.

Respectfully submitted,

*Kathleen G. Kane*

KATHLEEN G. KANE,
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: December 8, 2014

14

## VERIFICATION

The facts recited in the foregoing Petition for Review are true and correct to the best of my knowledge and belief. This statement is made with knowledge that a false statement is punishable by law under 18 Pa. C.S. § 4904(b).

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: December 8, 2014

15

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving one copy of the foregoing Petition for Review

upon the persons and in the manner indicated below:

*Via U.S. First-Class Mail,*
*Postage pre-paid:*

The Honorable William R. Carpenter
Court of Common Pleas of Montgomery County
Montgomery County Courthouse
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-5902
(Supervising Judge)

Thomas E. Carluccio, Esquire
Plymouth Greene Office Campus
1000 Germantown Pike, Suite D3
Plymouth Meeting, PA 19462-2484
(484) 674-2899
(Special Prosecutor)

Ann Thornburg Weiss, Clerk of Courts
Montgomery County Clerk of Courts Office
P.O. Box 311
Norristown, PA 19404-0311
(610) 278-3346
(Clerk of Courts)

KATHLEEN G. KANE
Attorney General
Commonwealth of Pennsylvania

OFFICE OF ATTORNEY GENERAL
16th Floor-Strawberry Square
Harrisburg, PA 17120
(717) 705-0098
(Fax) (717) 783-5431

Date: December 8, 2014

16

# Exhibit A

**Born, Susan J.**

| | |
|---|---|
| **From:** | Born, Susan J. |
| **Sent:** | Monday, July 07, 2014 2:18 PM |
| **To:** | Born, Susan J. |
| **Subject:** | FW: Please (also) confirm receipt |

RECEIVED
Office of Attorney General

JUL 07 2014

Right to Know Officer

---

**From:** Brad Bumsted [mailto:bbumsted@tribweb.com]
**Sent:** Monday, July 07, 2014 12:31 PM
**To:** Abbott, J.J.
**Subject:** Please (also) confirm receipt

This is an RTK request under PA Law.
For any emails or other documents on an internal AG review of pornographic emails sent among current and former AG staff from and to each other, understanding that names and email addresses may be redacted.

Brad Bumsted
State Capitol Reporter
Pittsburgh Tribune-Review
717-514-1032 (cell)
717-787-1405 (land)
www.triblive.com
bbumsted@tribweb.com

1st
RTKL

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers. Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

1.

**Born, Susan J.**

From:         Born, Susan J.
Sent:         Monday, July 07, 2014 2:19 PM
To:           Born, Susan J.
Subject:      FW: FW: Please confirm receipt

RECEIVED
Office of Attorney General

JUL 07 2014

Right to Know Officer

SR - 58682-JCTW

---------- Forwarded message ----------
From: **Brad Bumsted** <bbumsted@tribweb.com>
Date: Mon, Jul 7, 2014 at 12:36 PM
Subject: FW: Please confirm receipt
To: JJ Abbott <abbott.jj@gmail.com>

Clarified first request today to include former as well as current staff

This is an RTK request under PA law for the following:
Emails and/or Email attachments reviewed by Special Deputy Geoffrey Moulton that contain pornographic images -- sent by former and current AG staff to other current and former AG staffers -- and former and current staffers who were cc'd.
Thanks.
Brad Bumsted
State Capitol Reporter
Pittsburgh Tribune-Review
717-514-1032 (cell)
717-787-1405 (land)
www.triblive.com
bbumsted@tribweb.com

*Clarification
1rd RTK*

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers. Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

1



Aug. 11, 2014

JJ Abbott
Deputy Press Secretary
Pennsylvania Attorney General's Office
Strawberry Square
Harrisburg, PA 17120

VIA EMAIL:

Dear Mr. Abbott,

This is a public records request in accordance with the Pennsylvania Right-to-Know law
to review and/or have copies made of all e-mails sent and/or forwarded by former Chief
Deputy Attorney General Frank Fina and/or his former colleagues that include any
pornographic and or sexually explicit references, URL links, photographs and/or videos.

It is my understanding that emails containing such material may have been recovered
during the research that resulted in the May 30, 2014 Report to the Attorney General on
the Investigation of Gerald A. Sandusky.

Please contact me at 215-854-5973 if you have any questions or by e-mail at
brennac@phillynews.com. I can also be reached by mail at 801 Market Street, Suite 300,
Philadelphia, PA, 19107.

Thank you.

Sincerely,


Chris Brennan
Political Editor
Philadelphia Daily News



Aug. 13, 2014

JJ Abbott
Deputy Press Secretary
Pennsylvania Attorney General's Office
Strawberry Square
Harrisburg, PA 17120

VIA EMAIL:

Dear Mr. Abbott,

This is an amended public records request, following my Aug. 11, 2014 request, in
accordance with the Pennsylvania Right-to-Know law to review and/or have copies made
of all e-mails sent and/or forwarded by former Chief Deputy Attorney General Frank
Fina and/or his former colleagues that include any pornographic and or sexually explicit
references, URL links, photographs and/or videos.

AMENDMENT; This request includes any e-mail correspondence of the above described
nature between Frank Fina and former Attorney General Office employees Glenn Parno
and/or Richard Sheetz. That correspondence may have used the subject line title of
"Motivational Office."

It is my understanding that emails containing such material may have been recovered
during the research that resulted in the May 30, 2014 Report to the Attorney General on
the Investigation of Gerald A. Sandusky.

Please contact me at 215-854-5973 if you have any questions or by e-mail at
brennac@phillynews.com. I can also be reached by mail at 801 Market Street, Suite 300,
Philadelphia, PA, 19107.

Thank you.

Sincerely,

Chris Brennan
Political Editor
Philadelphia Daily News



**pennsylvania**
OFFICE OF OPEN RECORDS

RECEIVED
Office of Attorney General
JUL 29 2014
Right to Know Officer
SR-59177-GN3B

## STANDARD RIGHT-TO-KNOW REQUEST FORM

DATE REQUESTED: July 29, 2014

REQUEST SUBMITTED BY:        E-MAIL

NAME OF REQUESTOR: Steve Esack, reporter The Morning Call

STREET ADDRESS: Main Capitol Building, Room 524E Floor, Newsroom, Harrisburg, PA 17120

CITY/STATE/COUNTY (Required): Harrisburg/PA/Dauphin

TELEPHONE (Optional):    717-783-7305

RECORDS REQUESTED:
*Provide as much specific detail as possible so the agency can identify the information.*

Electronic copies of personal, non-official, non-business emails depicting pornographic images, video clips and sexually explicit motivational tools/messages sent on taxpayer-funded computers and servers between 2008 and 2012 among and between employees of the Pennsylvania Attorney General's Office, including but not limited to the following:
Frank Fina
Frank Noonan
Glenn Parno
E. Christopher Abruzzo
Christopher Carusone
Joe McGettigan
Randy Feathers
Tom Corbett

DO YOU WANT COPIES? YES

DO YOU WANT TO INSPECT THE RECORDS? YES

DO YOU WANT CERTIFIED COPIES OF RECORDS? YES or NO

RIGHT TO KNOW OFFICER:

DATE RECEIVED BY THE AGENCY:

AGENCY FIVE (5)-DAY RESPONSE DUE:

*\*\*Public bodies may fill anonymous verbal or written requests. If the requestor wishes to pursue the relief and remedies provided for in this Act, the request must be in writing. (Section 702.) Written requests need not include an explanation why information is sought or the intended use of the information unless otherwise required by law. (Section 703.)*

## Mummert, Mary L.

| | |
|---|---|
| **From:** | Mummert, Mary L. |
| **Sent:** | Monday, August 11, 2014 10:00 AM |
| **To:** | Right To Know Response |
| **Subject:** | RTK REQUEST - Amy Worden (Reporter) |

---

**From:** Born, Susan J.
**Sent:** Monday, August 11, 2014 9:17 AM
**To:** Mummert, Mary L.
**Subject:** FW: Inquirer/RTK

RECEIVED
Office of Attorney General

AUG 05 2014

Right to Know Officer
SR-59467-MF2T

Mary,

Below is a RTKL request that was received last week. Did you see this one yet?

*Susan*

---

**From:** Mulle, Robert A.
**Sent:** Tuesday, August 05, 2014 4:24 PM
**To:** Born, Susan J.
**Subject:** FW: Inquirer/RTK

One of "those" R2K's; we can handle upon your return from your well-earned vacation.
Bob

---

**From:** Abbott, J.J.
**Sent:** Tuesday, August 05, 2014 4:10 PM
**To:** Mulle, Robert A.
**Cc:** Martin, Renee G.
**Subject:** FW: Inquirer/RTK

Bob- This was sent to me because supposedly Amy had issues with the online form.

---

**From:** Worden, Amy [mailto:aworden@phillynews.com]
**Sent:** Tuesday, August 05, 2014 3:56 PM
**To:** Abbott, J.J.
**Subject:** Inquirer/RTK

Aug. 5, 2014

Dear Pa. attorney general's office:

Under the state Right-to-Know law, The Inquirer requests copies of all email traffic that is of a personal nature and involves pornographic or otherwise professionally inappropriate material to and from the work accounts of

1

former deputy attorney Frank Fina and fellow former prosecutors Marc Costanzo and Patrick Blessington from 2009, until their departure from the office's staff in late 2012 or early 2013.

Please include all recipients of the email chains that shared in this email and include the actual emails.

Thanks very much and please contact us if we can clarify this in any way.

Sincerely,


Amy Worden
Staff Writer
State Capitol Bureau
Room 524E
Harrisburg, PA 17120
717-783-2584
Twitter @inkyamy



The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material. Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers. Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

# Exhibit B



# pennsylvania
## OFFICE OF OPEN RECORDS

### STANDARD RIGHT-TO-KNOW REQUEST FORM

**DATE REQUESTED:** July 29, 2014

**REQUEST SUBMITTED BY:** E-MAIL

**NAME OF REQUESTOR:** Steve Esack, reporter The Morning Call

**STREET ADDRESS:** Main Capitol Building, Room 524E Floor, Newsroom, Harrisburg, PA 17120

**CITY/STATE/COUNTY (Required):** Harrisburg/PA/Dauphin

**TELEPHONE (Optional):** 717-783-7305

**RECORDS REQUESTED:**
*Provide as much specific detail as possible so the agency can identify the information.*

Electronic copies of personal, non-official, non-business emails depicting pornographic images, video clips and sexually explicit motivational tools/messages sent on taxpayer-funded computers and servers between 2008 and 2012 among and between employees of the Pennsylvania Attorney General's Office, including but not limited to the following:
Frank Fina
Frank Noonan
Glenn Parno
E. Christopher Abruzzo
Christopher Carusone
Joe McGettigan
Randy Feathers
Tom Corbett

**DO YOU WANT COPIES?** YES

**DO YOU WANT TO INSPECT THE RECORDS?** YES

**DO YOU WANT CERTIFIED COPIES OF RECORDS?** YES or NO

---

**RIGHT TO KNOW OFFICER:**

DATE RECEIVED BY THE AGENCY:

AGENCY FIVE (5)-DAY RESPONSE DUE:

**Public bodies may fill anonymous verbal or written requests. If the requestor wishes to pursue the relief and remedies provided for in this Act, the request must be in writing. (Section 702.) Written requests need not include an explanation why information is sought or the intended use of the information unless otherwise required by law. (Section 703.)*

# Exhibit C

# Email Communications Recovered during Moulton Review

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due |
|---|---|---|---|---|
| Brad Bumsted *Pittsburgh Tribune-Review* | Any emails or other documents sent among current and former AG staff reviewed by Special Deputy Geoffrey Moulton | 7/7/14 | 7/14/14 | 8/13/14; verbally extended to 8/21/14 |
| Steve Esack *The Morning Call* | Emails depicting pornographic images, video clips and sexually explicit motivational tools/messages between 2008 and 2012 among and between employees, including but not limited to the following: Frank Fina; Frank Noonan; Glenn Parno; E. Christopher Abruzzo; Christopher Carusone; Joe McGettigan; Randy Feathers and Tom Corbett | 7/29/14 | 8/5/14 | 9/4/14; agreed to 1 week extension after stay is lifted |
| Amy Worden *The Inquirer* | All email traffic that involves pornographic or otherwise professionally inappropriate material to and from former deputy attorney Frank Fina, Marc Costanzo and Patrick Blessington from 2009, until their departure from the office's staff in late 2012 or early 2013. **AMENDMENT:** Including but not limited to: Chris Abruzzo, Chris Carusone, Kevin Harley, Frank Noonan, James Barker, Bruce Beemer, Louis De Titto and Ellen Granahan from 2005 to present. | 8/5/14<br>Amended request on 8/22/14 (McCoy) | 8/12/14 | 9/11/14; notified of stay/hold by letter |

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due |
|---|---|---|---|---|
| Chris Brennan *Philadelphia Daily News* | All e-mails sent and/or forwarded by former Chief Deputy Attorney General Frank Fina and/or his former colleagues that include any pornographic and or sexually explicit references, URL links, photographs and/or videos.<br><br>**AMENDMENT:** This request includes any e-mail correspondence of the above described nature between Frank Fina and former Attorney General Office employees Glenn Parno and/or Richard Sheetz. | 8/12/14<br><br>Narrowed request on 8/13/14 | 8/19/14<br><br>8/20/14 | 9/19/14; notified of stay/hold by letter |
| Charles Thompson *Patriot News* | Any Office of Attorney General emails, sent or received, that would have been recovered through Special Deputy H. Geoffrey Moulton's review of the Jerry Sandusky investigation that were found to contain overtly sexual images or content | 9/2/14 | 9/9/14 | 10/9/14 |
| Mark Scolforo *The Associated Press* | Copies of internal agency emails under consideration for release by Judge Krumenacker | 9/4/14 | 9/11/14 | 10/10/14 |
| Karen Langley *Pittsburgh Post-Gazette* | All emails between and among people who at the time were employed by the Office of Attorney General that are unrelated to official duties and which contain or include attachments that contain or links to images, videos and/or language of a pornographic or sexually explicit nature | 9/19/14 | 9/26/14 | No extension |

ALL FINAL RESPONSES HAVE BEEN STAYED PER JUDGE KRUMENACKER (8/20/14)
Stay lifted on Friday, September 19, 2014

RTKL Requests Related to Non-OAG Personal Email Communications

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Brad Bumsted *Pittsburgh Tribune-Review* (60611) | Any sexually explicit emails – with attachments depicting nude women or partially clad women and adults engaged in sexual acts – sent or received by Brian Westmoreland while he was an employee of the attorney general's office | 9/24/14 | 10/1/14 | 10/31/14 | 10/30-Denied; not a record |
| Mary Wilson PA Public Radio (60660) | Records regarding and including e-mails of pornographic content exchanged among current and former employees of the Office of Attorney General, including but not restricted to Christopher Abruzzo, Christopher Carusone, Randy Feathers, Glenn Parno, Frank Noonan, Kevin Harley, Patrick Blessington, Richard A. Sheetz, Jr., Frank Fina, Claude Thomas, Bruce Beemer, Joseph McGettigan, William Ward, Ann-Marie Kaiser, and Jennifer Branstetter | 9/26/14 | 10/3/14 | 10/31/14 | 10/30-Denied; certain records do not exist; others are not records & civil investigation |
| Brad Bumsted *Pittsburgh Tribune-Review* (60687) | sexually-explicit movies, videos, stills or images, attached to emails and sent or received by current employees who are not members of collective bargaining units; request for the attachment and the email string showing who sent the email and who received it and the date | 9/26/14 | 10/3/14 | | Denied – not a record & civil investigation |

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Brad Bumsted *Pittsburgh Tribune-Review* (60716) | Names of judges and/or justices named in emails from 2008-2012 transmitted with sexually explicit images, videos, or movies, showing partially clad and topless females, nude women, and men and women engaged in sexual acts that were among recovered and reviewed by H. Geoffrey Moulton | 9/29/14 | 10/6/14 | | Denied – not a record & civil investigation |
| Simon Campbell *Pennsylvanians for Union Reform* (PFUR) | Annual salaries, birth years and hire dates of all current employees having sent or received explicit emails between 2008-2012; annual salaries, birth years and hire dates of all current employees who have been identified, having an annual salary of >$100,000 per year; final salaries, birth years, hire dates, departure dates of all former employees who are not the 8 identified former employees whose names were not released to the media due to "restrictions upon which we cannot elaborate"; final salaries, birth years, hire dates, departure dates of the 8 identified former employees; and copies of those pages in "state worker contracts" showing the "provisions" that allegedly preclude the OAG "from releasing the names of current | 9/29/14 | 10/6/14 | 11/5/14 | Granted in part; certain records provided upon receipt of payment |

2

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Pete Muntean WGAL News 8 (60735) | "employees identified as sending or receiving the e-mails" NOTING that PFUR does not seek any current or former employee names nor does PFUR seek any e-mail correspondence<br><br>All emails with sexually explicit attachments sent on state accounts from 2008 through 2014; include the full text of e-mails including file names, senders, recipients and timestamp. | 9/30/14 | 10/7/14 | | Denied – insufficiently specific, not a record & civil investigation |
| Angela Couloumbis *The Inquirer* (60780) | All email messages, from 2008 to 2012, that contain sexually explicit images, videos or other content that were shared between former and current members of the Attorney General's office and members of the state judiciary, including but not limited to Justice Seamus McCaffery | 10/1/14 | 10/8/14 | | Denied – not a record & civil investigation |
| Brad Bumsted *Pittsburgh Tribune-Review* (60811) | Emails allegedly sent by Justice Seamus McCaffery to the state (AG) email system now that they are in the public eye as a result of a Morning Call story Oct. 2, 2014 and that may contain sexually-explicit image attachments | 10/2/14 | 10/9/14 | | Denied – not a record & civil investigation |

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Angela Couloumbis *The Inquirer* (60834) | copies of emails or other messages sent or received between 2008 and 2012 by William Ryan | 10/3/14 | 10/10/14 | 11/7/14 | Denied – records do not exist |
| Brad Bumsted *Pittsburgh Tribune-Review* (60833) | any sexually explicit images and emails sent or received by Bill Ryan, former first assistant and acting AG | 10/3/14 | 10/10/14 | 11/7/14 | Denied – records do not exist |
| Brian Howard *Philadelphia Magazine* (60847) | Copies of emails sent from or to McCaffery between 2008 and 2012; all emails sent or received by but not limited to the following: McCaffery, Abruzzo, Parno, Fina and Noonan between 2008 and 2012 | 10/6/14 | 10/14/14 | | Denied – not a record & civil investigation |
| Brad Bumsted *Pittsburgh Tribune-Review* (60947) | emails that show the faces or heads of Jerry Sandusky and/or his wide Dottie, or their likenesses, super imposed on partially-clad, topless or nude men and women or men and women engaged in sex acts. | 10/8/14 | 10/16/14 | | WITHDRAWN BY REQUESTOR |
| Brad Bumsted *Pittsburgh Tribune-Review* (60949) | image attached to email, circulated among criminal prosecutors and agents and discovered in emails reviewed by Geoffrey Moulton that show two children, the girl with her top off, and the boy holding or attempting to hold her pants open | 10/8/14 | 10/16/14 | 11/14/14 | Denied – not a record |

4

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Brad Bumsted *Pittsburgh Tribune-Review* (60950) | All fees paid to outside law firms in 2013 and 2014 in connection with Right to Know law requests for work as appeal officers or to respond to requests on behalf of the Office of Attorney General. Please provide the dollar amount and the name of the lawyer or firm | 10/8/14 | 10/16/14 | | Contract with Attorney Wallet provided; no other records exist |
| Victor Fiorillo Philadelphia Magazine (60946) | copies of any responses sent by former employees of the Attorney General's Criminal Law Division to letters sent by the Human Resources department after those employees left or announced they were leaving. It is my understanding that when any employee of the Attorney General's office resigns, retires or is terminated, a letter is sent to them by the HR department asking various questions, including whether those former employees are aware of any corruption or other problems. It is the responses to those letters that I am seeking. I am requesting copies of any responses received between January 1, 2011 and December 31, 2011 | 10/8/14 | 10/16/14 | 11/14/14 | Denied – HR letters that have been sent in the past to former employees do not ask about corruption or other problems (per Nicole Kreiser those letters focus on pay, benefits, etc) **Records do not exist** |
| Gina Passarella The Legal Intelligencer (60976) | any emails sent to or from any Pennsylvania judge or justice on their government email account or their private email accounts to or from any other state | 10/9/14 | 10/17/14 | | Denied – insufficiently specific and not a |

5

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| | employee that included material of a lewd, pornographic or sexual nature, including words, descriptions, images, audio or video files or depictions in any other form. | | | | record/part of ongoing civil investigation |
| Brad Bumsted *Pittsburgh Tribune-Review* (61004) | any jokes or sexually explicit images depicting Jerry Sandusky and his wife, Dottie Sandusky among the recovered emails that had been deleted under previous administrations. This would include the term being "Sanduskied" in text of emails | 10/10/14 | 10/20/14 | 11/19/14 | Denied – records do not exist |
| Brad Bumsted *Pittsburgh Tribune-Review* (61241) | The names and salaries of AG employees, assigned or working for the special prosecutor in Norristown, Mr. Carluccio, including secretarial staff, lawyers and/or agents, whether they work is part of full-time | 10/22/14 | 10/29/14 | 12/1/14 | HR is unaware of any such arrangement – Comptroller referred to CDAG Barker – OAG personnel NOT assisting; DENIED records do not exist |

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Brad Bumsted *Pittsburgh Tribune-Review* (61243) | emails of a sexually explicit nature that may have been sent from Frank Fina to former grand jury judge, Barry Feudale from 2008-2012 and from Feudale to Fina, during that same period, which were recovered by Moulton's Sandusky investigation | 10/22/14 | 10/29/14 | 12/1/14 | Denied – records do not exist |
| Karen Langley *Post-Gazette* (61318) | 1. All email records that reference any business of the Pennsylvania Supreme Court, including but not limited to petitions for allocatur, cases pending before the Court, cases decided by the Court, court procedures, and discussions of or references to litigants and/or their counsel, sent by the following current and former justices of the Pennsylvania Supreme Court, Ronald Castille, Thomas Saylor, J. Michael Eakin, Max Baer, Debra McCloskey Todd, Seamus McCaffery, Correale Stevens, and Joan Orie Melvin, from January 1, 2008, through October 24, 2014, to employees of the Office of Attorney General. 2. All email records that reference any business of the Pennsylvania Supreme Court, including but not limited to petitions for allocatur, cases pending before the Court, cases decided by the Court, court | 10/24/14 | 10/31/14 | | Denied – insufficiently specific; lacks context |

7

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| | procedures, and discussions of or references to litigants and/or their counsel, sent by employees of the Office of Attorney General from January 1, 2008, through October 24, 2014, to the following current and former justices of the Pennsylvania Supreme Court: Ronald Castille, Thomas Saylor, J. Michael Eakin, Max Baer, Debra McCloskey Todd, Seamus McCaffery, Correale Stevens, and Joan Orie Melvin. | | | | |
| Brad Bumsted Pittsburgh Tribune-Review (61450) | 4 separate requests that will be responded to as 1 – 1. Evidence of misuse of state email systems and state computers through sexually explicit emails sent between Fina and Feudale including the text, photos, movies and videos; seeks sexually explicit jokes as well as images showing nude women and partially-clad women, people engaged in sex acts, and jokes and statements about ethnic groups (see 61243); 2. Evidence of misuse of state computers and records on state time through transmitting sexually explicit emails; seeking jokes about Jerry Sandusky and his wife, Dottie Sandusky. This may include images of Sandusky's faces on people involved in sex acts. Also seeking | 10/30/14 | 11/6/14 | 12/8/14 | TO BE DENIED AS FOLLOWS - 1. Denied – insufficiently specific & Feudale records do not exist; 2. Denied – insufficiently specific, repetitive and records do not exist; 3. Denied - insufficiently |

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| | emails with name and dates of senders and recipients; any emails using the term "Sanduskied" in text (see 61004); **3.** Evidence of misuse of state email systems and state computers through sexually explicit emails sent between current employees between 2008-2012 that include text, photos, images, movies and show nude or topless women, and men and women engaged in sex acts. Seeking evidence of misuse by current employees no longer under internal investigation, not seeking disciplinary action that may have been imposed rather *requesting the names* and the evidence of misuse (see 60687); and **4.** Evidence of misuse of state email systems and state computers through sexually explicit emails sent between Fina and other OAG employees between 2008-2012 that include text, photos, images, movies and show nude or topless women, and men and women engaged in sex acts. (see 58682) | | | | specific, repetitive and not a record; **4.** Denied - insufficiently specific, repetitive and not a record. |
| Brad Bumsted *Pittsburgh Tribune-Review* (61451) | 2010, 2011 & 2012 salary for Fina | 10/30/14 | 11/6/14 | 12/9/14 | To be granted in part – ?? provided personal history card |

9

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| Peter Hall *The Morning Call* (61484) | Copies of email messages sent by the below listed current and former Pennsylvania justices and judges to any employee of the OAG between 2008 and 2012 including but not limited to those recovered by Moulton: Castille, Baer, Eakin, McCaffery, Orie-Melvin, Saylor, Stevens, Todd, Allen, Bender, Bowes, Donohue, Elliott, Gantman, Jenkins, Lazarus, Mundy, Olson, Ott, Panella, Shogan, Stabile, Wecht, Fitzgerald, Musmanno, Platt, Stassburger, Covey, Brobson, Cohn Jubelirer, Leadbetter, Leavitt, McCullough, McGinley, Pellegrini, Simpson, Colins, Friedman, Quigley, Oler & Feudale | 10/31/14 | 11/7/14 | | Denied – insufficiently specific; not a record of this agency; civil investigation w/certain info redacted |
| Karen Langley *Post-Gazette* | 4,000 emails involving Supreme Court justices found in the email archives of the Office of Attorney General, as cited by Pennsylvania Supreme Court Chief Justice Ronald D. Castille in an Oct. 15 press release from the Administrative Office of Pennsylvania Courts. Please include the full contents of each email, including the sender, recipient(s), time and date, | 11/6/14 | 11/14/14 | | Denied – not a record & civil investigation and possibly exempt by other exceptions such as atty-work product, |

| Requestor | Records Requested | Recv'd | Date Due | Final Date Due | Response |
|---|---|---|---|---|---|
| | forwarding history, body, links and any attachments | | | | etc.; insufficiently specific |
| | | | | | |
| Deanna Durante NBC 10 | Emails depicting pornographic and it sexually explicit images, video clips motivational tools/ messages sent on tax payer funded computers from 2008 to 2012 | 11/24/14 | 12/3/14 | | Denied – not an agency record |
| | | | | | |
| | | | | | |

Remains Under Seal August 26, 2015

# Exhibit D

Remains Under Seal August 26, 2015

# Exhibit E

Remains Under Seal August 26, 2015

Exhibit F

Remains Under Seal August 26, 2015

# Exhibit G

Remains Under Seal August 26, 2015

Exhibit H

Remains Under Seal August 26, 2015

# Exhibit I

Exhibit J

# IN THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY, PENNSYLVANIA

*IN RE:*
THE THIRTY-THIRD STATEWIDE
INVESTIGATING GRAND JURY

Motion for Protective Order of Frank Fina

```
*    Supreme Court of Pennsylvania
*    217 M.D. MISC. DKT. 2010
*
*    Dauphin County Common Pleas
*    No. 1325 M.D. 2010
*
*
*    Notice Number 1
*
```

## OPINION AND ORDER

**Krumenacker, J:** Currently before the Court is the Motion for Protective Order filed by Frank Fina, Esquire (Fina). On August 28, 2014, Fina made the Motion seeking an order prohibiting the Office of Attorney General (OAG) from responding to four requests made by media outlets under the Right-to-Know Law (RTKL). 65 P.S. §§ 67.101 – 67.3104 (West 2014). The OAG argues that such an order is improper as the Court lacks jurisdiction to entertain the Motion where the materials sought do not relate to matters before the Grand Jury.

Between July 7, 2014 and August 13, 2014, the OAG received the following RTKL requests:

- July 7, 2014 from the Pittsburgh Tribune-Review seeking "any emails or other documents on an internal AG review of pornographic emails sent among the current and former AG staff from and to each other ..."

- July 29, 2014 from the Morning Call seeking "Electronic copies of personal, non-official, non-business emails depicting pornographic images, video clips and sexually explicit motivational tools/messages sent on taxpayer-funded computers and servers between 2008 and 2012 among and between employees of the Pennsylvania Attorney General's Office,

- August 5, 2014 from the Philadelphia Inquirer seeking "all email traffic that is of a personal nature and involves pornographic or otherwise professionally inappropriate material to and from the work accounts of former deputy attorney .... and fellow former prosecutors .... and .... from 2009, until their departure from the office's staff in late 2012 or early 2013. Please include all recipients of the email chains that shared in this email and include the actual emails."

- August 11, 2014 from the Philadelphia Daily News seeking "all emails sent and/or forwarded by former Chief Deputy Attorney General .... and/or his former colleagues that include any pornographic and or sexually explicit references, URL links, photographs and/or videos."

- August 14, 2014 the Philadelphia Daily News amended its request to include "any e-mail correspondence [that include any pornographic and or sexually explicit references, URL links, photographs and/or videos] between .... and former Attorney General Office employees .... and/or ...."

Fina argues that since the materials sought in the RTKL requests were discovered during an internal OAG review of the handling of the Gerald Sandusky investigation conducted by H. Geoffrey Moulton, Jr. (Moulton) they are protected by the secrecy provisions of the Investigating Grand Jury Act (Act). 42 Ps. C.S.A. §§4541-4553 (West 2014). The OAG argues that the mere fact the material was uncovered initially during the Moulton review, during which some information from the Sandusky grand jury investigation was disclosed pursuant to disclosure orders, does not bring them within the secrecy associated with an investigative grand jury as the materials were not gathered as part of an active investigation.

that the mere fact the material was uncovered initially during the Moulton review, during which some information from the Sandusky grand jury investigation was disclosed pursuant to disclosure orders, does not bring them within the secrecy associated with an investigative grand jury as the materials were not gathered as part of an active investigation.

For the reasons discussed herein the Motion is granted in part and denied in part as outlined in the attached Order.

# DISCUSSION

The very power of the grand jury, and the secrecy in which it must operate, call for a strong judicial hand in supervising the proceedings. The seminal role of the supervising judge of a grand jury was recognized by our Supreme Court in *In Re* Twenty–Fourth Statewide Investigating Grand Jury, 589 Pa. 89, 907 A.2d 505 (2006):

> We are cognizant that the substantial powers exercised by investigating grand juries, as well as the secrecy in which the proceedings are conducted, yield[ ] the potential for abuses. The safeguards against such abuses are reflected in the statutory scheme of regulation, which recognizes the essential role of the judiciary in supervising grand jury functions.

907 A.2d at 512 (citation omitted). Thus, "Pennsylvania's grand jury process is 'strictly regulated,' and the supervising judge has the singular role in maintaining the confidentiality of grand jury proceedings." Camiolo v. State Farm Fire and Casualty Co., 334 F.3d 345, 356 (3rd Cir. 2003) (citation omitted). "The supervising judge has the continuing responsibility to oversee grand jury proceedings, a responsibility which includes insuring the solemn oath of secrecy is observed by all participants." *In re* June 1979 Allegheny County Investigating Grand Jury, 490 Pa. 143, 415 A.2d 73, 78 (1980).

The traditional notion of secrecy in grand jury proceedings has long been recognized and preserved. Our Supreme Court discussed the need and rationale for such secrecy in *In re*

<u>Investigating Grand Jury of Philadelphia County, Appeal of Philadelphia Rust Proof Co., Inc.,</u>

496 Pa. 452, 437 A.2d 1128 (1981). In <u>Rust Proof</u> the Court explained that

> Grand jury proceedings have traditionally been conducted in secrecy. This secrecy, which is indispensable to the effective functioning of a grand jury's investigation, is designed
>
> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

<u>Id.</u> at 457-58, 437 A.2d at 1130-31 (internal quotations and citations omitted). The supervising judge is tasked with maintaining the secrecy and integrity of grand jury proceedings. <u>See,</u> Pa. R. Cr. P. 224, 225, 229 (West 2014).

In enacting the Act, the General Assembly sought to preserve the traditional rule of secrecy in grand jury proceedings. The Act provides, in relevant part:

> **(b) Disclosure of proceedings by participants other than witnesses.—** Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the Commonwealth for use in the performance of their duties. The attorneys for the Commonwealth may with the approval of the supervising judge disclose matters occurring before the investigating grand jury including transcripts of testimony to local, State, other state or Federal law enforcement or investigating agencies to assist them in investigating crimes under their investigative jurisdiction. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when directed to do so by the court. All such persons shall be sworn to secrecy, and shall be in contempt of court if they reveal any information which they are sworn to keep secret.

42 Pa. C.S.A. § 4549(b) (West 2014). Furthermore, although grand jury witnesses are generally permitted to disclose their testimony to others, the supervising judge may prohibit such disclosure "for cause shown." 42 Pa. C.S.A. § 4549(d) (West 2014). This secrecy, other than

the deliberations and vote of the jurors, is not absolute and both statute and rule permits specific disclosures. 42 Pa. C.S.A. § 4549(b) (West 2014); Pa. R. Cr. P. 230 (West 2014).

Our Supreme Court has adopted procedural rules to ensure the secrecy of such proceedings. See, Pa. Rs. Crim. P. 223, 224, 225, 229, 230, 231 (West 2014). In order to insure the secrecy of grand jury proceedings and to convey the obligation and vital importance of maintaining that secrecy the Act and Rules require secrecy oaths of all persons with access, no matter how slight, to grand jury information. See, 42 Pa. C.S.A. § 4549(b) (West 2014); Pa. R. Crim. P. 224 (West 2014). Thus all grand jurors, attorneys, interpreters, stenographers, judicial staff, and any other persons present at, assisting with, or with access to grand jury materials or proceedings must take a secrecy oath. Violation of the oath, whether intentional or accidental, is grounds for a contempt proceeding against the violator. 42 Pa. C.S.A. § 4549(b) (West 2014).

Within the context of the Act and Rules "proceedings" refer to transcripts, evidence, records, grand jury sessions, and hearings on matters ancillary to the investigation itself. See, 42 Ps. C.S.A. §§4541-4553 (West 2014); Pa. Rs. Cr. P. 220-231 (West 2014). Thus secrecy extends not only to matters that occur before the grand jurors but to all aspects of the investigation including but not limited to communications between OAG staff (whether attorneys or support staff), communications with counsel for witness, communications with co-operating witnesses, transcripts of hearings, documents and other evidence acquired during an investigation and in the control of the OAG.

When viewed in their totality the rationale for secrecy outlined in Rust Proof along with the requirements of the Act and Rules require that grand jury secrecy extend beyond the grand jury chamber to encompass all materials related to a grand jury investigation and to all persons

with access to those materials. The role served by such secrecy in these proceedings, outlined in Rust Proof, would be eviscerated if it did not extend beyond the four walls. Often times vital information in investigations is provided not through subpoenaed testimony but through interviews with cooperating witnesses or information from victims who have expectations that information they share will be kept confidential and at times have agreements with the OAG, which may include immunity agreements or agreements limiting the release and use of information provided by the witness. Should information, which may include investigative materials, notes, correspondence, videos and reports, related to these cooperating witnesses be readily available it would lead to the very harms that grand jury secrecy seeks to avoid as well as possibly placing such witnesses in danger.

Accordingly, to the extent that the emails sought by the RTKL requesters contain information related to any grand jury investigations such emails are shielded by grand jury secrecy unless a specific disclosure request is made. See, 42 Pa. C.S.A. § 4549(b) (West 2014); Pa. R. Cr. P. 230 (West 2014). Even where such a request is made the emails may yet be shielded from disclosure under the RTKL.

In addition to the protections afforded by grand jury secrecy the RTKL provides protections to matters related to criminal investigations. 65 P.S. 67.708 (b)(16) (West 2014). In pertinent part section 67.708 reads

> **(b) Exceptions.**--Except as provided in subsections (c) and (d), the following are exempt from access by a requester under this act:
>
> ...
>
> (16) A record of an agency relating to or resulting in a criminal investigation, including:
>
> (i) Complaints of potential criminal conduct other than a private criminal complaint.

(ii) Investigative materials, notes, correspondence, videos and reports.

(iii) A record that includes the identity of a confidential source or the identity of a suspect who has not been charged with an offense to whom confidentiality has been promised.

(iv) A record that includes information made confidential by law or court order.

(v) Victim information, including any information that would jeopardize the safety of the victim.

(vi) A record that, if disclosed, would do any of the following:

    (A) Reveal the institution, progress or result of a criminal investigation, except the filing of criminal charges.

    (B) Deprive a person of the right to a fair trial or an impartial adjudication.

    (C) Impair the ability to locate a defendant or codefendant.

    (D) Hinder an agency's ability to secure an arrest, prosecution or conviction.

    (E) Endanger the life or physical safety of an individual.

This paragraph shall not apply to information contained in a police blotter as defined in 18 Pa.C.S. § 9102 (relating to definitions) and utilized or maintained by the Pennsylvania State Police, local, campus, transit or port authority police department or other law enforcement agency or in a traffic report except as provided under 75 Pa.C.S. § 3754(b)(relating to accident prevention investigations).

65 P.S. § 67.708 (West 2014).

Under section 67.708 materials related to grand jury investigations are exempt from disclosure under the RTKL even where they meet the RTKL's definition a record. See, Hunsicker v. Pennsylvania State Police, 93 A.3d 911, 913 (Pa. Cmwlth. 2014); Coley v. Philadelphia Dist. Attorney's Office, 77 A.3d 694 (Pa. Cmwlth. 2013); Pennsylvania State Police v. Office of Open Records, 5 A.3d 473, 479 (Pa. Cmwlth. 2010). The protections afforded by grand jury secrecy and the RTKL exception for investigative materials are not mutually exclusive but work together to shield all materials related to grand jury investigations from disclosure either accidentally, by emphasizing the importance of secrecy through the oaths, or intentionally in response to an RTKL request by the investigation exception.

Here, however, the emails sought are not records within the meaning of the RTKL and so would not be subject to disclosure even if they were not protected by grand jury secrecy. It is well settled that

> Only "records" of the agency to which the request is directed, the responding agency, are subject to the RTKL. Bagwell v. Dep't of Educ., 76 A.3d 81 (Pa. Cmwlth. 2013) (*en banc*) (holding records at issue must be "of" the agency to which requester directed a request, even when the subject matter of the records involves another entity). Section 102 of the RTKL defines the term "record" as:
>
>> *Information,* regardless of physical form or characteristics, *that documents a transaction or activity of an agency* and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency. The term includes a document, paper, letter, map, book, tape, photograph, film or sound recording, information stored or maintained electronically and a data-processed or image-processed document.
>
> 65 P.S. § 67.102 (emphasis added).
>
> For emails to qualify as records "of" an agency, we look to the subject-matter of the records. Emails are not considered records of an agency simply because they are sent or received using an agency email address or by virtue of their location on an agency computer. See Easton Area Sch. Dist. v. Baxter, 35 A.3d 1259 (Pa. Cmwlth. 2012). The emails must document a transaction or activity of the responding agency. Id.; Mollick v. Twp. of Worcester, 32 A.3d 859 (Pa. Cmwlth. 2011).

Meguerian v. Office of the Atty. Gen., 86 A.3d 924, 929-30 (Pa. Cmwlth. 2013). Here the emails sought are described variously as being pornographic or sexually explicit in nature and as such do not appear to "document a transaction or activity of the"OAG. Further, both the Morning Call and the Philadelphia Inquirer refer to the emails as being personal in nature recognizing that they are not records within the RTKL. While this Court lacks jurisdiction to rule on the RTKL requests not related to grand jury materials it brings this line of cases to the attention of the requesters for their review in the hopes of avoiding prolonged and unnecessary litigation.

In summary the Court finds that the protections of secrecy in the grand jury realm extends to protect from disclosure any materials or communications related to grand jury investigations and so disclosure of such communications in response to a RTKL request is not permissible even where the RTKL itself may permit such disclosures. As to the emails sought that *do not* relate to grand jury matters, the Court lacks jurisdiction over those RTKL requests or the jurisdiction to enter a protective order in regards to them. The court would draw the parties and requesters attention to and advise them to review <u>Meguerian</u> and the cases cited therein before proceeding further.

**For the foregoing reasons the following Order is entered:**

# IN THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY, PENNSYLVANIA

IN RE:
THE THIRTY-THIRD STATEWIDE
INVESTIGATING GRAND JURY

Motion for Protective Order Frank Fina

\*   Supreme Court of Pennsylvania
\*   217 M.D. MISC. DKT. 2010
\*
\*   Dauphin County Common Pleas
\*   No. 1325 M.D. 2010
\*
\*   Notice Number 1
\*

# <u>ORDER</u>

AND NOW, this 19 day of September 2014, upon consideration of the Motion for

Protective Order filed by Frank Fina, Esq. and for the reasons discussed in the foregoing

Opinion, it is hereby **ORDERED, DIRECTED, AND DECREED** that the Motion is

**GRANTED IN PART AND DENIED IN PART** as follows:

1)   To the extent that the Right-to-Know Law requests seek any materials related

to Grand Jury matters the Motion is **GRANTED** and those materials cannot

be disclosed absent a specific order of Court permitting disclosure.

2)   To the extent that the Right-to-Know Law requests seek material not related

to Grand Jury matters the Court lacks jurisdiction to entertain a protective

order and the Motion is **DENIED** to those materials.

3)   The Stay Orders entered August 20 and 28, 2014 by this Court are

**VACATED**.

4)   This Opinion and Order **are not sealed** and will be publicly released.

BY THE COURT:

Norman A. Krumenacker, III, Judge

Page 10 of 10

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

UNSEALED PER ORDER
OF THE COURT DATED
AUGUST 26, 2015

| | | |
|---|---|---|
| PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, | : | NO. 171 MM 2014 |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY | : | |
| | : | |
| Respondent | : | |

OPINION

CARPENTER   J.                                          DECEMBER 12, 2014

I, as the Supervising Judge of the Thirty-Fifth Statewide Investigating Grand Jury, have strived for all of my actions to be consistent with the values of judicial objectivity and independence. Any actions that have been inconsistent with those values, I regret. And now, having been informed that my actions were inconsistent with those values and that a separate response to the Pennsylvania Office of the Attorney General's Petition for Review of the Protective Orders ("Petition for Review"), is required this Opinion follows and addresses those issues raised in the Per Curiam Order and the Concurring Statements authored by Chief Justice Castille and by Justice Stevens filed on December 4, 2014. I respectfully apologize for not anticipating that this Opinion was expected.

I do note that the only communication received by me from the Pennsylvania Supreme Court's Office of the Prothonotary prior to December 4, 2014, when responses to the

1

Petition for Review were due, was a letter addressed to "William R. Carpenter, Esq." and reading in part "Dear Attorney Carpenter". See, Exhibit "A", appended to this Opinion.

## FACTUAL AND PROCEDURAL HISTORY

The history giving rise to the initial Protective Order dated August 27, 2014, the amended Protective Order dated September 17, 2014 and finally the Order of October 30, 2014 outlining this Court's Findings of Fact and Conclusions of Law (collectively termed "Protective Order"), is detailed as follows. On August 25, 2014, this Court held an ex parte, in camera hearing with the Special Prosecutor Thomas E. Carluccio, Frank Fina and A. Marc Costanzo being present. The purpose of the hearing was to put on the record certain concerns brought to this Court's attention by Special Prosecutor Carluccio. I feel that it is necessary to cite to the record of the ex parte in camera proceedings in order to properly address the issues here. I request that you not unseal those proceedings for the Attorney General as there is confidential information not made part of this Opinion.

At that hearing, Mr. Fina detailed his unsolicited interaction with a reporter from Pittsburgh. According to Mr. Fina, the reporter contacted him on August 13, 2014. The substance of the conversation was to inform Mr. Fina that he was contacted by someone close to the Attorney General. That person provided details about Mr. Fina's personal emails that were uncovered by Geoffrey Moutlon during the review of the Sandusky case, and that there was a significant effort to release some portion of those emails that would be very embarrassing and destructive to him. (N.T. 8/25/14 pp. 2 – 3).

Mr. Fina also relayed an incident that occurred on August 18, 2014. On that date, Mr. Fina told the Court that someone who had assisted him during the review that Mr. Moulton performed, attorney Chris Carusone, was approached without solicitation, by someone named David Tyler, Chief Operating Officer for the Office of the Attorney General ("OAG"). In that interaction, Mr. Tyler told Mr. Carusone something to the effect that "tell your boy to back down

2

or cool down." Mr. Carusone indicated to Mr. Tyler that he didn't know what he was talking about. Mr. Tyler then made references to Mr. Fina's emails that would be very embarrassing and could be released. Mr. Tyler made further remarks to Mr. Carusone that Mr. Fina should keep his mouth shut. Id. at 4 – 5.

A third incident was relayed by Mr. Fina at the August 25, 2014 hearing. A few days earlier, on August 21, 2014, a reporter from Philadelphia contacted him. The reporter informed Mr. Fina that members of the OAG were aggressively suggesting to everybody in the Capitol Media Room, that the OAG had emails of his, that the media is going to want to see them and that they would discredit Mr. Fina. The reporter told Mr. Fina that it was something like he had never seen before in its aggressiveness and it was unlike past situations experienced by him when the OAG has tried to leak information. It seemed to the reporter that the OAG was trying to send Mr. Fina a message, that they had this information and were willing to use it. Id. at 9 – 11.

Mr. Fina told this Court that he believed that these messages or threats were related to that fact that he had been subpoenaed to testify before the Grand Jury. Id. at 11.

Mr. Costanzo was also present to testify at the August 25, 2014, hearing. He had concerns in regard to his cooperation with this investigation and his subpoena to testify before the Grand Jury. Mr. Costanzo relayed that the Attorney General had solicited Right-to-Know requests from the media and that the media has sent those requests to the Office of the Attorney General. Mr. Costanzo believed that the subject matter of the Right-to-Know requests were his personal and private emails that were received by him of a personal nature. Id. at 17 – 19.

Additionally, Mr. Costanzo testified that over the past several months, in various public ways the Attorney General has made statements about him that were not accurate and meant to convey something negative in an attempt to denigrate his reputation. He gave the Court an example that when the Attorney General was questioned about an undercover

3

operation involving Tyron Ali, her reaction in the press was to accuse the prosecutors, including Mr. Costanzo, of being racist and incompetent and she went out of her way to name Mr. Costanzo as one of those prosecutors. Mr. Costanzo told the Court that in reality, despite the Attorney General's depiction to the media, his involvement was minimal and peripheral at most. Id. at 19 – 20. Mr. Costanzo provided another example concerning a memorandum involving Mr. Mondesire's investigation and an article that appeared in the Daily News. The Daily News article suggested that possible criminal conduct on the part of Mr. Mondesire was brought to Mr. Costanzo's attention, and neither he nor Mr. Fina appropriately responded to that information. In reality Mr. Costanzo was not the receiver of the memo; rather, it was he who directed that the memo be prepared and then it was sent up to his boss. He was the sender of that memo and was waiting for a response. Id. at 20 – 21.

After considering the testimony of both Mr. Fina and Mr. Costanzo the August 27, 2014, Protective Order was issued, and the relevant portion reads as follows:

> AND NOW, this 27th day of August, 2014, it is hereby ORDERED, pursuant to 18 Pa.C.S. §4954 (relating to protective orders), that:
>
> 1. The Office of the Attorney General, except upon specific authorization by this Court or the Special Prosecutor, shall refrain from any involvement in, or access to, the investigative efforts of the Special Prosecutor.
>
> 2. Employees of the Office of the Attorney General shall refrain from engaging in, or soliciting, any act of obstruction, intimidation or retaliation against any witness summoned by the Grand Jury in the Special Prosecutor's investigation.
>
> 3. All transcripts of Grand Jury testimony shall be given only from the stenographer or their employer directly to the Supervising Judge and the Special Prosecutor, no copy shall be given to the Attorney General's Office.
>
> 4. Employees of the Office of the Attorney General shall not have access to transcripts of proceedings before the Grand Jury or Supervising Judge, exhibits, or other information pertaining to the Special Prosecutor's investigation. All information

4

pertaining to the Special Prosecutor's investigation. All information related to the work of the Special Prosecutor shall be kept in the custody of the Special Prosecutor and Supervising Judge.

5. Any person, including employees of the Office of the Attorney General, who engage in any act of obstruction, intimidation or retaliation against a witness summoned by the Grand Jury in the Special Prosecutor's investigation may be prosecuted as set forth in 1 8 Pa.C.S. §4955 (relating to violation of orders) and any other applicable provisions of the Crimes Code of Pennsylvania.

***

August 27, 2014 Protective Order.

Thereafter, the OAG filed a Motion for Reconsideration. This Court then issued its first September 17, 2014, Order which directed a reconsideration hearing to be held in regard to the issuance of the protective order under 18 Pa.C.S.A. §4954. See, September 17, 2014 Order.

Another order was issued on September 17, 2014. This order amended the original August 27, 2014, Protective Order to only subject the following person to paragraphs 2 and 5 of that Order as follows:

1. Any person who has been sworn to Grand Jury secrecy.
2. Any person who has or had access to Grand Jury information.
3. Any person associated with the J. Whyatt Mondesire proceedings and investigation.

See, September 17, 2014 Order.

After this Court ordered a reconsideration hearing be held, but before that hearing was scheduled, the OAG filed an Application for Special Relief with the Pennsylvania Supreme Court. That Application was dismissed as moot based on the fact that there would be a hearing.

Subsequently, on October 17, 2014, an *in camera* reconsideration hearing was conducted. At the start of the hearing, Attorney Lauran Ditka who appeared on behalf of the

5

OAG, renewed a request to subpoena Mr. Fina and Mr. Costanzo. That request was denied. Attorney Ditka also renewed a request to review the transcript of the August 25, 2014 *ex parte, in camera* hearing. That was denied. Finally, Attorney Ditka motioned for leave to call Special Prosecutor Carluccio, which was also denied.

At the hearing, the OAG only presented evidence of inappropriate and possibly pornographic emails that were recovered during the review of the Sandusky investigation. This was done through the testimony of James Barker, Chief Deputy Attorney General. (N.T. 10/17/14, 1:23 p.m., pp. 21 – 34). However, the OAG did not present any witness to substantiate its claim that the Protective Order as amended on September 17, 2014, impacted the operation of the OAG's functions.

Directly following the reconsideration hearing, an in *ex parte, in camera hearing* was conducted. First, Special Prosecutor Carluccio continued questioning Mr. Barker, who remained under oath. Mr. Barker testified that the Right-to-Know requests originally came in around July 7, 2014. Those requests did not specifically name anyone. They were general requests asking for inappropriate emails from employees. (N.T. 10/17/14, 2:12 p.m. pp. 2 – 3). Then in the beginning of August of 2014, additional the Right-to-Know requests were received by Mr. Barker. These requests were amended to specify certain employees of the Attorney General's office, including Mr. Fina, Mr. Costanzo and Mr. Carusone. Id. at 3. Mr. Barker was also included in a Right-to-Know request toward the end of August, 2014. Id. at 3 – 4.

By way of background, Mr. Barker testified that he became aware of the inappropriate emails in about February or March of 2014. However, it wasn't until after Special Prosecutor Carluccio started issuing subpoenas in July of 2014 to Mr. Fina and Mr. Costanzo that he began to receive Right-to-Know requests regarding the emails, and not much later he started receiving Right-to-Know requests specifically naming Mr. Fina, Mr. Costanzo and Mr. Carusone. Id. at 6 – 9.

6

Also to testify at this second October 17, 2014, hearing was George Kadish, special assistant investigator to Special Prosecutor Carluccio. Id. at 19. Mr. Kadish stated that he was present on August 26, 2014, when Mr. Costanzo and Mr. Fina came to testify before the Grand Jury. Id. Mr. Kadish explained that on that morning, he arrived at a quarter to eight, and as he entered the building he noticed some people milling around on the ground floor. Mr. Kadish thought it strange that there were more people than are usually there. Id. In particular, he noticed Agent Mike Miletto of the OAG who had already testified before the Grand Jury on a different date. Id. at 19. Mr. Kadish continued on to the third floor. At some point Mr. Fina and Mr. Costanzo arrived and were very upset. Id. at 20. Both men relayed to Mr. Kadish that when they had come into the ground floor, there were about four agents of the OAG waiting for them, giving them "dirty looks." Id. at 20. These agents followed the two men into the elevator and rode up with them to the third floor. Id. While on the elevator, Agent Miletto got face-to-face with Mr. Fina. Id. at 22. They all exited at the same time. Id. The agents followed Mr. Fina and Mr. Costanzo to where the two men were to meet with Mr. Kadish and Special Prosecutor Carluccio. Id. at 20. Shortly after their arrival, Special Prosecutor Carluccio was being summoned by a sheriff on behalf of an agent, Agent Mackelin. Id. at 21. With Mr. Kadish accompanying Special Prosecutor Carluccio, the agent singled out Mr. Costanzo and started to disparage him. Id.

On October 30, 2014, the OAG's Motion for Reconsideration of the August 27, 2014, Protective Order as amended by the September 17, 2014, Order was denied. Attached to that Order were the Court's Findings of Fact and Conclusions of Law. Those Findings of Facts and Conclusions of Law read as follows:

7

**FINDINGS OF FACT:**

Prior to the issuance of the Protective Order:

1. The identity of anyone subpoenaed by the Special Prosecutor was widely known within the Attorney Generals' Office.
2. The time and location of those witnesses appearing before the Grand Jury was also widely known within the Attorney General's Office.
3. The Attorney General was also acquiring copies of the Notes of Testimony presented by the Special Prosecutor to the Grand Jury, in a situation where the Attorney General's Office was the subject of the investigation.
4. Grand Jury witnesses were confronted as they arrived to testify before the Grand Jury. They were subjected to conduct of an intimidating nature.
5. Subsequent to the issuance of the Protective Order the above conduct has been abated.
6. The Grand Jury operates within one of the office buildings of the Attorney General. Grand Jury scheduling and issuance of subpoenas are necessarily done with the clerical employees of the Attorney General. Accordingly the Attorney General and her employees know when, where and which witnesses are appearing before the Grand Jury.
7. Here the Attorney General and her employees are the subject of the investigation into the leaking of secret Grand Jury information to the newspapers.
8. This Court has been furnished with substantial evidence, information and testimony in camera that fully supports the issuance of an the maintaining of the Protective Order.
9. The Court conducted a hearing on the Attorney General's Request to Vacate the Protective Order on October 17, 2014. At that hearing, the Attorney General called only one witness who in no way provided any reason or just cause to vacate the Protective Order.
10. The timing of the Right-to-Know Request naming Frank Fina and Mark Costanzo among others were submitted to the Attorney General's Office at the time they were subpoenaed and/or scheduled to testify.

8

11. In her "Motion to Quash Grand Jury Subpoena" the Attorney General through privately retained counsel submitted that because she was not sworn to secrecy with regard to prior Grand Juries "...she could not as a matter of law be in Contempt of Court with regard to any disclosure related to that Grand Jury proceeding."

12. This Court finds based upon substantial evidence as a fact that:

    A. The Protective Order is necessary to protect the secrecy of the Statewide Grand Jury proceedings;

    B. The Protective Order is necessary to maintain and ensure the integrity of the Grand Jury process and;

    C. The Protective Order is necessary and appropriate to deter Grand Jury witness intimidation and retaliation.

## CONCLUSIONS OF LAW:

The Protective Order is necessary and appropriate. The Attorney General has shown no cause to vacate the Protective Order or amend it further.

See, October 30, 2014 Order.

Subsequently, the OAG filed the underlying Petition for Review with the Pennsylvania Supreme Court seeking that the Protective Order be vacated. This Opinion serves as the Court's response addressing those issues outlined in the Per Curium Order and the Concurring Statements filed on December 4, 2014.

### ISSUES

I.    Whether the Protective Order does not infringe on the OAG's ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses.

II.    Whether the Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of pornographic images by members of the OAG.

9

III. Whether the Protective Order was properly issued based upon substantial evidence of intimidation of grand jury witnesses.

## DISCUSSION

I. The Protective Order does not infringe on the OAG's ability to fulfill its constitutional mandate relative to the investigation and prosecution of criminal offenses.

Per Chief Justice Castille's recommendation in his Concurring Statement filed on December 4, 2014, this Court issued an order on December 5, 2014, directing the OAG to "immediately identify precisely which, if any, of its law enforcement functions, other than a supposed right to investigate witnesses in an ongoing Special Prosecution involving OAG itself, have been impeded by the protective order here...If the OAG is so affected the OAG is directed to suggest the contours of a narrower order that would address the OAG's concerns affecting duties outside the realm of the Special Prosecution." December 5, 2014 Order, quoting Chief Justice Castille's Concurring Statement filed on December 4, 2014.

On December 9, 2014, the OAG complied with this Court's court order. In the OAG's response to the December 5, 2014 Court order, the OAG set forth examples which it believes illustrate how its constitutional mandate relative to the investigation and prosecution of criminal offenses is hampered by the Protective Order. Therein, the OAG's examples rely on an erroneous premise set forth which it would like the Pennsylvania Supreme Court to accept as true, namely that "the Court has made clear that it views **any sort of action on the part of any employee** of the Office of the Attorney General that is adverse in any way to such a witness as intimidation, obstruction and/or retaliation." See, Response of the OAG to the Order of Court Dated December 5, 2014, 12/9/14, pp. 1, 5 (emphasis added). All of the OAG's examples rely in this erroneous premise. This is not what the Protective Order was and is intended to prevent. Its purpose was/is to prevent the intimidation, obstruction and/or retaliation, in the ordinary sense of those words, of any grand jury witness in an effort to inhibit and/or impede that witness from testifying truthfully and fully before the Grand Jury. In fact, the testimony of Mr. Fina, Mr.

10

Costanzo and Mr. Kadish reveals that there were attempts, direct and indirect, by agents of the OAG to sway Mr. Fina's and Mr. Costanzo's testimony before the Grand Jury. It was the substance of the threats combined with the timing of those threats, i.e., when the OAG became aware that both men were subpoenaed to testify, that created an atmosphere of intimidation. The Protective Order strives to maintain the integrity of the Grand Jury system and process. It was never intended to prevent the OAG from carrying out its constitutional duties.

Additionally, the OAG never provided this Court with the curtesy of an opportunity to craft an order directly addressing its concerns, despite this Court's invitation to do so in August and again at the October 17, 2014, reconsideration hearing, in which Attorney Ditka was told that this Court would entertain limiting language regarding the Protective Order. This Court was open to that, but none was provided. The OAG's Response to the December 5, 2014 Order is the very first time it has set forth its concerns by way of presenting concrete illustrations of how their constitutional duties could possibly be affected, and that first time it has suggested contours of a narrower order that would address those concerns. It is essential to underscore that the OAG had the opportunity to present evidence at the October 17, 2014, reconsideration hearing of how its duties were hampered by the Protective Order, in a courtroom, under oath before this Judge. However, there was no proper evidence presented.

In contrast, the Protective Order was based upon testimony given under oath to me that I found to be credible and substantial. Nothing in the OAGs Petition for Review is based upon any evidence given under oath to any Judge.

II.     The Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of pornographic images by members of the OAG.

The Protective Order is not intended to restrict or impact "appropriate public discourse" of information connected with the possession and/or distribution of possibly pornographic images by members of the OAG. That is not the purpose of the Protective Order.

11

It is the intimidation by the OAG against grand jury witnesses that the Protective Order is meant to put an end to in order to maintain the integrity of the Grand Jury process. In fact, it is my belief that all of the inappropriate images and information related thereto should be appropriately released. The materials should not be selectively released. The materials should not be released unless the Attorney General can prove that the named individual received and opened the emails.

The OAG is insincere at best when in its Petition for Review it stated, "[t]he Attorney General's decision to serve the public interest by identifying egregious prior misconduct within the OAG and the identities of those public servants involved *has absolutely no nexus whatsoever to the Special Prosecutor's investigation.*" (emphasis is the original). This is not accurate. There has been a nexus between the threatened release of Mr. Fina's personal emails and his subpoena to testify before the Grand Jury. In addition, the Right-to-Know requests, specifically requesting the personal emails of Mr. Fina and Mr. Costanzo which were made by several news outlets at the urging of the OAG, were made after Special Prosecutor Carluccio subpoenaed them to testify before the Grand Jury. There has been a nexus.

It seems that the problem surrounding the public discussion has occurred because Attorney General Kane has cherry picked which and whose email to selectively release. It all should be released, without which a proper public discourse cannot occur.

Additionally, the release of information relating to such images and the images themselves does not obviate the need for a Protective Order. There was substantial evidence demonstrated in the August 25, 2014 hearing and the October 17, 2014 *ex parte, in camera* hearing that the OAG is willing to intimidate subpoenaed Grand Jury witnesses, either directly or indirectly. This should not be tolerated in any form, whether today it is the release of inappropriate emails and tomorrow it is intimidation in a different fashion. The Protective Order is meant to preserve the integrity of the grand jury system and process.

12

III.     **The Protective Order was properly issued based upon substantial evidence of intimidation of grand jury witnesses.**

> a. *There was substantial evidence that Grand Jury witnesses were being intimidated.*

The Protective Order issued on August 27, 2014, as amended by way of the September 17, 2014 Order, was properly issued pursuant to 18 PA.C.S §4954 based upon a substantial evidence presented at the August 25, 2014, *ex parte, in camera* hearing that witnesses who were subpoenaed to testify before the Grand Jury were being intimidated by agents of the OAG. In addition, evidence that was brought forth to this Court on the October 17, 2014 *ex parte, in camera* hearing further substantiated the necessity in maintaining the Protective Order. Moreover, the language of the Protective Order does not have the potential to produce a chilling effect as it relates to unrelated ongoing cases involving the OAG and some of the potential Grand Jury witnesses.

Section 4954 of the Criminal Code allows for the issuance of protective orders based upon the following:

### § 4954. Protective orders

Any court with jurisdiction over any criminal matter may, after a hearing and in its discretion, upon substantial evidence, which may include hearsay or the declaration of the prosecutor that a witness or victim has been intimidated or is reasonably likely to be intimidated, issue protective orders, including, but not limited to, the following:

(1) An order that a defendant not violate any provision of this subchapter or section 2709 (relating to harassment ) or 2709.1 ( relating to stalking).

(2) An order that a person other than the defendant, including, but not limited to, a subpoenaed witness, not violate any provision of this subchapter.

(3) An order that any person described in paragraph (1) or (2) maintain a prescribed geographic distance from any specified witness or victim.

13

(4) An order that any person described in paragraph (1) or (2) have no communication whatsoever with any specified witness or victim, except through an attorney under such reasonable restrictions as the court may impose.

18 Pa.C.S. § 4954.

At the August 25, 2014, *ex parte, in camera* hearing both Mr. Fina and Mr. Costanzo credibly testified that attempts were made by agents of the OAG, indirectly, to intimidate them, as detailed in the above cited testimony. For instance, Mr. Fina testified that he was contacted, unsolicited, by two separate reporters on two separate occasions prior to his appearance before the Grand Jury, warning him that there was an effort to release emails that had the potential to embarrass him. Mr. Fina believed that these were attempts to intimidate him related to the fact that he had been subpoenaed to testify. In addition, Mr. Costanzo testified that he too had been what he believed to be the target of intimidation by the OAG. He told this Court that the OAG solicited the media to make Right-to-Know requests, requesting private emails received by him. In addition, Mr. Costanzo made this Court aware of attempts by the OAG to publically undercut his credibility, to disparage him and to suggest he was behind botched OAG investigations. This Court believed that the testimony of Mr. Fina and Mr. Costanzo as more fully set forth earlier in this Opinion provided substantial evidence in which to issue the August 27, 2014, Protective Order in an effort to maintain the integrity of the grand jury process.

Not only was substantial evidence provided at the August 25, 2014, hearing, the OAG provided no evidence at the October 17, 2014 reconsideration hearing that required this Court to modify or vacate the Protective Order. At the October 17, 2014 reconsideration hearing, the OAG made no attempt to properly subpoena any witnesses to testify before the Court. Instead, the OAG improperly subpoenaed a reporter utilizing the subpoena power only reserved for the official business of the 35th Statewide Grand Jury containing my electronic signature. Those subpoenas read in relevant part, "You are ORDERED to appear as a witness

14

before the PENNSYLVANIA STATEWIDE GRAND JURY…" . However the October 17, 2014, reconsideration hearing did not involve testimony before the Grand Jury, but rather, it was before the undersigned as the Supervising Judge. The 35[th] Statewide Investigating Grand Jury was not even in session that week. The improper use of Statewide Grand Jury Subpoenas was never approved by me.

Additionally, at the October 17, 2014, reconsideration hearing the OAG offered only one witness to testify to inappropriate emails uncovered during the Sandusky investigation. There were no witnesses offered to substantiate claims that the OAG's duties and the responsibilities were or are hampered by the Protective Order, that it was overbroad and too vague. The OAG offered no proposed language to this Court to tailor the Protective Order to alleviate its concerns regarding its constitutional duties, despite an invitation form this Court to do so.

Moreover, the *ex parte, in camera* October 17, 2014, hearing provided additional support for the necessity of the Protective Order. The testimony adduced therein showed that in early July, 2014, the OAG received only general requests under the Right-to-Know Act. However, shortly after the OAG became aware in mid-August that certain witnesses were subpoenaed to testify before the Grand Jury, the OAG received additional Right-to-Know requests which specifically identified both Mr. Fina, Mr. Costanzo. Additionally, at this hearing was evidence presented through the testimony of Mr. Kabash of intimidating conduct by agents of the OAG and specifically those of Agent Miletto and the disparagement by Agent Mackelin of Mr. Costanzo.

> b. *The OAG's requests to subpoena Mr. Fina and Mr. Costanzo, to call Special Prosecutor Carluccio to testify and to review the notes of testimony from the August 25, 2014 ex parte, in camera hearing were properly denied.*

At the reconsideration hearing, the OAG renewed its request to subpoena Mr. Fina and Mr. Costanzo, for leave to call Special Prosecutor Carluccio to testify and to review the

transcript from the August 25, 2014, *ex parte, in camera* hearing. This Court denied the request relying on Commonwealth v. Hood, 872 A.2d 175 (Pa.Super. 2005).

In Hood, a protective order was granted after an *ex parte, in camera* hearing pursuant to Pa.R.Crim.P. 573(F), which allows a judge to grant a protective order after a showing of "sufficient showing", and in that context an *ex parte, in camera* hearing was found to be proper. There is even more reason to find such a hearing proper under 18 Pa.C.S. §4954, which requires "substantial evidence" in which to issue a protective order. The higher standard offers more protection to the opposing side, despite the *ex parte* nature of the hearing. The Hood Court explained the necessity of the *ex parte* nature of the *in camera* hearing and stated, "[w]e note at the outset that allowing the presence of defendant and defense counsel at the protective order hearing would have defeated the purpose of providing protection for these witnesses." Id. at 872 A.2d at 180.That is even more true when a protective order has been issued under §4954, which specifically addresses the protection against witness intimidation. This approach is not inconsistent with the argument of Special Prosecutor Carluccio in which he argued that "[t]he Attorney General's Office is not a defendant. They have not been charged. They are a third party in this investigation." (N.T. 10/17/14, 1:23 P.M., p. 7).

In particular, although the OAG and Attorney General Kane are now only considered witnesses to the leak of the prior grand jury information, the allegations of intimidation are directly attributable to the OAG. It seemed that agents of the OAG or Attorney General Kane herself feel threatened by the potentially damaging testimony that Mr. Fina or Mr. Costanzo in their respective Grand Jury testimony might have provided.

It is crucial to note that testimony before the Grand Jury, including that of members of the OAG, has firmly and definitively established that the 29th Statewide Grand Jury information that was inappropriately supplied to the press came from the OAG. In fact, Attorney General Kane has implicitly admitted that she was involved in the 2009 grand jury leak that the 35th Statewide Grand Jury is investigating at the time she filed her Motion to Quash her

16

subpoena to testify before the Grand Jury, in which she argued that she personally could divulge the documents because she was not subject to an oath of secrecy associated with the 2009 Grand Jury. More specifically, in Attorney General Kane's memorandum of law in support of her motion to quash subpoena, which she filed in her individually capacity through privately retained counsel, not through the OAG, she stated that, "Attorney General Kane was not sworn to secrecy with regard to the 2009 grand jury proceedings. By statute, only a limited group of individuals are sworn to secrecy... Because Attorney General Kane had no involvement whatsoever with the 2009 grand jury proceedings, she could not as a matter of law be in contempt of court with regard to any disclosure related to that grand jury proceeding." Memorandum of law in support of motion to quash 9/29/14. This passage seems to suggest that she believed she might be charged with a criminal offense and was already putting forth her defense. Therefore, although not defendants, the OAG and Attorney General Kane feel threatened by potentially damaging testimony, and have attempted to intimidate Grand Jury witnesses. Accordingly, the Protective Order is necessary to protect the integrity of the Grand Jury system.

     c. *The Protective Order does not have a chilling effect on the duties and responsibilities of the OAG.*

    Finally, this Court does not believe the Protective Order to be overbroad or too vague. Although the OAG consistently argues this point is each of its filings, this argument is disingenuous. At all times the OAG has sought to vacate and only vacate the Protective Order. As this Court noted at the October 17, 2014 reconsideration hearing, if the OAG was seeking modification of the Protective Order, then this Court would be receptive to additional revised language to consider. That was conveyed to the OAG in August and again in October of 2014, and was never pursued by the OAG.

    The conduct that is covered by the Protective Order can be gleaned from the traditional and dictionary meaning of the word intimidation and retaliation. According to the

17

Merriam Webster dictionary, the term "intimidate" means to "to make timid or fearful : frighten; *especially* : to compel or deter by or as if by threats". In addition, the term "retaliate" according to the Merriam Webster dictionary means "to do something bad to someone who has hurt you or treated you badly : to get revenge against someone". These definitions are not vague or overbroad. . Clearly, two attorneys, one from the OAG and one as a potential witness before the Grand Jury, having a disagreement about an unrelated investigation and getting into a heated discussion, an argument even, in no way falls into the conduct that is intimidating and retaliatory the same way as threating to expose personal emails that could embarrass and damage the reputation of a Grand Jury witness just prior to that witness's appearance before the Grand Jury as in Mr. Fina's case, or publically disparaging a Grand Jury witness by making false claims to the media as in the case of Mr. Costanzo.

As for the OAG's illustrations of how its functions are hampered by the Protective Order contained in the Response to this Court's December 5, 2014, Order, they are addressed in Issue I as set forth earlier in this Opinion. It should be emphasized that the OAG did not bring any evidence before this Court at the reconsideration hearing, at a time that evidence could have been presented under oath, in a courtroom and before this Judge. Not only is there a lack of evidence to substantiate the OAG's claims of interference with its responsibilities; but also there has been a lack of concrete examples of such alleged hindrance.

As for the OAG's suggestions for a narrower order: (1) *A protective order...should comply with the provisions of 18 Pa.C.S. 4954.* For all of the reasons previously state, I believe that the Protective Order does comply. (2) *A protective order should be directed at those persons who are found to have actually engaged in intimidation or retaliation.* The Protective Order as amended applies only to :

1. Any person who has been sworn to Grand Jury secrecy.
2. Any person who has or had access to Grand Jury information.
3. Any person associated with the J. Whyatt Mondesire proceedings and investigation.

18

To wait until after further intimidation and retaliation has occurred to identify those persons who are found to have actually engaged in intimidation or retaliation would defeat the purpose of the Protective Order. The additional harm sought to be prevented would have already occurred. (3) *Conduct that will be found to be intimidating, retaliatory, or otherwise in violation of the protective order should be delineated.* I believe that the Protective Order clearly sets forth that offensive conduct is conduct which is aimed at intimidating a witness from testifying or from telling the whole truth, or conduct aimed at retaliation against a witness who has testified. (4) *A protective order should have an expiration date.* I request that the Protective Order remain in place until the investigation has concluded.

CONCLUSION

Based upon the foregoing analysis, this Court respectfully requests that the Protective Order be upheld.

BY THE COURT:

WILLIAM R. CARPENTER          J.
SUPERVISING JUDGE OF THE THIRTY-FIFTH STATEWIDE INVESTIGATING GRAND JURY

Copies sent on December 12, 2014
By First Class Mail to:
Attorney General Kathleen M. Kane
Thomas E. Carluccio, Esquire

19

# EXHIBIT "A"



## Supreme Court of Pennsylvania

Amy Dreibelbis, Esq.
Deputy Prothonotary
Elizabeth L. Zisk
Chief Clerk

Middle District

601 Commonwealth Avenue, Suite 4500
P.O. Box 62575
Harrisburg, PA 17106
(717) 787-6181
www.pacourts.us

November 12, 2014

William R. Carpenter, Esq.
Court of Common Pleas
PO Box 311
Norristown, PA 19404

RE:     Pa. OAG., Pet. v. Super. Judge 35th Inv. Grd. Jury
        171 MM 2014
        Intermediate Court Docket No:
        Trial Court: Montgomery County Court of Common Pleas
        Trial Court Docket No: 1424-2014

Dear Attorney Carpenter:

This is to advise that the below listed item(s) was/were received in the above-captioned matter.

    1.) Petition for Review

    2.) Application to File Under Seal

An original and one (1) copy of either the Answer, or a letter stating that an Answer will not be filed, is required to be filed within fourteen (14) days after service. An additional three (3) days may be added if service was effectuated by mail. See Rule Pa.R.A.P. 121(e).

In order to facilitate the newly instituted electronic records management system, the Office of the Prothonotary requests that all filers leave the original copy of any document submitted for filing unbound. All remaining copies of answers should be bound in compliance with Pa.R.A.P. 124 (a)(5).

In addition to the paper copies of the items listed above, an electronic copy provided on Compact Discs (CDs) will be accepted and would be appreciated. Acceptable electronic formats, at this time, are PDFs, TIFFs, and Word documents. Said disc should be accompanied by an averment that the material on the CD is a complete and accurate representation of the paper version.

                            Very truly yours,
                            Office of the Prothonotary

/ac
cc:  Kathleen Granahan Kane, Esq.
     Ann Thornburg Weiss, Clerk of Courts